**FILED**

JUL 1 6 2024

CLERK, U S DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____ DEPUTY

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS

UNITED STATES OF AMERICA; STATE OF
CALIFORNIA; STATE OF COLORADO; STATE
OF CONNECTICUT; STATE OF DELAWARE;
THE DISTRICT OF COLUMBIA; STATE OF
FLORIDA; STATE OF GEORGIA; STATE OF
HAWAII; STATE OF ILLINOIS; STATE OF
INDIANA; STATE OF IOWA; STATE OF
LOUISIANA; STATE OF MARYLAND;
COMMONWEALTH OF MASSACHUSETTS;
STATE OF MICHIGAN; STATE OF
MINNESOTA; STATE OF MONTANA; STATE
OF NEVADA; STATE OF NEW HAMPSHIRE;
STATE OF NEW JERSEY; STATE OF NEW
MEXICO; STATE OF NEW YORK; STATE OF
NORTH CAROLINA; STATE OF OKLAHOMA;
COMMONWEALTH OF PUERTO RICO;
STATE OF RHODE ISLAND; STATE OF
TENNESSEE; STATE OF TEXAS; STATE OF
VERMONT; COMMONWEALTH OF VIRGINA;
AND STATE OF WASHINGTON.

EX. REL PATREK CHASE
            Plaintiffs,

            v.

UT SOUTHWESTERN MEDICAL CENTER;
PARKLAND HEALTH AND HOSPITAL
SYSTEM;
TRINITY HEALTH'S LOYOLA UNIVERSITY
MEDICAL CENTER;
SOUTHWEST TRANSPLANT ALLIANCE;
LIFEGIFT;
TEXAS ORGAN SHARING ALLIANCE;
LIVEONNY;
NEW JERSEY SHARING NETWORK;
UNITED NETWORK FOR ORGAN SHARING;
DR. PARSIA VAGEFI;
DR. MALCOLM MACCONMARA;
DR. CHRISTINE HWANG;
DR. HERBERT ZEH;
DR. ROBERTO DE LA CRUZ;
DR. FREDERICK P. CERISE;
DR. JOSEPH CHANG;
PATRICIA SHIREY;

Civil Action No. SA-23-CA-0381-JKP

*__QUI TAM__* ACTION
<u>FILED UNDER SEAL</u>

**AMENDED COMPLAINT
FOR VIOLATIONS OF:**

THE FEDERAL FALSE CLAIMS ACT

31 U.S.C. §§ 3729 *et seq.*

JESSICA HERNANDEZ;
PATTI NILES;
KEVIN MYER;
JOSEPH NESPRAL;
HELEN IRVING;
LEONARD ACHAN;
JOSEPH ROTH; AND
BRIAN SHEPARD
        Defendants.

**AMENDED COMPLAINT**

## I.  **INTRODUCTION**

1.      Organ transplantation is one of the greatest medical achievements of the last century. However, this life saving procedure has been hijacked by mismanaged organizations that enrich themselves with government funds. These organizations systematically fail to protect patients, unnecessarily take non-viable organs in order to bill Medicare, and bill Medicare for unnecessary costs. These same organizations are tasked with overseeing themselves. Instead, they cover up for bad actors and allow the rampant fraud to continue.

2.      This complaint seeks to shine a light on these bad acts and hold these bad actors accountable. Driving all of the fraud is an overarching goal to extract federal funds meant to support organ donation, and instead support personal excess and retain lucrative government contracts, despite the consistent failure to effectively collect and distribute organs.

3.      The United States pays for extracting organs from organ donors. The United States pays to ensure patients in need of an organ receive the testing necessary to be ready for transplantation. The United States pays for the transplantation. The United States pays for the overhead of the organizations that collect and distribute organs. The United States pays for the organization that is responsible for overseeing all aspects of organ donation. At all stages, the organizations involved fail to live up to the promises they make to receive the federal funds, instead defrauding the United States for their own personal gain.

4.      Three types of organizations primarily perpetrate the fraud. First, transplant centers, mainly hospitals, are responsible for actually performing the transplants, overseeing the patients on the waiting list, and choosing whether to accept organs for transplant. Second, the Organ Procurement Organizations (OPOs) are responsible for collecting organs from organ

donors, coordinating with transplant centers to place the organs, and transporting the organs to the hospitals that perform the transplants. *See* 42 U.S.C. § 273. Third, the United Network for Organ Sharing (UNOS) holds the contract with the Department of Health and Human Services (HHS) to operate the Organ Procurement and Transplantation Network (OPTN), which is responsible for managing the federal organ donation system — including providing recommendations on the policies and rules surrounding organ donation and transplantation, developing and maintaining technology that manages the organ transplant waiting list, and overseeing OPTN members — which includes the OPOs and transplant centers. *See* 42 U.S.C. § 274.

5. This complaint seeks to hold accountable nine of the worst organizations in organ donation, as well as related individuals. Three hospitals, Parkland, UT Southwestern, and Loyola; five OPOs, New Jersey Sharing Network, LiveOnNY, Southwest Transplant Alliance, LifeGift, and Texas Organ Sharing; and UNOS. All of these organizations have engaged in this systematic scheme of fraud for at least the past ten years, from March 2013 to the present.

6. First, UT Southwestern Medical Center created a scheme to improperly pass over patients in need of organ transplants at the less affluent Parkland Hospital. This allowed UT Southwestern, which controlled and billed for all transplant work at Parkland, to charge unnecessary and excessive fees for individuals at Parkland on the organ transplant waiting list. UT Southwestern never intended to provide transplants to these patients. Instead, UT Southwestern rejected viable organs for Parkland patients and accepted the same organs for their UT Southwestern patients, leaving Parkland with almost no transplants.

7.     Second, Trinity Health's Loyola University Medical Center regularly transplanted patients who were not eligible for transplant, such as providing liver donations to alcoholic patients who were still actively drinking or had little to no family support to maintain their transplant. Loyola's patients regularly experienced adverse incidents, which included multiple cases of graft failures and deaths. Yet Loyola continued its unsafe practices in an attempt to maximize its Medicare billings.

8.     Loyola also double billed Medicare, charging costs for pre-transplant services both directly to Medicare and including the costs on Loyola's cost report for reimbursement from Medicare.

9.     Finally, Loyola included other improper costs and inflated costs on Loyola's cost report to Medicare.

10.     These excesses can happen because the OPOs are given monopolies by HHS in exchange for overseeing all aspects of organ donation. This has allowed OPOs, UNOS, and Transplant Centers to cover up problems so they can continue to improperly extract profits from the organ donation system.

11.     The OPOs — Southwest Transplant Alliance, LifeGift, Texas Organ Sharing, LiveOnNY, and New Jersey Sharing Network — regularly include excessive and unnecessary costs on their own cost reports. This includes costs for procuring non-viable kidneys solely to include the procedure on their cost report, as well as other unnecessary costs such as excessive salaries and designer furniture. The OPOs also fail to live up to their promise to try to recover every viable organ, instead improperly failing to recover organs from poorer and minority hospitals and then falsely reporting their organ recovery statistics to hide their fraud.

12. Finally, UNOS, which is supposed to oversee all of the OPOs and Transplant Centers, is instead protecting the bad actors and trying to ensure there is no real oversight of the industry. Instead of fixing problems when they are presented, UNOS attempts to bury problems to protect the various members of the organ procurement world.

13. These failures have real life consequences. Every organ that is not procured is a life that is not saved. And every organ that is improperly transplanted, either because it is not actually a correct blood type match or because the donor has transmissible diseases, puts a patient at serious, often deadly, risk. UNOS itself estimates that as many as 28,000 viable organs do not make it to patients in need each year. UNOS also found that the OPOs could identify over 18,300 additional cases a year. *See* Organ Procurement and Transplantation Network, OPTN Deceased Donor Potential Study at 8-9; 72. In short, available organs outstrip demand, and there should be no organ donor waiting list for most organs. But the system is broken and focused on extracting money from the United States rather than ensuring Americans have access to the lifesaving organs they deserve.

14. As one transplant center consultant explained, "I don't think anything on the OPO side will improve until they feel like they can't get away with hiding things." This Complaint seeks to stop the Defendants from hiding their fraud and force Defendants to face the consequences of their conduct.

## II. PARTIES

15. Relator Patrek Chase has worked in organ donation for over two decades. He began his career in organ transplantation when he was hired to do hospital development for the Organ Procurement Organization, Donor Network of Arizona. He went on to work for the OPOs

in New York and New Jersey, LiveOnNY, formerly New York Organ Donor Network, and NJ Sharing Network.

16.    Relator-Chase transitioned to the transplant center side of organ donation when he was hired as Operations Manager for the Center for Liver Disease and Transplant for New York Presbyterian Hospitals Columbia and Weil Cornell Liver Transplant programs. He was ultimately recruited by Parkland Health and Hospital System in Dallas, TX, as the Administrative Director of Parkland's Kidney Transplant program in August 2019. He was improperly constructively discharged after uncovering Parkland's and UT Southwestern's fraud in September 2020.

17.    He was hired as the Executive Director for Loyola Medical Center's Solid Organ Transplant Programs and Outpatient Dialysis Clinic in October 2020. At Loyola, he began raising concerns about increased organ transplant failures, deaths, infections, and return to operation room (OR) rates. These concerns were continuously dismissed for the sake of "increasing transplant volumes," and Relator-Chase was soon asked to resign from his position in May 2022 in retaliation for uncovering Loyola's fraud.

18.    UT Southwestern Medical Center ("UT Southwestern") is a hospital and organ transplant center based in Dallas, Texas.

19.    Parkland Health and Hospital System ("Parkland") is a hospital and organ transplant center based in Dallas, Texas. It is the only public hospital for Dallas County, and also serves as the primary teaching facility for UT Southwestern Medical Center.

20.    Trinity Health's Loyola University Medical Center ("Loyola") is a hospital and transplant center based in Maywood, Illinois.

21. Southwest Transplant Alliance is an OPO responsible for coordinating the recovery and allocation of organs and tissues for transplant in eastern Texas, serving over 270 hospitals across 89 counties in Texas and one in Arkansas. It is headquartered in Dallas, Texas.

22. LifeGift is an OPO responsible for coordinating the recovery and allocation of organs and tissues for transplant throughout North, Southeast, and Western Texas, serving over 200 hospitals across 109 counties. LifeGift has offices in Houston, Texas; Fort Worth, Texas; and Lubbock, Texas.

23. Texas Organ Sharing Alliance is an OPO responsible for coordinating the recovery and allocation of organs and tissues for transplant throughout Central and South Texas, serving hospitals across 48 counties. It is headquartered in San Antonio, Texas.

24. LiveOnNY (formerly known as the New York Organ Donor Network) is an OPO responsible for coordinating the recovery and allocation of organs and tissues for transplant throughout the greater New York City area, serving a population of 13 million people and nearly 100 hospitals across 12 counties. It is headquartered in New York City.

25. New Jersey Sharing Network is an OPO responsible for coordinating the recovery and allocation of organs and tissues for transplant throughout the state of New Jersey. It is headquartered in New Providence, New Jersey.

26. The United Network for Organ Sharing (UNOS) is a private non-profit organization that holds the contract with HHS to operate the OPTN, and oversees both OPOs and transplant centers across the country. It is headquartered in Richmond, Virginia.

27. Dr. Parsia Vagefi is the current Chair of Strategy and Finance in UT Southwestern's Department of Surgery and serves as the Chief of the Division of Surgical Transplantation.

28. Dr. Malcolm MacConmara is a former Transplant Surgeon at UT Southwestern who was assigned to Parkland's transplant program.

29. Dr. Christine Hwang is a current Transplant Surgeon at UT Southwestern and formerly acted as the Medical Director assigned to Parkland's transplant program.

30. Dr. Herbert Zeh is the current Chair of the Department of Surgery at UT Southwestern.

31. Dr. Roberto De La Cruz is the current Vice President (VP) and Chief Clinical Officer (CCO) at Parkland.

32. Dr. Frederick Cerise is the current President and Chief Executive Officer (CEO) at Parkland.

33. Dr. Joseph Chang is the current Chief Medical Officer (CMO) at Parkland.

34. Patricia Shirey is the current VP of Clinical Operations and Ambulatory Care at Parkland.

35. Jessica Hernandez is the current Senior Vice President (SVP) of Population Health at Parkland.

36. Patti Niles is the former President and CEO of Southwest Transplant Alliance. She was appointed as CEO in 2013 before retiring in 2022.

37. Kevin Myer is the current President and CEO of LifeGift. He has been employed as CEO since 2013. Myer previously worked as the Assistant Director for the UNOS Department of Evaluation and Policy.

38. Joseph Nespral is the current CEO of Texas Organ Sharing Alliance. He began working for Texas Organ Sharing Alliance in 1997 and was promoted to CEO in 2017.

39. Helen Irving is the former President and CEO of LiveOnNY. She was appointed as CEO in 2011 before retiring in 2021.

40. Leonard Achan is the current President and CEO of LiveOnNY. He was appointed to both positions in 2021.

41. Joseph Roth is the former President and CEO of NJ Sharing Network. He served in this position for 23 years before leaving in 2022.

42. Brian Shepard is the former CEO of UNOS. He was appointed as CEO in 2012 and departed in 2022, following the completion of his contract.

III. **JURISDICTION AND VENUE**

43. This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33 (FCA) as well as the various state False Claims Acts. *See infra* at ¶ 93.

44. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. §§ 3730(b)(1) and 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. Additionally, this Cout has supplemental jurisdiction over Relator's state law claims under 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy under

Article III of the United States Constitution as Plaintiff-Relator's claims under the False Claims Act.

45.     Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint. Moreover, even had such a public disclosure occurred, Relator would qualify as an "original source" of the information in this Complaint. Relator made a pre-filing disclosure of evidence to the government on February 24, 2023.

46.     This Court has personal jurisdiction over each of the Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process. Moreover, each of the Defendants maintain minimum contacts with the United States, and they each reside in or transact business in this District. Further, each of the Defendants committed a tort that occurred, in whole or in part, in this State, and they each have recruited Texas residents for employment in this State. *See* Tex. Civ. Prac. & Rem. Code § 17.042(2)-(3).

47.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a) because Defendants can be found in and/or transact business in this District. At all times relevant to this Complaint, each of the Defendants regularly conducted business within this District. Moreover, numerous acts violating 31 U.S.C. §§ 3729-3733 occurred in this District, and a substantial part of the events giving rise to the claims alleged herein occurred here.

## IV.     ORGAN DONATION IN THE UNITED STATES

### A.  Regulatory Structure of the National Organ Transplantation System

48.     Under the authority of the National Organ Transplant Act, HHS is tasked with overseeing organ donation in the United States. HHS delegates much of this oversight to the OPTN.

49. The OPTN is responsible for managing the national organ donation system. This includes setting organ donation policy, managing the organ donation list, matching organs to needy patients, and overseeing the OPOs. *See* 42 C.F.R. §§ 121.4, 121.7, 486.320 (requiring OPOs and transplant centers to follow OPTN rules and requirements). The OPTN therefore has vast responsibility for both oversight and operation of the national organ donation system.

50. The OPTN creates enforceable policies for organ donation. Every OPO and transplant hospital participating in Medicare and Medicaid must be a member of the OPTN. 42 C.F.R. § 121.3(b). As a member of the OPTN, they must follow the OPTN's policies. The OPTN board of directors must develop policies on organ allocation and donation, which become effective when approved by the Secretary of HHS. 42 C.F.R. § 121.4.

51. The OPTN is responsible for overseeing the OPOs and investigating any problems in organ donation. *See* 42 C.F.R. § 121.10(b)(1)(iii). The OPTN serves as the clearinghouse for any problems or complaints related to OPOs. The OPTN receives, investigates, and decides on the best resolution for any OPO-related complaint. Additionally, the OPTN sets the guidelines and rules for how OPOs and Transplant Centers should operate.

52. The OPTN therefore operates as a semi-government agency, with enforcement and guidance similar to a MAC (Medicare Administrative Contractor).

53. The OPTN is also systematically responsible for running the U.S. Organ Transplant waitlist. Hospital Transplant programs pay the OPTN a fee to list their patients as eligible and in need of an organ. The OPTN also tracks all organs offered for donation. Finally, the OPTN manages the national system to match organs with those who need an organ transplant.

54. The OPTN is run by a non-profit under a contract with the Health Resources Services Administration (HRSA) under HHS. Since 1986, UNOS has been the only entity to hold the OPTN contract. HRSA recently announced plans to break up the OPTN contract into multiple parts with the goal of having multiple different contractors.

55. The OPTN and UNOS are effectively the same. They are governed by effectively the same board of directors: as of early 2023, only one OPTN board member does not serve on UNOS's board, and only two UNOS board members do not serve on OPTN's board.

56. The board of directors at each organization is unusually large. Currently, there are 41 members on the OPTN's board and 43 members on UNOS's board.

57. Even though the OPTN is charged with oversight of the OPOs, five of the 41 voting OPTN board members are current OPO executives:

    a. Virginia McBride is both a member of the OPTN Board of Directors, as well as the Executive Director of OurLegacy, an OPO serving portions of Florida.

    b. Meg Rodgers is both a member of the OPTN Board of Directors, as well as the Director of Transplant Center Relations of LifeSource Upper Midwest, an OPO serving Minnesota, North Dakota, South Dakota, and portions of Wisconsin.

    c. Jan Finn is both a member of the OPTN Board of Directors, as well as the President and Chief Executive Officer of Midwest Transplant Network, an OPO serving Kansas and western Missouri.

    d. Jeffrey Orlowski is both a member of the OPTN Board of Directors, as well as the Chief Executive Officer of LifeShare Transplant Donor Services of Oklahoma, an OPO across the state of Oklahoma.

e. Barry Massa is both a member of the OPTN Board of Directors, as well as the Executive Director of LifeCenter Organ Donor Network, an OPO serving portions of Indiana, Ohio, and Kentucky.

58. UNOS has over $68 million in annual revenue, primarily from Federal Healthcare (Medicare, Medicaid, TRICARE, Federal Health Employee Benefits Plan, hereinafter Federal Healthcare). UNOS receives its funding through two means. First, HRSA pays UNOS a $6.5 million annual fee to act as the OPTN contractor. UNOS receives another roughly $57 million, primarily in fees from listing patients on the organ waitlist. Those fees are paid by transplant centers listing their patients, and then in turn paid by insurance — predominantly the federal government through Medicare. Finally, UNOS receives roughly $1.6 million in contracts with other organizations, such as transplant centers and OPOs, to perform research, analytics, and other data and analysis work. Again, these contract fees are passed along to the United States for any patient with Federal Healthcare or on the OPOs' and transplant centers' cost reports.

59. The $57 million in organ waitlist registration fees is from two separate fees. One fee is paid to the OPTN, and passed along to UNOS. Another is charged directly by UNOS. Both are predominately reimbursed by Medicare and for the same service of listing patients on the waitlist.

60. The current fee is $868 per patient and is generally increased every year, sometimes by 10 percent or more. UNOS has proposed raising the fee to $944, and the proposed increase is currently under review by HRSA.



**OPTN Registration Fee**

61.     UNOS charges a separate fee for listing patients on the organ waitlist. This charge is for the same work that UNOS already performs for the OPTN and for which the OPTN already charges transplant centers. UNOS describes this fee as "a monthly charge based on additional work to include analysis and data related services provided to all transplant community members that the Organization bills to those same member organizations that received an OPTN fee and is solely a UNOS based fee. Transplant community members who register patients each month receive a UNOS fee invoice that aligns with the number of registrations from the prior month, similar in timing to the OPTN billing practice. The UNOS Fee revenue is recognized immediately as revenue as all of the services have been provided at the time of billing. The transaction price for the UNOS Fee is set each year and ultimately approved by the UNOS Board of Directors."

62.     The United States, through Federal Healthcare, is the largest payer of this $57 million in funding from organ waitlist registration fees. All of this $57 million is because of

UNOS's role as the OPTN contractor. Without the OPTN contract, UNOS would have no funding.

## B. Structure and Operation of Individual OPOs

63.     There are currently 56 OPOs that each cover a Donation Service Area (DSA). The Centers for Medicare and Medicaid Services (CMS) is responsible for assigning the DSAs. While OPOs' DSAs do not overlap, OPOs do consolidate and sometimes break up. Over the past ten years, there were as many as 58 OPOs covering 58 DSAs.

64.     Some OPOs cover an entire state, such as the New Mexico Donor Services that covers all of, and only, New Mexico. Others split up a state, such as the Southwest Transplant Alliance, LifeGift, and Texas Organ Sharing, which divide Texas as well as part of Arkansas. But, as the Texas OPOs' DSAs show, the OPO DSAs are arbitrary. For example, Southwest Transplant Alliance covers the Texas panhandle, some of the gulf coast, and northeast Texas, as well as an entire county in Arkansas.



STA's service area includes communities of more than 10 million people across Texas.

STA is headquartered in Dallas and serves the following cities

| | |
|---|---|
| Abilene | Midland / Odessa |
| Beaumont | Sherman / Denison |
| Bryan / College Station | Temple |
| Corpus Christi | Texarkana |
| Dallas | Tyler |
| El Paso | Victoria |
| Galveston | Wichita Falls |
| Longview | |

**TEXAS OPO SERVICE AREA**

LifeGift covers various disparate and non-contiguous areas that are not served by the Southwest Transplant Alliance. Texas Organ Sharing Alliance covers the remaining southernmost part of Texas, in addition to one county in an area otherwise served by Southwestern Transplant Alliance as shown above.

65. By statute, CMS grants each OPO a monopoly on organ procurement in their DSA. A condition for any hospital to receive reimbursement from Medicare or Medicaid is that the hospital must have a contract with their local OPO for the OPO to collect organs from clinically eligible patients who are being cared for at these hospitals. 42 U.S.C. §§ 1320b-8(a)(1)(B), (C), (b)(2) (providing that a hospital or critical access hospital can only participate in Medicare or Medicaid if it is a member of the OPTN and has an agreement with the local OPO, and further providing that there shall only be one OPO per DSA).

66.    The OPOs are responsible for collecting organs from organ donors. This includes both individuals who state a preference for organ donation before dying, such as on a driver's license, and next of kin of the deceased who can authorize organ donation. As such, the OPOs are expected to work with all of the hospitals in their DSA to talk to the families of the deceased so that they can evaluate potential organ donors, encourage organ donation, and collect viable organs for transplant.

67.    CMS certifies OPOs. In turn, the OPO can seek reimbursement from CMS for all of the OPO's costs for organ procurement related to Medicare patients. The OPOs submit a cost report to CMS, certifying that all of the costs on the cost report are reasonable, necessary, and allowed under CMS rules. The specific certification is:

> MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT.
>
> I HEREBY CERTIFY that I have read the above statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by [(Provider Name(s) and Number(s))] for the cost reporting period beginning [date] and ending [date], and that to the best of my knowledge and belief, it is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

*See* 42 C.F.R. § 413.24(f)(4)(iv)(A)(4), (B) (noting that OPOs are obligated to certify the above when submitting a cost report); *see also* Organ Procurement Organization Histocompatibility Laboratory General Data and Certification Statement, Part II, Form CMS-216-94.

### C. An OPO's Success is Predicated on Collecting as Many Organs as Possible

68.     OPOs are evaluated based on their success in collecting as many organs as possible – both donors who have organs transplanted, and total number of organs transplanted (one donor can donate up to eight organs). *See* 42 C.F.R. § 486.318. Recently, OPOs were allowed to include pancreases procured for research in their count of collected organs. 42 C.F.R. § 486.318(a)(3)(ii). This has resulted in multiple OPOs collecting vastly increased numbers of pancreases in order to report a high rate of organ recovery, despite the lack of a corresponding need from researchers.

69.     The OPOs are required to report the data necessary to calculate this rate. *See* 42 C.F.R. § 486.328. OPOs must also implement a Quality Assessment and Performance Improvement (QAPI) plan. 42 C.F.R. § 486.348.

70.     Transplant centers are UNOS and CMS approved hospitals with the specialized experience necessary to perform organ transplantation. The transplant centers make the clinical decision regarding which patients are eligible for organ transplant and then places the eligible patients on their center's waitlist. Once patients are waitlisted, the transplant center is responsible for monitoring the patients and accepting and transplanting organs into these patients when an organ becomes available. There are currently 251 transplant centers.[1]

---

[1] Organ Procurement & Transplantation Network , https://optn.transplant.hrsa.gov/about/

71.     Transplant centers can only operate if they have a contract with an OPO. 42 U.S.C. § 121.9(a)(2)(i).

72.     Anyone with end stage renal disease (ESRD) is automatically covered by Medicare. The only cure for ESRD is a kidney transplant. Absent a kidney transplant, a patient requires painful and costly dialysis to live. Dialysis is grueling for the patient (with most patients dying within five years on dialysis), and costly for the taxpayer (with Medicare payments for treatment of ESRD totaling $36 billion each year— roughly one percent of the entire federal budget). There are roughly 104,500 people waiting for an organ transplant in the U.S., and about 89,000 of them are waiting for a kidney.[2] Further, of the roughly 43,000 organ transplants in 2022, roughly 25,000, or over half, were kidneys.[3]

73.     For other organs, the reimbursements for transplant related costs are based on the organ recipient's healthcare. The United States will pay for organ procurement and transplant costs through the Federal Healthcare program for organ recipients with Federal Healthcare. If the recipient has private health insurance, the private health insurer will pay for the organ donation costs.

74.     OPOs receive reimbursement for the procurement of organs intended for transplant. 42 C.F.R. § 413.402(a). This includes organs that are subsequently determined to be

---

[2] "Organ Donation and Transplant Statistics," National Kidney Foundation, https://www.kidney.org/news/newsroom/factsheets/Organ-Donation-and-Transplantation-Stats

[3] All-time records against set in 2021 for organ transplants, organ donation records from deceased donors, UNOS (Jan. 11, 2022), https://unos.org/news/2021-all-time-records-organ-transplants-deceased-donor-donation/#:~:text=In%202021%2C%2041%2C354%20organ%20transplants,and%20Transplantation%20Network%20under%20federal

unsuitable for transplant. *Id.* An organ is intended for transplant when it is designated as such by the OPO. 42 C.F.R. § 413.412(a)(1).

75.    CMS will reimburse fees related to organ transplant but will not reimburse fees that are not related to organ transplant. "Items or services that are not related or reasonable to acquire an organ for transplantation, non-allowable administrative and general costs, or costs that are not related to patient care, are not considered organ acquisition costs." 42 C.F.R. § 413.402(d)(1).

76.    Costs that are incurred in connection with a Medicare covered transplant are reimbursable. 42 C.F.R. § 413.404(a)(1). Because every kidney transplant is a Medicare covered transplant, anytime a kidney is procured, the costs of the organ recovery procedure become reimbursable.

77.    Not all organs are viable. Some organs are not viable because of the donor. For example, someone with cancer cannot be an organ donor for fear of infecting the recipient with the donor's cancer. Some organs are not viable because they are damaged or otherwise will not survive; for example, if the organ does not receive blood for a certain amount of time, it will no longer be viable for transplant.

78.    Transplant centers are responsible for overseeing potential organ donation recipients. When they identify a patient in need of an organ that they are willing to list for a transplant, they will contact UNOS and pay fees to put that patient on the organ transplant list. The transplant center must then make the patient ready to receive an organ at a moment's notice if one becomes available. To do this, the transplant center must perform a battery of tests on the individual, often dozens of tests for each patient, and repeat the tests every six months to a year

to keep the patient on the waitlist. If the patient is Medicaid or Medicare eligible, then all of the costs are reimbursed by Medicaid or Medicare.

79.     UNOS maintains the national organ donation waiting lists. When an OPO collects an organ, they will report the collection to UNOS, who will in turn reach out to prospective recipients. The hospitals that are overseeing the patients in need of an organ will receive a notification with a short one-hour window in which to accept the organ. If the hospital does not accept the organ, the organ is offered to the next person on the list. Whether the organ is accepted is ultimately determined by the doctor on the patient's behalf.

80.     OPOs charge transplant centers a standard acquisition charge (SAC) for each organ. 42 C.F.R. § 413.404. The kidney SAC is calculated as the "costs related to kidney acquisition that were incurred in the prior cost reporting period and dividing those costs by the number of usable deceased donor kidneys procured during that cost reporting period." 42 C.F.R. § 413.404(c)(2)(iii). Therefore, any non-useable kidney initially acquired and included on the cost report will increase an OPO's kidney SAC, because it will increase the costs related to kidney acquisition without increasing the number of useable kidneys the OPO procured.

81.     The OPO's cost report must follow the standard cost reporting rules. 42 C.F.R § 413.420(e)(1). This includes the use of reasonable allocation of cost methodology, accurate data, and the certification in paragraph 66 *supra*. 42 C.F.R. § 413.24.¶

82.     OPO costs are also subject to the normal principles of cost reasonableness. 42 C.F.R. § 413.420(a)(1).

83.     The OPOs collectively have roughly $3 billion in revenue a year. The OPOs' revenue comes primarily from three sources. First, CMS reimburses all kidney procurement

costs. Second, transplant centers pay SAC fees to the OPOs for the organs that the transplant centers accept. For any Federal Healthcare patient, these fees are reimbursed by Federal Healthcare. Third, the OPOs get fees from tissue processing centers for procuring medical products of human origin, including human tissue.

### D. OPTN and UNOS are Responsible for Overseeing Organ Procurement Operations by OPOs

84. The OPTN has a Membership and Professional Standards Committee (MPSC) responsible for reviewing any complaints about OPOs. First, UNOS staff reviews the complaint and determines whether to refer the complaint to the MPSC. The MPSC may refer the matter to a working group, such as the OPO working group. If the MPSC substantiates the problem, the MPSC can issue a warning, require a peer review, or make a formal probation referral to CMS. Only probation findings are publicly disclosed.

85. Though the MPSC is intended to exercise oversight over the OPOs, multiple members of the MPSC are prominent directors from OPOs:

    a. Barbara Gordon is an At-Large representative on the MPSC and is also the Director of Quality Systems for Infinite Legacy, an OPO serving Maryland, Northern Virginia, and Washington, D.C.

    b. Kyle Herbert is an At-Large representative on the MPSC and is also the President & CEO of Live On Nebraska, an OPO serving the entirety of the State of Nebraska and Pottawattamie County, Iowa.

    c. Melinda Locklear is an At-Large representative on the MPSC and is also the Chief Quality and Information Officer of HonorBridge, an OPO serving 77 counties in North Carolina as well as Pittsylvania County, Virginia.

d. Regina Palke is an At-Large representative on the MPSC and is also the Director of Recovery Services at LifeLink of Florida, an OPO serving 15 counties in western and southwestern Florida.

e. Sean F. Van Slyca is an At-Large representative on the MPSC and is also the Executive Director of Sierra Donor Services, an OPO serving nearly four million people in California.

f. Candy L. Wells is an At-Large representative on the MPSC and is also the Director of Organ Utilization for LifeCenter Northwest, an OPO serving Montana and Washington.

86. The MPSC views its jurisdiction as very limited to violations of OPTN bylaws. Further, the MPSC views its directive as limited to addressing the problem and organization referred to in the complaint and does not recommend broader industry or OPTN changes.

87. The OPTN also has an Operations and Safety Committee (OSC). The OSC is responsible for recommending broader changes to OPTN policy and requirements. However, the OSC does not get referrals from the MPSC and only looks at de-identified aggregate data.

88. In sum, though the OPTN and UNOS are intended to oversee the provision of organ donation services by the OPOs, the structure is designed so that OPO executives can steer the oversight process and the oversight committees are ultimately toothless. Accordingly, no actual oversight occurs.

## V.    **THE FALSE CLAIMS ACT**

89. The FCA provides for civil liability for "any person who (A) knowingly present, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1).

90.     Likewise, the "Reverse False Claims" provision of the FCA imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

91.     An entity acts "knowingly" under the FCA when it: (1) has actual knowledge; (2) acts in deliberate ignorance of the truth or falsity; or (3) acts in reckless disregard of the truth or falsity. It is not necessary to prove a specific intent to defraud. 31 U.S.C. § 3729(b)(l). This Complaint uses "knowing" to describe all three definitions of knowing in the FCA.

92.     The term "material" means having a natural tendency to influence, or being capable of influencing, the payment or receipt of money or property. 31 U.S.C. § 3729(b)(4). Compliance with informed consent and usage requirements for human tissue research is material.

93.     Various states, the District of Columbia, and the Commonwealth of Puerto Rico also maintain their own analogues to the federal FCA. These "state False Claims Acts" are modelled off the federal FCA and also permit private individuals to recover when Defendants defraud state governments, including when they fraudulently submit or cause the submission of fraudulent claims to Medicaid. *See, e.g.,* Tex. Hum. Res. Code Ann. §§ 36.001-.132; 740 Ill. Comp. Stat. 175/1–175/8; N.J. Stat. Ann. §§ 2A:32C-1 to -18; N.Y. State Fin. Law §§ 187–194.

## VI. UT SOUTHWESTERN PASSED OVER VIABLE ORGANS IN ORDER TO PERFORM EXCESSIVE TESTS ON PARKLAND PATIENTS

94.     Parkland is a community hospital in Dallas that primarily serves a less affluent and more diverse population. UT Southwestern is an academic medical hospital in Dallas that primarily serves a more affluent population.

95.     Parkland entered into a contract with UT Southwestern, whereby UT Southwestern provides physician support and testing for Parkland's patients in Parkland's Kidney Acquisition Clinics as well as part of Parkland's other clinical services at the hospital. The contract also allows UT Southwestern to provide management and other medical services that UT Southwestern Clinicians may request for Parkland's Kidney Acquisition Clinic.

96.     In practice, UT Southwestern provided all services and support for Parkland's transplant patients. Parkland patients would go to UT Southwestern for their most expensive testing.

97.     UT Southwestern provides the doctors who oversee transplant patients at Parkland. These doctors decide whether Parkland will accept an organ to transplant into a Parkland patient. Specifically, while Relator was at Parkland, UT Southwestern Drs. MacConmara and Hwang were on call for both the UT Southwestern and Parkland patients. They would decide whether to accept an organ when it was offered to either a UT Southwestern or Parkland patient. One of the two doctors was always on call in case an organ became available.

98.     These same doctors also oversaw UT Southwestern transplant patients. Therefore, these doctors were often offered the same organ for two different patients at two different hospitals. Given the nature of organ donation, sometimes the delay between an organ being

-26-

offered to a Parkland patient and a UT Southwestern patient would mean the organ was rejected by one doctor for a Parkland patient and accepted by the other for a UT Southwestern patient. However, the two doctors closely coordinated and were expected to share notes on the patients and the organs.

99.     UT Southwestern was not providing services in the Parkland patients' best interest. Instead, UT Southwestern regularly rejected organs for Parkland patients only to later accept the same organs for UT Southwestern patients.

100.    UT Southwestern did this to maximize its own profit from Parkland. Every organ it improperly rejected meant the Parkland patient would have to continue to go to UT Southwestern for testing to remain eligible for a transplant.

101.    The following are examples of the organs UT Southwestern improperly rejected.

102.    KG was a 50-year-old male. On October 20, 2019, he was 15th in line for a kidney. UT Southwestern doctors, Drs. MacConmara and Hwang, passed up a kidney for KG due to supposedly poor organ quality. Drs. MacConmara and Hwang also passed over four other patients at Parkland for the same organ, RP, a 60-year-old male who was 23rd on the list, LR, a 54-year-old female who was 24th on the list, ME, who was 37th on the list, and MA, who was 44th on the list. But doctors at UT Southwestern later accepted the organ for a UT Southwestern patient. There is no reason why the organ would be rejected because of organ quality and then accepted by the same doctors for different patients.

103.    Drs. MacConmara and Hwang passed on organs for KG two more times, rejecting an organ because of poor organ preservation when KG was 16th on the list, and rejecting another organ because of poor organ biopsy findings when KG was 13th on the list. Yet each time, the

organ was later accepted by the same doctors for a UT Southwestern patient. The same problems with organ preservation and organ biopsy would still exist when the same doctors accepted the organ for the UT Southwestern patient.

104.    There is no reasonable explanation why an organ would be rejected for these reasons for one patient and then accepted for another. Instead, the UT Southwestern doctors were improperly favoring UT Southwestern patients in order to commit fraud using Parkland patients.

105.    KG was kept on the organ transplant waiting list. This allowed UT Southwestern to continue to order tests for KG and bill those tests to Medicare. KG was transplanted only after Relator raised with Dr. MacConmara and Patricia Shirey the fact that KG was continually passed over for organs that Drs. MacConmara and Hwang later accepted for a UT Southwestern patient.

106.    From January 2019 to November 2019, 80 organs were turned down by UT Southwestern for Parkland patients because of concerns with donor quality, meaning the UT Southwestern doctors thought there was a problem with the organ that made the doctors unwilling to accept the organ for transplant. The UT Southwestern doctors made the specific determination that these organs were not viable for transplant into the Parkland patients. However, 29 of those same organs were later transplanted at UT Southwestern despite UT Southwestern doctors' prior determination that these organs were not viable for transplant.

107.    From January 2019 to November 2019, nine organs were turned down by UT Southwestern for Parkland patients because the doctors believed the organ was not properly preserved (i.e. it was not properly kept cold or had been out of the donor for too long). The UT Southwestern doctors made the specific determination that these organs were not viable for

transplant into the Parkland patients. Three of those same organs were later transplanted at UT Southwestern despite UT Southwestern's prior determination that the organ was not viable.

108.     From January 2019 to November 2019, seven organs were turned down by UT Southwestern for Parkland patients because the doctors found a specific problem with the organ that they thought made it unsuitable for transplant. The UT Southwestern doctors made the specific determination that these organs were not viable for transplant into the Parkland patients. Two of those same organs were later transplanted at UT Southwestern despite UT Southwestern's prior determination that the organs were not viable.

109.     From January 2019 to November 2019, two organs were turned down by UT Southwestern doctors for Parkland patients because the doctors found specific damage or defects with the organs that made them not viable. The UT Southwestern doctors made the specific determination that these organs were not viable for transplant into the Parkland patients. But one of those same organs was later transplanted at UT Southwestern despite UT Southwestern's prior determination that the organ was not viable.

110.     From January 2019 to November 2019, 5 organs were turned down by UT Southwestern for Parkland patients because the doctors believed the organ was from a donor that posed an "increased risk" of an undetected disease, specifically HIV, hepatitis B, or hepatitis C. The UT Southwestern doctors made the specific determination that these organs were not viable for transplant into the Parkland patients. One of those same organs was later transplanted at UT Southwestern despite UT Southwestern's prior determination that the organ was not viable.

111.     In total, between January and November 2019, doctors at UT Southwestern declined 45 organs for Parkland patients that they later transplanted at UT Southwestern. UT

Southwestern declined a total of 127 organs for Parkland patients. UT Southwestern doctors only conducted transplants for 6 Parkland patients from July 1, 2020, to June 30, 2021. Meanwhile, UT Southwestern conducted transplants for 215 UT Southwestern patients during the same period. In 2021, UT Southwestern performed 424 heart, lung, kidney, and liver transplants. Similarly, between July 1, 2018, and June 30, 2019, UT Southwestern doctors only conducted transplants for 6 Parkland patients compared to 111 transplants for UT Southwestern patients.

112. Between 2019 and 2020, a total of 93 patients were removed by UT Southwestern doctors from Parkland's transplant waitlist because they deteriorated past the point of transplant. Seven patients died while waiting for a transplant, and 56 became too sick to receive a transplant. The following patients are among those who suffered due to UT Southwestern's policies:

    a. RG, a 29-year-old male, RP, a 63-year-old male, and JC, a 50-year-old male, were removed from the waitlist because they died while waiting to receive a transplant.

    b. CH, a 40-year-old male, was one of those patients whose health declined so severely that he became unable to receive a transplant.

    c. MB, a 53-year-old female, and two other patients were removed from the waitlist because they were transferred to another center after UT Southwestern doctors did not provide them with the care they needed at Parkland.

113. If UT Southwestern had properly accepted organs for Parkland, these patients could have received the lifesaving treatment they were seeking.

114. Additionally, UT Southwestern overcharged Parkland for tests and surgeries. Under the contract between Parkland and UT Southwestern, UT Southwestern charged 100% of Medicare reimbursement for certain tests and 133% for others. Notably, UT Southwestern

required the most expensive tests, in particular all human leukocyte antigen (HLA) testing and other expensive tests like left heart catheter testing, to be performed at UT Southwestern as opposed to Parkland. Some of these charges, and all of those charges related to kidney transplants, were reimbursable by Medicare.

115.    Further, a patient can find their own organ donor by identifying a living individual that matches their blood type and agrees to donate their organ. This is often a relative and called a living donor. Because the patient identifies the donor and the donor is often only willing to donate to the patient, the patient, rather than the doctors, dictates who will receive the organ. Unlike organs from the normal organ donation process that UT Southwestern steered to UT Southwestern patients, UT Southwestern could not dictate that the living donor's organ, found by the Parkland patient, went to a UT Southwestern patient.

116.    However, UT Southwestern insisted on an inefficient process for these living donations in order to maximize UT Southwestern's billing. UT Southwestern insisted that the organ recoveries were performed at UT Southwestern instead of Parkland, even though Parkland is properly equipped to remove the organ from the living donor. UT Southwestern then charged Parkland for the full price of the surgery, rather than charging Parkland at cost. This resulted in much higher expenses than if the organ recovery was performed at Parkland. The organ, and the UT Southwestern doctors, then had to be transported from UT Southwestern to Parkland for the actual transplant. If the organ recovery was conducted at Parkland, then the organ and the doctors would merely need to move from one operating room to another.

117.    Parkland is only allowed to bill its cost of services. Therefore, if Parkland tested and performed living donor surgery for its patients in house, Parkland could only charge its own

cost of the test. Similarly, UT Southwestern can only charge costs for testing its own patients. However, Parkland's cost for using UT Southwestern is what UT Southwestern charges Parkland. UT Southwestern did not simply charge Parkland at cost, but included a 33 percent markup for their Living Donor Surgical cases because UT Southwestern refused to perform the operation at Parkland.

118. Similarly, by creating the scheme to keep the transplant patients at Parkland and use the UT Southwestern lab for expensive tests, UT Southwestern is able to inflate the charges to 133 percent of the Medicare costs and fraudulently increase their claims to Medicare.

119. Relator-Chase suggested that Parkland hire its own doctors to remove UT Southwestern's influence on Parkland's organ transplants. Relator-Chase made the proposal to Ambulatory Chief Medical Officer, Dr. Joe Chang, and VP of Ambulatory, Patricia Shirey. Both agreed and a meeting with the senior leadership of both UT Southwestern and Parkland was scheduled to discuss the findings. Relator-Chase then presented his proposal to Parkland's Capital Planning Review Committee (CPRC) — which was attended by Dr. Joseph Chang, the CMO of Parkland, and other key individuals involved in Parkland's financial decision making — and the proposal was approved during the committee meeting. Relator-Chase was then asked to present the proposal at the Chief's Meeting, which is attended by Parkland's top executives, including its CEO. However, Relator-Chase was later told by Patricia Shirley that Jessica Hernandez, SVP of Population Health, would instead go to the Chief's Meeting in Relator's place. Relator-Chase was later informed by Patricia Shirley that the Parkland executives denied his proposal, despite it being approved by the CPRC. It is highly irregular for the Chief's meeting to not approve a decision previously approved by the CPRC.

120.    Relator-Chase requested a meeting with Yvette Chapman of Southwest Transplant Alliance and requested to see the organ acceptance criteria for Parkland patients and UT Southwestern. Relator-Chase received the information and passed it along to Parkland leadership. Despite presenting this documentation to Parkland leadership, UT Southwestern and Parkland failed to address the manipulation.

121.    Relator-Chase eventually compiled the statistics on UT Southwestern doctors passing over Parkland patients for UT Southwestern patients and reported the issue to UNOS. UNOS reviewed the data and asked for an explanation from Parkland. The UT Southwestern doctors provided their stated explanation for declining the organs. The explanations all made the organs seem unusable. There was no explanation provided addressing why the organs were later accepted at UT Southwestern.

122.    UNOS failed to properly exercise its oversight capabilities and failed to identify the fraud. Instead of comprehensively investigating the issue, it accepted UT Southwestern's explanation and failed to refer the report to the MPSC.

123.    Similarly, the Southwest Transplant Alliance was responsible for overseeing UT Southwestern and Parkland but failed to report waitlist manipulation to the appropriate regulators, OPTN and UNOS.

## VII.    LOYOLA FRAUD

124.    Loyola improperly transplanted patients who were not eligible for transplant.

125.    Loyola was not running a safe transplant program. Instead, it wanted to get as much volume as possible to increase reimbursement from Medicare. Loyola had three deaths in

its operating rooms within six weeks. There were also multiple deaths among kidney transplant patients.

126.    Loyola created what it claimed was a specialty in particularly sick patients. It developed relationships with area hospitals and had those hospitals transfer their sickest patients to Loyola for transplant. Loyola would then list these patients on the organ donor list as status 1A, meaning the patient was unlikely to live more than a few days without a transplant. This put the patient at the top of the donation list, and they were regularly able to get an organ.

127.    Loyola, however, did not properly screen and did not actually care if these patients' lives would be saved by the donation. Instead, Loyola focused on the billing and profitability of these patients. Loyola would receive reimbursement for the patient's discharge, even if the reason for discharge was death. Further, if the patient was actually discharged and then had complications because the transplant did not actually improve the patient's condition, the patient would return to Loyola for post-transplant complications. Loyola could then bill for these costly complications.

128.    Many of the patients died soon after Loyola provided these improper transplants. This fraudulent conduct put at least two lives in jeopardy: First, the Loyola patient who died from the improper transplant; and second, the patient on the organ donor waitlist who could have received a life-saving organ transplant, had Loyola not improperly transplanted the organ.

129.    For example, a patient who has liver failure due to alcoholism is only eligible for a liver transplant if they are sober. If they are still drinking, they will just damage the new liver and become even sicker.

130.    Loyola ignored this and transplanted a liver into an alcoholic. The patient did not get better and stayed in the hospital for 128 days. The patient was on Medicare, and all 128 days of the hospital stay were paid for by Medicare. If Loyola had not done the transplant, the patient would not have needed the 128-day hospital stay.

131.    Relator discussed this patient's 128-day hospital stay with Loyola's Inpatient Chief Medical Officer, Dr. Kevin Smith. Dr. Smith stated that "to increase transplant volume we need to be willing to take risks," explicitly stating Loyola's view that patient risk was acceptable for Loyola to increase its transplant billings.

132.    In 2022, XynQAPI did a report on liver graft failures at Loyola. It found that in four of the five cohorts it studied, liver graft failures were higher than expected. This includes graft loss and death after a liver transplant.

133.    Loyola kept three sets of books to hide this fraud. First, Loyola kept the real data on organ donation failure rates in CareDX and used this data for internal reports. Second, Loyola kept even more details in an Excel file. The Chief of Abdominal Transplant Surgeon, Dr. Luis Fernandez, instructed the Quality Manager, Deborah Parilla, to create a separate dashboard that both she and Relator were told explicitly "not to share with anyone externally."

134.    But Loyola had different data on organ donation failure rates in their EMR, Epic. The Epic data showed either fake or less detailed information that hid the true high rate of organ donation failure at Loyola.

135.    For example, if Loyola did a failed transplant where the patient died in the operating room, the internal records would call it a graft failure and transplant related death. However, Loyola did not record this as an official transplant death in Epic, claiming the

transplant "technically never worked or achieved anastomosis." This allowed Loyola to report data outside of Loyola that hid the true problems with Loyola's transplant program.

136. Loyola's internal Surgical Morbidity and Mortality Cases tracker recorded any complication or death related to transplants. These included post-surgical infections, returns to the operating room post-procedure during the same hospital admission, graft failure, and death. For the period March 1, 2022 to April 17, 2022, a period of 48 days, Loyola recorded 60 separate incidents. Surgeon Raquel Garcia-Roca was involved in 33 separate incidents. Surgeon David Lee was involved in 23 separate incidents.

137. Relator Chase raised his concerns with the number of transplant patient deaths in the OR with Loyola's Vice President of Finance, Manmeet Taneja. Taneja responded that "deaths still count as discharges" implying that Loyola's interests were still met as Loyola still received payment if the patient died.

138. Additionally, Loyola fraudulently double billed Medicare. Loyola would both put its costs on Loyola's cost report submitted to Medicare, and bill the services directly to Medicare. Loyola was thus getting reimbursement from Medicare twice for one procedure.

139. Loyola also inflated its cost report to Medicare to obtain funds to which it was not entitled by inflating time studies to improperly charge more staff time to Medicare. Through this, Loyola was able to put over half of its staff salary on its cost report and receive reimbursement from Medicare.

140. Loyola hired a contractor, Transplant Solutions, LLC, to review Loyola's transplant program and financial operations in December 2021. While the contractor was careful

not to explicitly accuse Loyola of fraud, there are numerous references to problems with Loyola's cost reports.

141.     Transplant Solutions noted Loyola's double billing, specifically finding that "patients have been and are being billed for these services [pre-transplant evaluation services]. Additionally, costs reported on the Medicare Cost Report show little physician pre-transplant evaluation costs." Transplant Solutions notes this was reported to Loyola compliance, and there was a conscious decision not to confirm the finding. In short, Transplant Solutions found double billing, told Loyola, and stopped looking so as not to confirm (and need to report) the fraud.

142.     Transplant Solutions also noted specific concerns with time and therefore cost allocations. In short, Transplant Solutions found that Loyola was inflating the time it allocated to Medicare on the cost report. Specifically, it stated the following cost centers "raised questions" in an internal report.

   a.   "Nurse Administration is allocated based on RN FTEs [full time employees] (probably modified) and is only allocated to Liver Acquisition. The Departmental has costs that should be allocated to all of the OACC [organ acquisition cost center] departments."

   b.   Further, "Clinical Pastoral Education [the primary method of training hospice chaplains] is based on Time Spent and is only allocated to Lung Acquisition. If the process is part of the Live Donor evaluation process or the pre-transplant evaluation process, it may be allowable. However, it is questionable."

   c.   Finally, the "Pharmacy Residency Program is based on Program FTE's and is allocated to Heart and Lung acquisition only. Please review for appropriateness."

143.    Additionally, Transplant Solutions found that patients are billed for their deductible and coinsurance for pre-transplant evaluations when these costs should go on the cost report. Transplant Solutions specifically noted, "this is inappropriate, and these documents need to be modified."

144.    In response to a separate Quality Assessment report from CareDx — which identified significant gaps in Quality and Patient Safety — Ryan Mayhew, the Regional Physician Quality Officer for Loyola, wrote, "we essentially don't have a functioning quality program in the transplant realm and it's a major vulnerability."

145.    Relator Chase had a meeting with Janice Wolfe about the double billing. The issue was raised all the way up to the Chief Financial Officer, but they kept Relator Chase out of the meeting. When Relator Chase followed up about the issue he was brushed off and told the issue was fixed but never saw anything that would in fact confirm the issue was fixed. Instead, soon after Loyola fired Relator Chase.

## VIII.   OPO FRAUD

146.    The five OPO defendants, New Jersey Sharing Network, LiveOnNY, Southwest Transplant Alliance, LifeGift, and Texas Organ Sharing, are all defrauding the United States by charging for unnecessary kidneys and including costs on their cost report that are not reasonable or necessary.

147.    Under new regulations, OPOs are rated into three Tiers based on the OPOs' success in collecting organs. Tier 1 are OPOs at or above the 25 percent threshold rate. Tier 2 are OPOs at the median threshold. Tier 3 are OPOs below the median threshold. As every OPO

could meet the highest tier, the tier system allows a calculation of how many additional organs, and thereby deaths, an OPO could prevent if it was performing up to standards.

148. LiveOnNY covers Long Island, New York City, and southern New York. It is a "Tier 3 – Failing OPO" and the fourth worst performing OPO in the country. Had LiveOnNY met Tier 1 standards, it could have avoided an estimated 369 preventable deaths.

149. Texas Organ Sharing Alliance is also a "Tier 3 – Failing OPO" and the eighth worst performing OPO in the country. Had Texas Organ Sharing Alliance met Tier 1 standards, it could have avoided an estimated 264 preventable deaths.

150. Southwest Transplant Alliance is considered a "Tier 2 – Underperforming OPO" and is ranked in the middle of all OPOs at 24. Had Southwest Transplant Alliance met Tier 1 standards, it could have avoided an estimated 50 preventable deaths.

151. LifeGift is considered a "Tier 2 – Underperforming OPO" and is ranked in the middle of all 57 OPOs at 25. Had LifeGift met Tier 1 standards, it could have avoided an estimated 84 preventable deaths.

152. Only New Jersey Sharing Network, which covers Northern and Central New Jersey, is considered a "Tier 1 – Passing OPO." However, New Jersey Sharing Network is one of the worst performing OPOs in the country at recovering organs from Black donors.

### A. Charging for Unnecessary Kidneys

153. Because kidneys are 100% covered by Medicare, any procurement that involves a kidney is covered by Medicare. If a transplant does not involve a kidney, then the procurement is covered by the eventual recipient's insurance, which may be Federal Healthcare.

154.    Medicare covers all kidney procurements, even if, after procurement, a medical professional determines the kidney is not viable. If other viable organs are procured, Medicare will cover the proportionate cost for Medicare recipients.

155.    Given the guaranteed reimbursement for kidneys, OPOs, including Defendant OPOs, instruct their staff to procure the kidney even when the OPO knows the kidney is not viable.

156.    OPOs can often tell that a kidney will not be viable. Either the body has been dead for too long and the kidney does not have enough blood, the donor has a problem such as cancer or another disease that makes them an ineligible donor, or the surgeon can tell the kidney is not viable from a visible inspection of the body, such as cuts or other damage. In these instances, the surgeons or OPOs are instructed to procure the kidney and then throw it in the trash. Because it is technically collected, the OPO then claims it on their cost report and gets reimbursement from Medicare. This all occurs while over 21.3 percent of collected kidneys are not even transplanted into recipients waiting for a life-saving kidney transplant.

157.    As one example, OPOs often seek donations after cardiac death (DCD) even when they know the donor will not have viable organs. The OPO will convince the family of someone who is on life support but will not recover to take the person off life support and donate the organs after they die. However, often the OPO knows the organs are either already damaged from the person's physical state (i.e. a bad car crash) or the person will not die within 60-90 minutes of coming off life support, and therefore their organs will deteriorate too significantly to be viable. Even if the person dies more than 90 minutes after being taken off life support, the

OPO will still harvest their organs to charge for the extraction, but immediately discard the organs as non-viable.

158.     However, Medicare only pays for medically necessary procedures, and when the surgeon knows the kidney is not viable but harvests it anyway, the procedure is not medically necessary.

159.     Additionally, OPOs, in particular LiveOnNY and NJ Sharing Network, will recover organs even if the donor has been dead for too long and the organ is therefore not viable for transplant. The OPOs will still collect the organs and immediately throw them away to increase their statistics and improperly bill Medicare.

### B. Charging for Excessive Costs

160.     CMS reimburses OPOs directly for any cost related to a Medicare patient. This includes all costs related to kidneys. However, OPOs are only responsible for organ procurement, rather than organ transplant. Because any donor will most likely have more than one organ, the OPOs' work will necessarily require splitting costs between the Medicare covered portion and the non-Medicare covered portion.

161.     OPOs neither properly allocate charges to Medicare nor limit their charges to only those that are reasonable and necessary.

162.     For example, LiveOnNY has an office space with similar designs to a high-end law firm with expensive New York real estate. However, the costs for this design and real estate are primarily billed to CMS.

163.     As another example, in the 2010-2013 timeframe, LiveOnNY's CEO bragged that while they were at risk of decertification from CMS, they were going to fight CMS and would be

suing CMS with CMS's own money. When LiveOnNY did beat decertification, the CEO received a $250,000 bonus.

164.    Southwest Transplant Alliance built its own medical facility so it could perform the procurements itself and put all of the fees on its own cost report. An OPO building a medical facility creates an inefficient process because the donor body needs to be transported from the hospital to the transplant center for procurement. Then, if the patient is at the hospital, the organ will need to be transported back to the hospital.

165.    However, it does allow Southwest Transplant Alliance to greatly increase its billings to Medicare, because it can now bill for the office space and all of the costs associated with the procedure rather than paying those costs to the hospital.

166.    LiveOnNY and New Jersey Sharing Network also regularly paid lobbyists. Upon information and belief, those lobbying costs were improperly reimbursed by CMS. Lobbying costs fall plainly outside those costs which can be properly reimbursed through CMS.

167.    Further, the OPOs provide excessive salaries and bonuses to staff, particularly to their executives.

168.    At the end of the year, before each OPO submits its cost report, the staff reviews its costs to ensure that the costs have increased from the year before. If they are not, the OPO will incur unnecessary charges, including salary increases and bonuses, unnecessary furniture, and other expenses, to ensure their budgets are going up and the OPO will receive more funding the next year.

169.    The operating costs are exorbitant. For example, the former CEO of Southwest Transplant Alliance, Patricia Niles, made $762,269 in 2019, the former CEO of New Jersey

Sharing Network, Joseph Roth, made $727,598 in 2020, the current CEO of LifeGift, Kevin Myer, made $539,524 in 2019, the former CEO of LiveOnNY, Helen Irving, made $479,444 in 2020, and the current CEO of Texas Organ Sharing Alliance, Joseph Nespral, made $356,761 in 2020.

170.    These excessive costs drive up the actual cost of organ donation. Between 1996 and 2014, the cost of acquiring organs increased by 253 percent, but the volume of donors increased by only 57 percent, and the volume of transplants increased by only 45 percent.

171.    Further, the excessive costs are generally focused on the top executives at the OPOs. The line level staff responsible for the actual work of the OPOs are often paid at or below market rates for their expertise and instead sold on the OPOs mission. This leads to the OPOs not fulfilling their mission to collect every viable organ because the staff responsible for the work is underpaid and overworked to compensate for the excessive costs for the OPOs executives.

### C. OPOs Fail to Attempt to Recover Every Organ

172.    OPOs are required to try to recover every organ possible. *See* 42 C.F.R. § 486.322. This is because any recovered organ means a life saved.

173.    However, OPOs regularly fail to try to recover every organ. OPOs regularly fail to go to hospitals that service low-income or minority populations under the mistaken belief that these patients will not consent to organ donation. Further, OPOs fail to attempt to recover organs from older donor candidates who may only have one viable organ. They refer to these as "low yield candidates." But even one recovered organ can mean one saved life.

174.     In fact, the OPOs specifically instruct certain hospitals to not refer potential organ donors. If the donors are not referred, then they will not count toward the OPO's statistics for failing to recover an organ.

175.     For example, LiveOnNY does not try to recover from patients who only have one kidney available because it will lower their yield rate: if they only recover one kidney, their organ per donor is lower. So, if a donor only has one kidney, even though that kidney could be transplanted, LiveOnNY does not ask the donor's family to donate. This practice is also done by other OPOs.

176.     Further, LiveOnNY and New Jersey Sharing Network are located in some of the most densely populated areas of the United States. As such, they have some of the most opportunities for organ collection anywhere in the United States. But both OPOs generally transplant more organs than they collect because they do not put the time and effort into collection that they are required to.

177.     The OPOs also control how their statistics are reported. So, when an OPO fails to respond to a potential donor, they can simply fail to put that potential donor into their electronic health record and put in a fake reason for why the potential donor was not contacted. The OPOs hide their failings through this false data. While the metrics were changed in 2022 so that the OPOs have less control over how their statistics are reported, the OPOs still try to game the system so that they appear to perform better than they actually are performing.

IX.    **UNOS'S FAILURES**

   **A. UNOS Fails to Oversee OPOs**

178.     It is widely understood that UNOS has failed to oversee OPOs and organ donation in the way required by the law and regulation.

-44-

179.     For example, a bipartisan Senate investigation found that:

    a.   The OPTN is failing to provide adequate oversight of the nation's 57 OPOs,
         resulting in fewer organs available for transplant.

    b.   The lack of oversight by UNOS causes avoidable failures in organ procurement
         and transplantation resulting in risks to patient safety. These failures include
         testing procedure errors, transportation issues resulting in life saving organs being
         lost or destroyed in transit, and process and procedure failures.

    c.   UNOS lacks technical expertise to modernize the OPTN IT system, resulting in
         risk of system interruption or technical failure with the potential to harm patients
         across the country.

180.     UNOS receives complaints on behalf of the OPTN. These complaints are not properly vetted by UNOS and reported to the OPTN MPSC. The MPSC is made up of volunteer staff. But complaints are only referred to the MPSC staff once vetted by OPTN staff. UNOS will not refer a complaint if the issues are outside of what UNOS views as OPTN authority or do not violate a policy.

181.     Even more glaring, OPO violations are first referred to a working group of the MPSC that is made up of MPSC members who work at OPOs. Currently, six members of the MPSC board, almost 15 percent of the board, are OPO executives. In essence, UNOS gives the MPSC OPO members the chance to spike any investigation before it even starts.

182.     UNOS received 1,118 complaints against all 57 OPOs between 2010 and 2020. UNOS referred less than half of the complaints to the MPSC, only referring 444 of the 1,118 complaints.

183. 104 of those complaints were for testing procedure errors, such as donor blood type mix ups, not identifying infectious diseases in the organ donor, or failing to perform the required blood and urine tests on the donor. These problems led to actual issues for donor recipients. 211 donors transmitted disease and 249 recipients developed diseases from the donated organs. 70 of those 249 recipients died because of the disease they received. UNOS only referred 30 percent of these testing procedure complaints to the MPSC.

184. 109 of those complaints were for not following the allocation procedure. LifeGift was reported multiple times between 2018 and 2019 for not following the heart and lung allocation procedures, which resulted in at least one unnecessary discarded heart. UNOS only referred 17 percent of these recovery procedure complaints to the MPSC.

185. 53 of the complaints were for transportation failures, which would negatively impact the organ's quality or expected arrival time to the transplant center. UNOS only referred 6 percent of these transportation failures to the MPSC.

186. When UNOS does refer a case to the MPSC, it does so in a way to limit the action the MPSC takes. Of the 444 cases referred to the MPSC, only one case resulted in probation. Three resulted in a peer visit, 63 resulted in a letter of warning, 298 were uncontested or resulted in a letter of noncompliance, and 68 were closed without any action.

187. Only probation cases are publicly disclosed. Therefore, by ensuring that the MPSC does not take action, both through not providing referrals and downplaying the problems, UNOS is able to hide the problems in the organ transplant system. Further, UNOS does not follow up with the person who submitted the complaint.

188.     Brian Shepard, the CEO of UNOS, described the MPSC as "like putting up your kids' artwork at home. You value it because of how it was created rather than whether it's well done."

On Mar 1, 2018, at 11:57 AM, Brian M. Shepard <███████████████> wrote:

> I know you agree, but this whole thing drives me nuts. I don't know how to fill important positions with people who know what they're doing.
>
> Allowing the community to fill these jobs increases the community's belief in the validity of the outcomes. Even while it make MPSC more variable, or allocation policy less coherent. It's like putting your kids' artwork up at home. You value it because of how it was created rather than whether it's well done. Only in this case, we persuade ourselves that it's well done anyway.

189.     UNOS does not view the MPSC's role as addressing broader trends in OPO non-compliance. Instead, the MPSC refers any broader issues to the OPTN OSC. However, the OSC does not review any individual cases but only de-identified data.

190.     In essence, UNOS views the MPSC as not responsible for systematic problems and the OSC as not responsible for looking into any individual OPOs. Thus, the systemic problems with OPOs are never addressed as UNOS has set up a system where no one is responsible for reviewing and addressing the problems.

191.     This is unsurprising, as the OPTN is filled with many prominent members of some of the most problematic OPOs and other friends of the OPOs who have a vested interest in the status quo.

192.     For example, the Organ Procurement Organization Committee of the OPTN "considers issues relating to organ procurement organizations and their role in increasing the number of organs recovered and allocated efficiently and effectively. The Committee considers medical, scientific, and ethical aspects of organ procurement as they pertain to the purview and

responsibilities of the OPTN." The committee has 18 voting members, of which 14 are OPO representatives.[4]

193. UNOS knows that the United States will not catch its failures as HHS instead relies on UNOS to operate the OPTN as it promises to. There are only 3-4 employees at HRSA responsible for overseeing the OPTN contract. And, as UNOS knows, HHS splits the monetary and policy oversight. While HRSA is responsible for organ transplant policy, CMS is responsible for reimbursement. While organ donation receives billions of dollars, it is dwarfed by other Medicare spending and therefore is considered small and specialized so that it receives little oversight from CMS. UNOS knows this diverse and limited staff that oversees organ transplant has to rely on UNOS, and UNOS therefore believes it can get away with covering up the problems in organ donation to keep the cash from the United States flowing.

194. For example, over twelve years, not one OPO has ever had its cost report audited.

195. UNOS also retaliates against those who report problems. It is widely known in the industry that if someone raises a complaint to UNOS, they are likely to be frozen out of the organ donation world entirely. Therefore, UNOS discourages any complaints in the first place.

196. UNOS takes advantage of this split oversight. UNOS's position is that the OPTN is not authorized to review or enforce CMS coverage decisions. Therefore, UNOS does not review OPO costs or investigate unallowed cost expenditures by OPOs. In essence, UNOS, through the OPTN, has been given the oversight authority of a MAC but disclaims any responsibility for the actual expenditure of CMS funds.

---

[4] Committee members are listed on the OPTN's website. Organ Procurement Organization Committee, OPTN, https://optn.transplant.hrsa.gov/about/committees/organ-procurement-organization-committee/

197.    UNOS recognizes its role in oversight, stating on its FAQs that: "There are three steps in oversight. As the OPTN, UNOS manages the first two – self reporting and peer review. UNOS provides data reports, tools and coaching to help members improve and avoid the third step, which is regulatory. Centers for Medicare & Medicaid Services (CMS) provides regulatory oversight."

198.    However, after the United States Senate Finance Committee began investigating UNOS, UNOS added to its website to claim "many people think UNOS oversees every facet of the transplant process. We don't […] UNOS is a forum for organ donation and transplant professionals to come together and determine how the national system should work."

199.    This is exemplified by the fact that, despite the major failures of the U.S. organ transplant system, no OPO has ever lost its government contract.

200.    Instead, oversight operates as a catch and kill operation, whereby UNOS and the OPOs retaliate against anyone who raises concerns. As one transplant consultant explained, "if I had a complaint, I probably wouldn't go anywhere. The messenger usually gets shot, so knowing what I know, I wouldn't go to UNOS or CMS."

201.    The following are representative examples of UNOS failing to perform its oversight function.

<div align="center">LifeGift</div>

202.    LifeGift is one of the Texas OPO defendants. UNOS received a complaint from a hospital that LifeGift improperly allocated a heart and lungs recovered from a donor. The hospital noted this was the second time that a patient seeking organs from LifeGift died before receiving a transplant when they should have received an organ.

**Detailed Description of the Event:** •

We received a heart-lung offer for patie ███ sequence 19 (heart) and 20 (heart-lung).
All previous offers declined so we were primary. Notified by OPO lungs had already been
placed. The OPO AOC was contacted by OPO on-site in an attempt to obtain rationale for
the lung placement-none provided. OPO coded us out for 830 without our knowledge.
We believe we should have been offered the lungs based on OPTN policy 6.6F.i.
Additionally, the same situation occurred on 10/16/18 with the same OPO. UNOS ID
AFJM361 match 1134453. Our recipient in this case did not survive to transplant The
recipient was of small stature and this was one of the very few opportunities for a
transplant. D ███████ pulmonologist on -call, contacted the accepting physician
in an attempt to get him to agree to release the lungs for this heart0-lung candidate, but
he refused. Our physicians, D ███████ (cardiologist) and D ███████
(pulmonologist) were both involved with one or both of these offers

203.    In both instances, LifeGift initially matched the lungs to a different patient before matching the heart. However, per OPTN policy, when a heart-lung candidate is allocated a heart, the lung must go to the same candidate. In both instances, the transplant center that received the heart requested their patient also receive the lungs, but LifeGift refused to give the lungs. In both cases, the patient in need of the heart died before transplant and the recovered heart was discarded.

204.    UNOS inquired with LifeGift and LifeGift responded, blaming the entire incident on the hospital. UNOS notified LifeGift that it had committed a policy violation. LifeGift violated the same policy again a month later.

205.    LifeGift resisted UNOS's efforts to investigate. The incidents were eventually referred to MPSC. Throughout the investigation, MSPC staff noted that board members who were affiliated with OPOs pushed to protect LifeGift and did not advocate for heart-lung transplant candidates and OPTN policy.

welcome! I'm pissed though.

I know, but lots of OPO peeps in here.
strong opinions

No joke. Poor outnumbered thoracic peeeps
Policy clearly says "must." There are hardly any policies that say "must."

206. The MPSC recommended a notice of noncompliance, but the case was ultimately closed with no action. MPSC staff indicated that it was the OPO board members, such as Alex Glazier, the President and CEO of New England Donor Services, who pushed for the case to be closed with no action.



Thought you might be interested in reading the 3rd and final reviewer's comments for TXGC's HR/LU allocation policy violation. [redacted] and [redacted] both said NON (with no additional comments, unfortunately). Here's Alex Glazier's: 11:46

needing lungs requested the OPO rescind the prior lung offer? This seems like an inappropriate request by the ctr. Will that behavior be addressed by the MPSC? My question for the OPO is, in these circumstances where heart allocation has to resume after lungs have been placed, why is the OPO offering a heart to a candidate listed as needing heart/lungs? If the lungs are no longer available, those candidates should be screened off to avoid this type of frustrating [redacted] I think this case should be closed with no action and I think there should be correspondence back to the Ctr about making requests for OPOs to rescind offers. " 11:46

Wait let's try that again: 11:46

Glazier: "I am not clear why this is a policy violation at all? The sequence of allocation appears to be that the OPO appropriately allocated lungs and then later in the allocation process the ctr with a heart candidate needing lungs requested the OPO rescind the prior lung offer? This seems like an inappropriate request by the ctr. Will that behavior be addressed by the MPSC? My question for the OPO is, in these circumstances where heart allocation has to resume after lungs have been placed, why is the OPO offering a heart to a candidate listed as needing heart/lungs? If the lungs are no longer available, those candidates should be screened off to avoid this type of frustrating [redacted] I think this case should be closed with no action and I think there should be correspondence back to the Ctr about making requests for OPOs to rescind offers. " 11:47

[redacted]

ok, so by that logic, the next time I am allocating a kidney and the candidate needs a heart, go ahead and give it to them. And when the lung people start asking about a heart, I should just tell them, "tough toenails!! Already placed that! 11:49

This is goddamn bananas 11:49

[redacted]

How does an attorney not read that policy and see a violation of it? 11:50

<u>Donor Network West</u>

207. On or around December 22, 2020, Donor Network West (CADN) recovered organs from a teenage donor who died from gunshot wounds. The donor's blood type was determined incorrectly. Three of the people that received organs from the donor experienced graft rejections and their immune systems attacked the donated organs. Three out of four of the recipients nearly died.

208. CADN relayed serious concerns to UNOS pre-transplant, but UNOS ignored the concerns, provided incorrect advice, and told CADN to put "something in…big and bold" and "you should be okay."

| | | |
|---|---|---|
| 12-21-2020<br>17:45 | ████████████ █<br>United Network for<br>Organ Sharing<br>(UNOS) – CALL<br>TRANSCRIPTION | • ████ Organ Center, this is ████<br>████ Hi ████ my name is ████ ████ I work for Donor Network West in California. I have a question regarding, I guess, UNOS Policy (question mark). I really don't know how I am going to ask, but I am going to try. A patient we are currently working up for organ donation, this patient unfortunately came in, was admitted and had an emergent thoracotomy in the ED and was massively transfused. He received over 30 units of products. |

• ████ Right, ok, so if you take a look at, actually the policy that is going to cover this is 2.5 and 2.6. 2.5 and, basically 2.5 covers hemodilution assessment. So, what it states (reads policy 2.5). 2.6 covers a little bit more in depth what needs to be done to determine blood type so I'm guessing you have two samples drawn on two separate occasions, different collection times, submitted separately (████ yes, uh huh). Ok, the best thing that I can tell you to do, because what it's also saying here is that documentation is needed to showing blood type determination is conducted according to your own written protocol, and a complete history of all blood products received by the donor since admission needs to be in the donor's medical record. So, as long as all of that is there, you should be okay; but because this is such a unique situation, I would definitely recommend putting something in donor highlights, big and bold, so that everybody sees it. I would, when you go notify primary centers that should be the first thing that you let them know. You know, just be very above board about everything. But as long as the documentation is there of received blood products and the two ABO source

documents and hemodilution worksheet and all that, as long as all that is in there, you should be okay.

209.     CADN self-reported to UNOS that they assigned the wrong blood type. UNOS

staff recommended referring the case to MPSC.

<center>Life Connection of Ohio</center>

210.     Life Connection of Ohio (OHLC) received an organ referral for a patient with a

brain bleed. OHLC conducted a medical record review on March 29, 2020, and started looking

for organ matches on March 31, 2020. On April 1, 2020, the donor was deemed brain dead and

OHLC transplanted the patient's organs. The donor hospital received a surgical pathology report

from a brain biopsy, that had a received date two days before brain death and a signature eleven

hours before the brain death, which indicated that the patient had a malignant brain tumor.



211.     OHLC was not informed of the brain biopsy until April 22, 2022. At that time

OHLC notified the transplant centers that received the organs. OHLC also learned there was a

mention of the tumor in the hospital chart.

212.     On June 4, 2020, UNOS received a complaint that OHLC failed to identify that

the donor's cause of death was cancer. Transplanting an organ from a donor with cancer creates

the risk that the transplant recipient could die within 3 years. UNOS opened a review and found

that OHLC had records that stated the radiologist could not rule out a brain mass.



**UNOS Incident Handling: Triage Form**

Staff completing: ███████      PSP#: ━━━━      CMRS#: ███████

IH Receipt date/time: 6/4/20 12:02 pm      Triage date/time: 6/4/20 12:04 pm

Date/time management notified: 6/4/20 12:04 PM

Subject/blinding code: ███████      Date of event: 4/2/20

Reporter/blinding code: *Patient*      Donor ID: ███████

Issue: HR recipient, 9 weeks post-tx, told donor died of metastized Glioblastoma, he may die w/in 3 yrs. Surgeon told pt. hi "need up" not catching before tx

213.    On July 31, 2020, UNOS informed OHLC that they were not forwarding the case

to the MPSC.

Dear ███████ :

The United Network for Organ Sharing (UNOS) serves as the Organ Procurement and Transplantation Network (OPTN) under contract with the Health Resources and Services Administration (HRSA) of the U.S. Department of Health and Human Services. Under that contract, UNOS staff continuously review reported or identified patient safety and/or public health related concerns.

UNOS Member Quality appreciates your response to the inquiry letter sent to Life Connection of Ohio (OHLC) on June 22, 2020. Specifically, this inquiry involved the malignancy evaluation and disclosure by OHLC for donor ███████ .

At this time, UNOS Member Quality is requesting no additional information and will not forward this matter to the Membership and Professional Standards Committee (MPSC) for review. Please be aware UNOS could submit this matter to the MPSC should additional information become available in the future.

### Nevada Donor Network

214.    A kidney recipient died six days post-transplant from a rare bacterial infection on

July 13, 2017. The CDC learned about this incident on July 19, 2017, and contacted UNOS.

However, UNOS had learned of the incident five days prior from a Nevada Donor Network

(NVLV) self-report submitted on July 14, 2017. UNOS did not share this information with the CDC.

Printed 7/17/2017 8:46:49 AM

## Improving Patient Safety

**Safety Situation Details**

**Situation ID**                                               **Reported 07/14/2017**

The goal of the Improving Patient Safety system is to collect information about safety related incidents occurring system-wide, in order to increase organ utilization and decrease the morbidity and mortality of transplant patients.

⚠️ **What is a Safety Situation?**
A situation or activity that affected or could have affected patient safety.

**What to report:**

- Any patient safety situation
- Any other situation that causes a safety concern from a transplantation, donation, and/or quality perspective.

**Please report such situations in a timely manner.**

**Situation Information**

**Reporting Institution:** ⚪                              **NVLV-Nevada Donor Network-Independent OPO(Member)**

215.    Instead, UNOS labeled the NVLV self-report "low priority."

216.    The infection was identified as tularemia, a rare infectious disease. It is important to report and contain diseases like tularemia and ensure that these diseases are not passed to the vulnerable population that needs organs. UNOS failed to follow its policy to escalate incidents that related to a threat to public health.

217.    The CDC, in a July 19, 2017, email, expressed concerns to UNOS and asked if they received any reports about the transplant recipients' deaths. UNOS did not inform the CDC about NVLV's self-report.

Sent from my iPhone
On Jul 19, 2017, at 2:50 PM, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮@cdc.gov> wrote:

Dear all,
We just received a call from our bacterial diseases group at CDC as they were notified of two patients (in CA and NV) who have confirmed tularemia infection – both were recipients of kidneys from a common donor. One (NV) recipient has died.

Have you (UNOS) received a report on this? CDC obviously will accept the investigation. We do not know yet if there are other organ recipients or tissues were recovered.

Please let us know as soon as you hear back about this
I am available at all times at below contact information

▮▮▮▮

▮▮▮ ▮▮ ▮▮▮▮▮▮

Office of Blood, Organ, and Other Tissue Safety
Division of Healthcare Quality Promotion
Centers for Disease Control and Prevention

## Mississippi Organ Recovery Agency

218.    UNOS received a report of two instances where kidneys were delayed in transit,

resulting in extended cold ischemic time, which degrades the organ's quality, for two kidneys

and a third kidney that had to be discarded. UNOS requested further information and received a

response from Mississippi Organ Recovery Agency (MSOP), but the case was closed with no

action and MPSC did not review the case.

**Situation Information**

Reporting Institution: ✕                          AZMC-Mayo Clinic Hospital-Transplant Hospital(Member)

AZMC is reporting two instances where NGL (Network Global Logistics) was used as the transportation courier service and the organs did not arrive to the airport in time to make the flight. This resulted in 3 cancelled kidney transplants due to prolonged cold ischemic time. 2/25/17- UNOS ID: ▮▮▮▮ Match ID: ▮▮▮▮ AZMC accepted the left kidney. Second case was from 12/17/16. UNOS ID ▮▮▮▮ Match ▮ ▮▮▮▮ AZMC had accepted both the right and left kidney.

## Donor Alliance

219.    Donor Alliance (Colorado/Wyoming OPO) filed a patient safety event report

regarding Sterling Courier services and UNOS after Sterling Courier failed to pick up a kidney

and UNOS communication failures resulted in extended delays for the transportation of that kidney.

**Date Event Occurred:** ✱ 03/20/2018

**Detailed Description of the Event:** ✱ A kidney for transplant was left at the Donor Alliance Recovery Center by Sterling Courier. According to their paperwork, they were to only pick up the left kidney. There was a data entry error by Sterling Courier that led to the right kidney not being added to the job with the left kidney. There was additional miscommunication between UNOS and NYRT on acceptance of the right kidney and arranging transport of the right kidney. Donor Alliance was never made aware that the right kidney was not picked up with the left kidney. DA was also not notified when alternate arrangements were supposed to be made by UNOS for right kidney to NYRT. UNOS did not have proper handoff between shifts and to DA. The consequence of the errors in communication is that a transplantable organ had to be discarded and a recipient who was expecting to receive that kidney was not going to get a transplant.

220. UNOS conducted a review and found there was a "lack of clear or complete communication during hand off from one shift to the next" and recommended corrective actions.

**Please specify additional details regarding the RCA:** RCA by Sterling found: The data the Customer Service Representative entered into QuickTrak (Sterling's internal shipment tracking system) did not save to the job, as the Customer Service Representative neglected to hit the correct key upon exiting. The action eliminated any awareness of the additional organ to the Customer Service Representatives who were involved as the shipment progressed. RCA by UNOS found: Lack of clear or complete communication during hand off from one shift to the next. CA measures include: 1. We have reviewed and discussed this case in detail at yesterday's staff meeting to re-educate on our processes, and discuss best practices with clear and proactive communications. 2. We have decided to pilot a process of putting active transportation cases on our electronic "Active Cases" dashboard to eliminate gaps when staff change shifts. RCA by Donor Alliance found: DA organ staff needs to communicate with the tissue staff when an organ is to be picked up by a courier company. CA is to implement a communication process (white board and log for communication between organ and tissue teams).

221. However, UNOS never conducted any additional inquiries or investigations and never referred the matter to MPSC.

Good Morning █

█ forwarded my team your email regarding closure of an event submitted by CORS in April 2018. Our protocol is to send formal closure correspondence for events when we've first sent an inquiry to request additional information (and sometimes RCAs, CAPs) from a member. I've just reviewed the case and see that UNOS didn't send an inquiry, so no closure letter would've been sent. I'm attaching the Acknowledgement letter that was sent when your team submitted the event to the system. This will be the only correspondence to CORS for this case. Please let me know if you have questions about this.

Kind regards,

█

*Safety Analyst*

 UNITED NETWORK
FOR ORGAN SHARING

## Jackson Memorial Hospital Transplant Center

222.     Jackson Memorial Hospital Transplant Center in Miami made a report to UNOS
after a kidney was discarded after it was lost in transit. The kidney came from We Are Sharing
Hope (SCOP). American Airlines lost the kidney, and only found the kidney after it was no
longer usable. UNOS reviewed the case and contacted SCOP who noted that the problem was the
result of transportation and courier issues. UNOS never sent the case to MPSC.

| From: | █@lifepoint-sc.org> |
|---|---|
| Sent: | Wednesday, October 14, 2015 1:05 PM |
| To: | █ |
| Cc: | █ |
| Subject: | Request for Information -Donor AC█ |



█

Here is a time line of the transportation issues that we had with the right kidney on █ We use Network Global Logistics (NGL) for out of state courier services. NGL normally uses Delta Airlines as primary and United Airlines as secondary on all jobs. On this particular day, Delta's systems were down and could not accept shipments. United did not have a flight that arrived in Miami before the American Airlines flight. Therefore, we used American for this shipment.

The package was in the custody of American Airlines when it was lost. Since the shipment agreement was between NGL and American Airlines, we have not been in direct contact with the airline. I spoke to ████████, Escalations Manager at NGL, who spoke to American Airlines about the lost package. The airline told him that the package was misplaced after it was scanned in upon arrival at Miami Airport. A search of the plane and immediate area around the ramp was unsuccessful. A more extensive search of the entire ramp/cargo/luggage area was conducted and the package was

223.    This was one of three transportation errors at SCOP between 2015-2017.

| | | | | | | |
|---|---|---|---|---|---|---|
| 9/25/15 | SCOP | | ██ | | | Transport issues/decline |
| 3/1/16 | ██ | | ██ | | | Courier dropped off wrong KI |
| 3/15/16 | ██ | | | | | KI Laterality Courier |
| 3/21/16 | ██ | | | | | Chain of custody |
| 6/2/16 | ██ | | | | | Pancreas forgotten at airport |
| 6/10/16 | SCOP | | | | | Courier dropped off wrong KI |
| 6/13/16 | ██ | | | | | Transportation |
| 6/30/16 | ██ | | | | | Pancreas missed flight |
| 8/2/16 | ██ | | | | | Courier left organ |
| 8/5/16 | ██ | | | | | Air transport kidney |
| 8/10/16 | ██ | | | | | Transportation TTM |
| 9/21/16 | ██ | | | | | Courier kidney |
| 2/27/17 | ██ | | | ██ | | Missed flight |
| 2/27/17 | ██ | | | ██ | | Missed flight |
| 3/6/17 | SCOP | | ██ | | | Missed flight |

### Indiana Donor Network

224.    UNOS received a tip from an anonymous caller about Indiana Donor Network (INOP) regarding a donor that was still alive when his organs were recovered and that the surgeon — who initially declared death — proceeded with organ recovery after it was clear the donor did not die until ten minutes into the organ recovery.

Caller wished to remain anonymous, so did not obtain name or number. Did not want UNOS to contact and even asked if he was speaking on a recorded line. He just said that he had heard things that had been weighing on him and he wanted to ensure that UNOS knew and looked into it.

Donor ID: ████████ (INOP)
DCD Donor
Date of event: 2/23/2017

Concerns:

- Donor was alive when he was opened to recover organs.
- Support was withdrawn in the OR and the team monitored the HR for 5 minutes.
- Donor was opened.
- After the donor was opened, a heartbeat was identified. Heart rate was again monitored, and ten minutes later the donor died.
- Sources have told the reporter that the recovering surgeon was the physician who declared death, then proceeded with organ recovery.
- The attending may have been in the room the whole time, but reporter says he is privy to information that says otherwise and that the recovering surgeon declared the patient dead.
- He wants to ensure that we review the DCD vitals in the attachments and take note of times.

Thanked him for calling, again assured him that he would be anonymous, but that we would be investigating this case. He had no desire to have me contact him, and said he might call the week after next—he didn't even want to share information with other safety analysts by calling the MRL next week if he had any updates.

225. A UNOS analyst marked this a "medium" case and checked "no" for a question asking if there was direct harm to a patient. UNOS closed the case without referral to MPSC.

Category Assigned:

☐ High (AD/Director to notify Executive Director and Assistant Executive Director immediately. Preliminary investigation complete within 24 hours.)

☒ Medium (AD/Director to notify Executive Director and Assistant Executive Director within 3 days of receipt of intake.)

☐ Low (OIG A-9: Audit & Monitoring; OPTN Exec Director and HRSA will be provided a notice...

2. Was there direct and specific harm to an identified patient or patients?   ☐ Yes  ☒ No

226. At the same time this tip was reported, INOP was under review by UNOS and CMS for INOP's failure to properly record donors' brain death declaration and documentation, and was serving probation.

As President of the Organ Procurement and Transplantation Network (OPTN) and United Network for Organ Sharing (UNOS), I am writing to inform you of an adverse action taken by the OPTN/UNOS Board of Directors in response to its review of Indiana Donor Network (INOP).

At its meeting on December 5-6, 2016, the Board of Directors placed INOP on Probation. The Board adopted the following resolution:

> RESOLVED, that the Board of Directors places Indiana Donor Network on Probation based violation of Policy 2.2 (OPO Responsibilities), effective December 6, 2016.

The Board approved this resolution by a vote of 34 For, 0 Against, and 0 Abstentions.

## Life Alliance Recovery Organization

227.     Life Alliance Recovery Organization (FLMP) recovered organs from a donor before the donor's heart stopped and against the family's wishes. The donor was declared brain dead and the family consented to transplantation following cardiac death, but they withdrew their consent prior to the recovery.

228.     MPSC reviewed the case and FLMP's submission, which stated that the root cause of the issue was the emotional state of the donor's mother.

Late entry Mother ▆▆▆ and brother ▆▆▆ arrived at the Hosital just minutes before OR , we briefly gathered in patient's room to make the pertinent arrangements for the WDLS process. When required, we escorted patient's bed to the OR. Personalized Moment of Honor was read and then patient was extubated. We exited the OR and mom became very distraught. I deemed appropriate stay with them for family support and I was able to address their concerns about next steps since they are planning a viewing in ▆▆▆▆▆. Around 18:00 mom decided to leave and politely asked me to call them once OR finished. Received a notification from DMC ▆▆▆ with the OR outcomes. A call was placed to Brother ▆▆▆ who was very grateful for our communication.

229.     CMS also conducted a complaint survey about the case, and approved FLMP's corrective measures and found FLMP compliant. However, MPSC issued FLMP a letter of warning for violation of policy and expressed concerns about the culture of the OPO in its decision.

The MPSC appreciated FLMP's presentation, but still has concerns regarding the OPO's Quality Assurance and Performance Improvement (QAPI) program and its culture and leadership. The committee was also concerned by FLMP's decision to re-approach the donor's mother after the recovery to gain documentation of authorization for brain-death recovery, and believed this may have caused additional, unnecessary emotional injury to the donor family.

Based on its review, the MPSC approved the following:

> RESOLVED, that the Membership and Professional Standards Committee issues a Letter of Warning to Life Alliance Organ Recovery Agency for violation of Policy 2.15.H (Organ Recovery).

## B. UNOS Cybersecurity Issues

230.    In their role as the facilitator of organ procurement matching, UNOS manages an online platform, UNet, to match donors with organs across the country. As the current OPTN contractor, UNOS is responsible for the safety, security, and efficiency of this system.

231.    Parties within the organ donation and procurement world, such as OPOs, transplant centers, and hospitals, rely on UNet to match patients with donors.

232.    UNet is comprised of four subsystems:

   a.    UNet Waitlist, which adds eligible transplant candidates to the national waitlist and stores their health data;

   b.    UNet DonorNet, which stores the health data for eligible organ donors and matches transplant patients with donors;

   c.    UNet TransNet, which is responsible for the packaging and labeling of organs to ensure they reach their intended patient efficiently; and,

   d.    UNet TIEDI, which maintains records for transplant patients and donors. That collected data is used to support the implementation of performance improvement initiatives.

233. However, UNOS fails to safeguard the cybersecurity of this system and shirks its obligation to protect patients' confidential health information.

234. This failure is evidenced by numerous data breaches that have exposed patient information. Most recently, owing in part to UNOS's lax oversight, a data breach of UNOS's systems in December 2023 exposed over 1.2 million patient records.

235. These security breaches in 2022 and 2023 exposed personal identifiable information and protected health information, including social security numbers, patient treatment information, and medical diagnoses of over one million people.

236. HRSA is responsible for overseeing UNOS's cybersecurity. It has a Chief Information Security Officer whose job it is to ensure that whoever holds the OPTN contract, which has always been UNOS, has adequate cybersecurity controls in place.

237. HHS officials have admitted that they do not have an "in-depth IT staff" in place to effectively assess UNOS' cybersecurity practices. This leaves HRSA unable to effectively audit and monitor UNOS's technologies.

238. An OIG audit found that until 2018, the OPTN contract had no cybersecurity requirements in place and HRSA conducted limited oversight over UNOS' technology. Even after federal cybersecurity requirements were implemented in 2018, OIG still found oversight was lacking and UNOS was not in compliance with federal standards.

239. Additionally, UNOS uses outdated technology and stores their backend data in physical data centers. Both of these practices make patients' personal data especially vulnerable to hacking or external physical damage.

240. One leading healthcare technology executive described UNOS' technology practices as "literally duct tape" due to their outdated technologies and vulnerabilities. UNOS has even had its system crash for a total of 17 days since 1999.

241. In February 2022, the Senate Finance Committee warned Department of Homeland Security officials and intelligence agencies of the system's vulnerability to cyberattacks, and stated they have "no confidence" in the system's security.

242. UNOS is aware of these vulnerabilities, but refuses any changes to their code and has denied the federal government access to audit their technologies nearly 100 times.

243. Former UNOS CEO Brian Shepard has represented publicly that UNOS' system is secure and effective and criticized a report by the United States Digital Service for "read[ing] more like an op-ed".

244. Despite these clearly documented issues, UNOS safeguards its shoddy system and claims it is a "trade secret" worth $55 million.

## X.     PARKLAND RETALIATED AGAINST RELATOR CHASE

245. As discussed above, Relator Chase repeatedly reported the Parkland fraud, including raising the fraud with UNOS.

246. Relator Chase had always met or exceeded expectations in his performance reviews before reporting the fraud.

247. Relator Chase had also applied for, and was offered, a position with the Southwest Transplant Alliance. Southwest Transplant Alliance revoked the job offer on the same day that UNOS closed its investigation.

248. Relator Chase's direct supervisor at Parkland, Patricia Shirey, then informed Relator Chase that she had to give Relator-Chase a written warning. The stated reason for the warning was for Relator Chase's need to manage his emotions, body language, and tone with staff and improve his communications.

249. However, Shirey told Relator Chase that she "didn't agree with it but senior leadership was forcing her to and if she didn't write him up her job would be on the line also." Shirey stated that she informed Yvonne Alsbury, who worked in Parkland's human resources team, that Relator Chase had done nothing wrong, and there had been no prior coaching she could reference in a write up, so Alsbury instructed Shirey to "make something up."

250. This written warning was in direct retaliation for Relator Chase's protected activity.

251. Relator Chase understood that Parkland intended to continue to retaliate against him and eventually terminate him. Parkland's actions operated as a constructive discharge and Relator-Chase therefore left Parkland to find new employment.

## XI. CLAIMS FOR RELIEF

<div align="center">

**Claim for Relief I**
**Violations of False Claims Act (31 U.S.C. § 3729(a)(1)(A))**
**Presentation of False Claims**
**(All Defendants)**

</div>

252. Relator realleges and incorporates by reference all foregoing allegations as though fully set forth therein.

253. Through the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment.

254.     Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the Government and/or to contractors, grantees, or other recipients of Government funds used to advance Government interests, materially false and fraudulent claims for payment.

255.     The Government paid claims and incurred losses, and/or contractors, grantees, or other recipients of Government funds used to advance Government interests paid claims and incurred losses, as a result of Defendants' wrongful conduct.

256.     The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, paid and continues to pay claims that the Government would not have paid but for Defendants' illegal conduct.

257.     Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities throughout the United States. Relator has no control over, or dealings with, such entities and has no access to the records in their possession.

258.     By reason of such false and/or fraudulent claims, the Government has been damaged in a substantial amount to be determined at trial and is entitled to three times its damages plus a civil penalty as required by law for each violation.

### Claim for Relief II
### Violations of False Claims Act (31 U.S.C. § 3729(a)(1)(B))
### Use of False Statements
### (All Defendants)

259.     Relator realleges and incorporates by reference all foregoing allegations as though fully set forth therein.

260.     Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to false or fraudulent claims to the Government and/or to contractors, grantees, or other recipients of Government funds used to advance Government interests.

261.     The Government paid claims and incurred losses, and/or contractors, grantees, or other recipients of Government funds used to advance Government interests paid claims and incurred losses, as a result of Defendants' wrongful conduct.

262.     Relator cannot at this time identify all of the false statements material to false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities throughout the United States. Relator has no control over, or dealings with, such entities and has no access to the records in their possession.

263.     By reason of such false and/or fraudulent statements, the Government has been damaged in such a substantial amount to be determined at trial and is entitled to three times its damages plus and civil penalty as required by law for each violation.

<div align="center">

**Claim for Relief III**
**Violations of False Claims Act (31 U.S.C. § 3729(a)(1)(G))**
**Reverse False Claims**
**(All Defendants)**

</div>

264.     Relator realleges and incorporates by reference all foregoing allegations as though fully set forth therein.

265.     Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements

material to an obligation to pay or transmit money to the Government and/or to contractors, grantees, or other recipients of Government funds used to advance Government interests.

266.    As a result of Defendants' wrongful conduct, the Government incurred losses, and/or contractors, grantees, or other recipients of Government funds used to advance Government interests incurred losses, because an obligation to transmit money was avoided.

267.    Relator cannot at this time identify all of the avoided claims for payment that were caused by Defendants' conduct. The avoided claims were presented by numerous separate entities across the United States. Relator has no control over, or dealings with, such entities, and has no access to the records in their possession.

268.    By reason of such false and/or fraudulent claims, the Government has been damaged in a substantial amount to be determined at trial and is entitled to three times its damages plus a civil penalty as required by law for each violation.

### Claim for Relief IV
### Violations of False Claims Act (31 U.S.C. §3730(h))
### Retaliation
### (Parkland Health and Hospital System)

269.    Relator incorporates by reference herein each of the preceding paragraphs as if fully set forth in this paragraph.

270.    Relator engaged in protected activity under the FCA by investigating and reporting Defendant Parkland's false or fraudulent practices internally, including issues related to the unjustified rejection of organs for Parkland patients in need of transplant in favor of those same organs being transplanted into UT Southwestern Patients.

271.    Defendant Parkland had knowledge of Relator's protected activity.

272.     Following Relator's protected activity, Relator was removed from his position, harassed by Defendant, and eventually forced out of his job due to Defendant's retaliatory conduct.

273.     The False Claims Act provides that the Relator is entitled to two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorney's fees.

## Claim for Relief V
## California False Claims Act
## Cal. Gov't Code §§ 12650–12656

274.     Relator realleges and incorporates by reference all foregoing allegations as though fully set forth in this paragraph.

275.     Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of California and/or to contractors, grantees, or other recipients of the State of California funds used to advance the State of California's interests, false and fraudulent claims for payment.

276.     The State of California paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of California funds used to advance the interests of the State of California paid claims and incurred losses, as a result of Defendants' wrongful conduct.

277.     By reason of such false and/or fraudulent claims, the State of California has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

278.     Pursuant to Cal. Govt. Code § 12651(a), the State of California is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every

false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by Defendants.

279.     Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of California. Relator has no control over or dealings with such entities and has no access to the records in their possession.

280.     The State of California, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of California would not have paid but for Defendants' illegal conduct.

281.     By reason of Defendants' acts, the State of California has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

282.     Additionally, the State of California is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

283.     Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of California pursuant to Cal. Gov't Code § 12652(c)(1).

### Claim for Relief VI
### Colorado False Claims Act
### Cal. Gov't Code §§ 12650–12656

284.     Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

285.     Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Colorado and/or to

contractors, grantees, or other recipients of the State of Colorado funds used to advance the interests of the State of Colorado, false and fraudulent claims for payment.

286.    The State of Colorado paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Colorado funds used to advance the interests of the State of Colorado paid claims and incurred losses, as a result of Defendants' wrongful conduct.

287.    By reason of such false and/or fraudulent claims, the State of Colorado has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

288.    Pursuant to Col. Rev. Stat. § 25.5-4-305, the State of Colorado is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by Defendants.

289.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Colorado pursuant to Colo. Rev. Stat § 25.5-4-306(2).

<div style="text-align:center">

**Claim for Relief VII**
**Connecticut False Claims Act**
**Conn. Gen. Stat. §§ 4-274 to -289**

</div>

290.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

291.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Connecticut and/or to contractors, grantees, or other recipients of the State of Connecticut funds used to advance the interests of the State of Connecticut, false and fraudulent claims for payment.

292.    The State of Connecticut paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Connecticut funds used to advance the interests of the State of Connecticut paid claims and incurred losses, as a result of Defendants' wrongful conduct.

293.    By reason of such false and/or fraudulent claims, the State of Connecticut has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

294.    Pursuant to Conn. Gen. Stat. § 4-275, the State of Connecticut is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by Defendants.

295.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Connecticut pursuant to Conn. Gen. Stat. § 4-277.

<div align="center">

**Claim for Relief VIII**
**Delaware False Claims and Reporting Act**
**Del. Code Ann. tit. 6, §§ 1201–1211**

</div>

296.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

297.    Defendants knowingly, or acting with deliberate ignorance and/or reckless Disregard of the truth, presented and/or caused to be presented, to the State of Delaware and/or to contractors, grantees, or other recipients of the State of Delaware funds used to advance the interests of the State of Delaware, false and fraudulent claims for payment.

298.     The State of Delaware paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Delaware funds used to advance the interests of the State of Delaware paid claims and incurred losses, as a result of Defendants' wrongful conduct.

299.     By reason of such false and/or fraudulent claims, the State of Delaware has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

300.     Pursuant to Del. Code Ann. tit. 6, § 1201(a), the State of Delaware is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by Defendants.

301.     Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Delaware pursuant to Del. Code Ann. tit. 6, § 1203(b).

<div align="center">

**Claim for Relief IX**
**Florida False Claims Act**
**Fla. Stat. §§ 68.081–.09**

</div>

302.     Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

303.     This is a claim for treble damages and penalties under the Florida False Claims Act.

304.     Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Florida and/or to contractors, grantees, or other recipients of the State of Florida funds used to advance the interests of the State of Florida, false and fraudulent claims for payment.

305. The State of Florida paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Florida funds used to advance the interests of the State of Florida paid claims and incurred losses, as a result of Defendants' wrongful conduct.

306. By reason of such false and/or fraudulent claims, the State of Florida has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

307. Pursuant to Fla. Stat. Ann. § 68.082, the State of Florida is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

308. Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Florida pursuant to Fla. Stat. § 68.083.

### Claim for Relief X
### Georgia False Medicaid Claims Act
### Ga. Code Ann. §§ 49-4-168 to -168.6

309. Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

310. Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Georgia and/or to contractors, grantees, or other recipients of the State of Georgia funds used to advance the interests of the State of Georgia, false and fraudulent claims for payment.

311. The State of Georgia paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Georgia funds used to advance the interests of the State of Georgia paid claims and incurred losses, as a result of Defendants' wrongful conduct.

312. By reason of such false and/or fraudulent claims, the State of Georgia has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

313. Pursuant to Ga. Code Ann. § 49-4-168.1(a), the State of Georgia is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

314. Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Georgia pursuant to Ga. Code Ann. §49-4-168.

## Claim for Relief XI
## Hawaii False Claims Act
## Haw. Rev. Stat. §§ 661-21 to -31

315. Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Hawaii and/or to contractors, grantees, or other recipients of the State of Hawaii funds used to advance the interests of the State of Hawaii, false and fraudulent claims for payment.

316. The State of Hawaii paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Hawaii funds used to advance the interests of the State of Hawaii paid claims and incurred losses, as a result of Defendants' wrongful conduct.

317. By reason of such false and/or fraudulent claims, the State of Hawaii has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

318. Pursuant to Haw. Rev. Stat. § 661-21(a), the State of Hawaii is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

319. Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Hawaii pursuant to Haw. Rev. Stat. § 661-25.

<div align="center">

**Claim for Relief XII**
**Illinois False Claims Act**
**740 Ill. Comp. Stat. 175/1–175/8**

</div>

320. Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

321. Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Illinois and/or to contractors, grantees, or other recipients of the State of Illinois funds used to advance the interests of the State of Illinois, false and fraudulent claims for payment.

322. The State of Illinois paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Illinois funds used to advance the interests of the State of Illinois paid claims and incurred losses, as a result of Defendants' wrongful conduct.

323. By reason of such false and/or fraudulent claims, the State of Illinois has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

324. Pursuant to 740 Ill. Comp. Stat. § 175/3(a), the State of Illinois is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

325. Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Illinois pursuant to 740 Ill. Comp. Stat. 175/4(b).

**Claim for Relief XIII**
**Indiana Medicaid False Claims and Whistleblower Protection Act**
**Ind. Code §§ 5-11-5.5-7 to -18**

326. Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

327. Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Indiana and/or to contractors, grantees, or other recipients of the State of Indiana funds used to advance the interests of the State of Indiana, false and fraudulent claims for payment.

328. The State of Indiana paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Indiana funds used to advance the interests of the State of Indiana paid claims and incurred losses, as a result of Defendants' wrongful conduct.

329. By reason of such false and/or fraudulent claims, the State of Indiana has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

330. Pursuant to Ind. Code § 5-11-5.7-2(b), the State of Indiana is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

331. Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Indiana pursuant to Ind. Code § 5-11-5.7-4(a).

<div style="text-align:center">

**Claim for Relief XIV**
**Iowa False Claims Act**
**Iowa Code §§ 685.1–.7**

</div>

332. Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

333. Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Iowa and/or to contractors, grantees, or other recipients of the State of Iowa funds used to advance the interests of the State of Iowa, false and fraudulent claims for payment.

334. The State of Iowa paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Iowa funds used to advance the interests of the State of Iowa paid claims and incurred losses, as a result of Defendants' wrongful conduct.

335.    By reason of such false and/or fraudulent claims, the State of Iowa has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

336.    Pursuant to Iowa Code § 685.2, the State of Iowa is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

337.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Iowa pursuant to Iowa Code § 685.3(2).

<div align="center">

**Claim for Relief XV**
**Louisiana Medical Assistance Programs Integrity Law**
**La. Rev. Stat. Ann. §§ 46:437–:440**

</div>

338.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

339.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Louisiana and/or to contractors, grantees, or other recipients of the State of Louisiana funds used to advance the interests of the State of Louisiana, false and fraudulent claims for payment.

340.    The State of Louisiana paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Louisiana funds used to advance the interests of the State of Louisiana paid claims and incurred losses, as a result of Defendants' wrongful conduct.

341. By reason of such false and/or fraudulent claims, the State of Louisiana has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

342. Pursuant to La. Rev. Stat. Ann. § 46:438.6, the State of Louisiana is entitled to three times the amount of actual damages plus the maximum penalty and fine allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

343. Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Louisiana pursuant to La. Rev. Stat. Ann. § 46:439.1.

### Claim for Relief XVI
### Maryland False Health Claims Act
### Md. Code Ann., Health-Gen. §§ 2-601 to -611

344. Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

345. Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Maryland and/or to contractors, grantees, or other recipients of the State of Maryland funds used to advance the interests of the State of Maryland, false and fraudulent claims for payment.

346. The State of Maryland paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Maryland funds used to advance the interests of the State of Maryland paid claims and incurred losses, as a result of Defendants' wrongful conduct.

347. By reason of such false and/or fraudulent claims, the State of Maryland has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

348. Pursuant to Md. Health-General Code Ann. § 2-602(b)(i) and (ii), the State of Maryland is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

349. Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Maryland pursuant to Md. Code Ann., Health-Gen. § 2-604(a)(1).

<div align="center">

**Claim for Relief XVII**
**Massachusetts False Claims Act**
**Mass. Gen. Laws ch. 12, §§ 5A–5O**

</div>

350. Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

351. Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the Commonwealth of Massachusetts and/or to contractors, grantees, or other recipients of the Commonwealth of Massachusetts funds used to advance the interests of the Commonwealth of Massachusetts, false and fraudulent claims for payment.

352. The Commonwealth of Massachusetts paid claims and incurred losses, and/or contractors, grantees, or other recipients of the Commonwealth of Massachusetts funds used to advance the interests of the Commonwealth of Massachusetts paid claims and incurred losses, as a result of Defendants' wrongful conduct.

353. By reason of such false and/or fraudulent claims, the Commonwealth of Massachusetts has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

354. Pursuant to Mass. Gen. Law. ch. 12, § 5B, the Commonwealth of Massachusetts is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

**355.** Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the Commonwealth of Massachusetts pursuant to Mass. Gen. Laws. ch. 12, § 5C(2).

<center>

**Claim for Relief XVIII**
**Michigan Medicaid False Claims Act**
**Mich. Comp. Laws §§ 400.601–.615**

</center>

356. Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

357. Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Michigan and/or to contractors, grantees, or other recipients of the State of Michigan funds used to advance the interests of the State of Michigan, false and fraudulent claims for payment.

358. The State of Michigan paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Michigan funds used to advance the interests of the State of Michigan paid claims and incurred losses, as a result of Defendants' wrongful conduct.

359. By reason of such false and/or fraudulent claims, the State of Michigan has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

360. Pursuant to Mich. Comp. Laws § 400.612, the State of Michigan is entitled to a civil penalty equal to the full amount received by the person benefiting from the fraud, three times the amount of actual damages, plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement presented or caused to be presented by the Defendants.

361. Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Michigan pursuant to Mich. Comp. Laws § 400.610a.

<div align="center">

**Claim for Relief XIX**
**Minnesota False Claims Act**
**Minn. Stat. §§ 15C.01–.16**

</div>

362. Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

363. Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Minnesota and/or to contractors, grantees, or other recipients of the State of Minnesota funds used to advance the interests of the State of Minnesota, false and fraudulent claims for payment.

364. The State of Minnesota paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Minnesota funds used to advance the interests of the State of Minnesota paid claims and incurred losses, as a result of Defendants' wrongful conduct.

365. By reason of such false and/or fraudulent claims, the State of Minnesota has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

366. Pursuant to Minn. Stat. § 15C.02(a), the State of Minnesota is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

367. Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Minnesota pursuant to Minn. Stat. § 15C.05.

**Claim for Relief XX**
**Montana False Claims Act**
**Mont. Code Ann. §§ 17-8-401 to -413**

368. Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

369. Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Montana and/or to contractors, grantees, or other recipients of the State of Montana funds used to advance the interests of the State of Montana, false and fraudulent claims for payment.

370. The State of Montana paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Montana funds used to advance the interests of the State of Montana paid claims and incurred losses, as a result of Defendants' wrongful conduct.

371. By reason of such false and/or fraudulent claims, the State of Montana has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

372. Pursuant to Mont. Code Ann. § 17-8-403, the State of Montana is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

373. Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Montana pursuant to Mont. Code Ann. § 17-8-406.

## Claim for Relief XXI
### Nevada Submission of False Claims to State or Local Government
### Nev. Rev. Stat. §§ 357.010–.250

374. Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

375. Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Nevada and/or to contractors, grantees, or other recipients of the State of Nevada funds used to advance the interests of the State of Nevada, false and fraudulent claims for payment.

376. The State of Nevada paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Nevada funds used to advance the interests of the State of Nevada paid claims and incurred losses, as a result of Defendants' wrongful conduct.

377. By reason of such false and/or fraudulent claims, the State of Nevada has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

378. Pursuant to Nev. Rev. Stat. § 357.040(1), the State of Nevada is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

379. Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Nevada pursuant to Nev. Rev. Stat. § 357.080.

**Claim for Relief XII**
**New Jersey False Claims Act**
**N.J. Stat. Ann. §§ 2A:32C-1 to -18**

380. Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

381. Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of New Jersey and/or to contractors, grantees, or other recipients of the State of New Jersey funds used to advance the interests of the State of New Jersey, false and fraudulent claims for payment.

382. The State of New Jersey paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of New Jersey funds used to advance the interests of the State of New Jersey paid claims and incurred losses, as a result of Defendants' wrongful conduct.

383. By reason of such false and/or fraudulent claims, the State of New Jersey has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

384. Pursuant to N.J. Stat. Ann. § 2A:32C-3, the State of New Jersey is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

385. Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of New Jersey pursuant to N.J. Stat. Ann. § 2A:32C-5.

<div align="center">

**Claim for Relief XIII**
**New Mexico Medicaid False Claims**
**N.M. Stat. Ann. §§ 27-14-1 to -15**

</div>

386. Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

387. Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of New Mexico Medicaid program and/or to contractors, grantees, or other recipients of the State of New Mexico funds used to advance the interests of the State of New Mexico Medicaid program, false and fraudulent claims for payment.

388. The State of New Mexico Medicaid program paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of New Mexico Medicaid program funds used to advance the interests of the State of New Mexico paid claims and incurred losses, as a result of Defendants' wrongful conduct.

389. By reason of such false and/or fraudulent claims, the State of New Mexico Medicaid program has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by the New Mexico Medicaid False Claims Act for each violation.

390. Pursuant to N.M. Stat. Ann. § 27-14-4, the State of New Mexico is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

391. Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of New Mexico pursuant to N.M. Stat. Ann. § 27-14-8.

### Claim for Relief XIV
### New Mexico Fraud Against Taxpayers Act
### N.M. Stat. Ann. §§ 44-9-1 to -14

392. Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

393. Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of New Mexico and/or to contractors, grantees, or other recipients of the State of New Mexico funds used to advance the interests of the State of New Mexico, false and fraudulent claims for payment.

394. The State of New Mexico paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of New Mexico funds used to advance the interests of the State of New Mexico paid claims and incurred losses, as a result of Defendants' wrongful conduct.

395. By reason of such false and/or fraudulent claims, the State of New Mexico has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

396. Pursuant to N.M. Stat. Ann. §44-9-3(C), the State of New Mexico is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

397. Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of New Mexico pursuant to N.M. Stat. Ann. § 44-9-5.

<div align="center">

**Claim for Relief XV**
**New York False Claims Act**
**N.Y. State Fin. Law §§ 187–194**

</div>

398. Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

399. Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of New York and/or to contractors, grantees, or other recipients of the State of New York funds used to advance the interests of the State of New York, false and fraudulent claims for payment.

400. The State of New York paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of New York funds used to advance the interests of the State of New York paid claims and incurred losses, as a result of Defendants' wrongful conduct.

401. By reason of such false and/or fraudulent claims, the State of New York has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

402. Pursuant to N.Y. State Fin. Law § 189(1), the State of New York is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

403. Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of New York pursuant to N.Y. State Fin. Law § 190(2).

## Claim for Relief XVI
## North Carolina False Claims Act
## N.C. Gen. Stat. §§ 1-605 to -618

404. Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

405. Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of North Carolina and/or to contractors, grantees, or other recipients of the State of North Carolina funds used to advance the interests of the State of North Carolina, false and fraudulent claims for payment.

406. The State of North Carolina paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of North Carolina funds used to advance the interests of the State of North Carolina paid claims and incurred losses, as a result of Defendants' wrongful conduct.

407. By reason of such false and/or fraudulent claims, the State of North Carolina has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

408. Pursuant to N.C. Gen. Stat. § 1-607(a), the State of North Carolina is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

409. Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of North Carolina pursuant to N.C. Gen. Stat. § 1-608(b).

<div style="text-align:center">

**Claim for Relief XVII**
**Oklahoma Medicaid False Claims Act**
**Okla. Stat. tit. 63, §§ 5053–5053.7**

</div>

410. Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

411. Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Oklahoma and/or to contractors, grantees, or other recipients of the State of Oklahoma funds used to advance the interests of the State of Oklahoma, false and fraudulent claims for payment.

412. The State of Oklahoma paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Oklahoma funds used to advance the interests of the State of Oklahoma paid claims and incurred losses, as a result of Defendants' wrongful conduct.

413. By reason of such false and/or fraudulent claims, the State of Oklahoma has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

414. Pursuant to 63 Okla. Stat. § 5053.1(B), the State of Oklahoma is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

415. Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Oklahoma pursuant to Okla. Stat. tit. 63, § 5053.3.

<div align="center">

**Claim for Relief XVIII**
**Rhode Island False Claims Act**
**R.I. Gen. Laws §§ 9-1.1-1 to -9**

</div>

416. Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

417. Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Rhode Island and/or to contractors, grantees, or other recipients of the State of Rhode Island funds used to advance the interests of the State of Rhode Island, false and fraudulent claims for payment.

418. The State of Rhode Island paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Rhode Island funds used to advance the interests of the State of Rhode Island paid claims and incurred losses, as a result of Defendants' wrongful conduct.

419. By reason of such false and/or fraudulent claims, the State of Rhode Island has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

420. Pursuant to R.I. Gen. Laws § 9-1.1-3, the State of Rhode Island is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

421. Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Rhode Island pursuant to R.I. Gen. Laws § 9-1.1-4(b).

**Claim for Relief XXIX**
**Tennessee Medicaid False Claims Act**
**Tenn. Code Ann. §§ 7-5-181 to -185**

422. Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

423. Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Tennessee and/or to contractors, grantees, or other recipients of the State of Tennessee funds used to advance the interests of the State of Tennessee, false and fraudulent claims for payment.

424. The State of Tennessee paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Tennessee funds used to advance the interests of the State of Tennessee paid claims and incurred losses, as a result of Defendants' wrongful conduct.

425. By reason of such false and/or fraudulent claims, the State of Tennessee has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

426. Pursuant to Tenn. Code § 71-5-182(a)(1), the State of Tennessee is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

427. Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Tennessee pursuant to Tenn. Code Ann. § 71-5-183(b).

**Claim for Relief XXX**
**Texas Medicaid Fraud Prevention Law**
**Tex. Hum. Res. Code Ann. §§ 36.001–.132**

428. Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

429. Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Texas and/or to contractors, grantees, or other recipients of the State of Texas funds used to advance the interests of the State of Texas, false and fraudulent claims for payment.

430. The State of Texas paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Texas funds used to advance the interests of the State of Texas paid claims and incurred losses, as a result of Defendants' wrongful conduct.

431. By reason of such false and/or fraudulent claims, the State of Texas has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

432. Pursuant to Tex. Hum. Res. Code Ann. § 36.052, the State of Texas is entitled to the full amount received by the person benefiting from the fraud, two times the amount of actual damages, plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

433. Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Texas pursuant to Tex. Hum. Res. Code Ann. § 36.101.

<div align="center">

**Claim for Relief XXXI**
**Vermont False Claims Act**
**Vt. Stat. Ann. tit. 32, §§ 630–642**

</div>

434. Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

435. Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Vermont and/or to contractors, grantees, or other recipients of the State of Vermont funds used to advance the interests of the State of Vermont, false and fraudulent claims for payment.

436. The State of Vermont paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Vermont funds used to advance the interests of the State of Vermont paid claims and incurred losses, as a result of Defendants' wrongful conduct.

437.    By reason of such false and/or fraudulent claims, the State of Vermont has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

438.    Pursuant to 32 V.S.A. §§ 631-32, the State of Vermont is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

439.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Vermont pursuant to Vt. Stat. Ann. tit. 32, § 632(b)(1).

## Claim for Relief XXXII
## Virginia Fraud Against Taxpayers Act
## Va. Code Ann. §§ 8.01-216.1 to .19

440.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

441.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the Commonwealth of Virginia and/or to contractors, grantees, or other recipients of the Commonwealth of Virginia funds used to advance the interests of the Commonwealth of Virginia, false and fraudulent claims for payment.

442.    The Commonwealth of Virginia paid claims and incurred losses, and/or contractors, grantees, or other recipients of the Commonwealth of Virginia funds used to advance the interests of the Commonwealth of Virginia paid claims and incurred losses, as a result of Defendants' wrongful conduct.

443. By reason of such false and/or fraudulent claims, the Commonwealth of Virginia has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

444. Pursuant to Va. Code Ann. § 8.01-216.3(A), the Commonwealth of Virginia is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

445. Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the Commonwealth of Virginia pursuant to Va. Code Ann. § 8.01-216.5(a).

### Claim for Relief XXXIII
### Washington State Medicaid Fraud False Claims Act
### Wash. Rev. Code §§ 74.66.005–.130

446. Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

447. Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Washington and/or to contractors, grantees, or other recipients of the State of Washington funds used to advance the interests of the State of Washington, false and fraudulent claims for payment.

448. The State of Washington paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Washington funds used to advance the interests of the State of Washington paid claims and incurred losses, as a result of Defendants' wrongful conduct.

449. By reason of such false and/or fraudulent claims, the State of Washington has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

450. Pursuant to Rev. Code Wash. § 74.66.020(1), the State of Washington is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

451. Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Washington pursuant to Wash. Rev. Code § 74.66.050.

<div align="center">

**Claim for Relief XXXV**
**The District of Columbia False Claims Law**
**D.C. Code §§ 2-381.01 to .09**

</div>

452. Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

453. Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the District of Columbia and/or to contractors, grantees, or other recipients of the District of Columbia funds used to advance the interests of the District of Columbia, false and fraudulent claims for payment.

454. The District of Columbia paid claims and incurred losses, and/or contractors, grantees, or other recipients of the District of Columbia funds used to advance the interests of the District of Columbia paid claims and incurred losses, as a result of Defendants' wrongful conduct.

455.     By reason of such false and/or fraudulent claims, the District of Columbia has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

456.     Pursuant to D.C. Code Ann. § 2-381.02, the District of Columbia is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

457.     Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the District of Columbia pursuant to D.C. Code § 2-308.15(b)(1).

<div align="center">

**Claim for Relief XXXVI**
**False Claims to Government of Puerto Rico Programs, Contracts, and Services Act**
**P.R. Laws tit. 32 § 2934 *et. seq.* (2020)**

</div>

458.     Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

459.     Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the Commonwealth of Puerto Rico and/or to contractors, grantees, or other recipients of Commonwealth of Puerto Rico funds used to advance the interests of the Commonwealth of Puerto Rico, false and fraudulent claims for payment.

460.     The Commonwealth of Puerto Rico paid claims and incurred losses, and/or contractors, grantees, or other recipients of the Commonwealth of Puerto Rico funds used to advance the interests of the Commonwealth of Puerto Rico paid claims and incurred losses, as a result of Defendants' wrongful conduct.

461.    By reason of such false and/or fraudulent claims, the Commonwealth of Puerto Rico has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

462.    Pursuant to P.R. Laws tit. 32 § 2934(1)(d), the Commonwealth of Puerto Rico is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

463.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the Commonwealth of Puerto Rico under P.R. Laws tit. 32 § 2934A(2)(a).

### Demand for Jury Trial

464.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

### Prayer for Relief

WHEREFORE, Relator Patrek Chase, acting on behalf of and in the name of the United States, demands and prays that judgment be entered in favor of the United States against the specified Defendants on Counts I, II, and III of the Complaint as follows:

A.    For treble the amount of the United States' damages, plus civil penalties for each false claim;

B.    For all costs and fees of this civil action including attorneys' fees;

C.    That Relator be awarded the maximum amount allowed under the FCA; and,

D.      For pre- and post-judgment interest and for such other and further relief as the Court deems just and equitable.

MOREOVER, Relator Patrek Chase, acting on his own behalf, demands and prays that judgment be entered in Relator's favor against the Defendants on Count IV as follows:

E.      Economic damages for lost wages and benefits, including two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the retaliation and reprisal;

F.      Compensatory (non-economic) damages, including but not limited to damages for emotional distress and loss of reputation;

G.      Punitive damages to punish Defendants for their malicious acts of retaliation and to deter the Defendants from undertaking similar retaliatory conduct against other employees and/or contractors who engage in protected activity, in an amount to be determined at trial;

H.      For all costs and fees of this civil action including attorneys' fees; and,

I.      Such other and further relief that this Court may deem just and equitable;

MOREOVER, Relator Patrek Chase, acting on his own behalf, demands and prays that judgment be entered in Relator's favor against the Defendants for the state False Claims Act counts, Counts V-XXXVI, as follows:

J.      For double or treble the amount of the respective State Plaintiff's damages, whichever is the maximum penalty provided by law, plus civil penalties for each false claim;

K.      For all costs and fees of this civil action including attorneys' fees;

L.      That Relator be awarded the maximum amount allowed under the various state FCAs; and,

M.      For pre- and post-judgment interest and for such other and further relief as the Court deems just and equitable.

Dated: July 15, 2024

**FLOOD & FLOOD**

By: _____
    Chris Flood

Chris Flood
Texas Bar No. 07155700
Email: chris@floodandflood.com
Flood & Flood
914 Preston St., Suite 800
Houston, Texas 77002
Telephone: (713) 223-8877
Fax: (713) 223-8879

-and-

**BUFFONE LAW GROUP, PLLC**

By: _/s/ Samuel J. Buffone, Jr._
    Samuel J. Buffone, Jr.

Samuel J. Buffone, Jr. (D.C. Bar No. 1721688)
Buffone Law Group
4301 Connecticut Ave. NW, Suite 310
Washington, D.C. 20008
Telephone: (202) 997-8562
Sam@buffonelawgroup.com

***Attorneys for Plaintiff-Relator Patrek Chase***