# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| UNITED STATES OF AMERICA; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; THE DISTRICT OF COLUMBIA; STATE OF FLORIDA; STATE OF GEORGIA; STATE OF HAWAII; STATE OF ILLINOIS; STATE OF INDIANA; STATE OF IOWA; STATE OF LOUISIANA; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF MONTANA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OKLAHOMA; COMMONWEALTH OF PUERTO RICO; STATE OF RHODE ISLAND; STATE OF TENNESSEE; STATE OF TEXAS; STATE OF VERMONT; COMMONWEALTH OF VIRGINA; AND STATE OF WASHINGTON.<br><br>EX. REL PATREK CHASE<br>          Plaintiffs,<br><br>    v.<br><br>UT SOUTHWESTERN MEDICAL CENTER; PARKLAND HEALTH AND HOSPITAL SYSTEM; TRINITY HEALTH'S LOYOLA UNIVERSITY MEDICAL CENTER; SOUTHWEST TRANSPLANT ALLIANCE; LIVEONNY; NEW JERSEY SHARING NETWORK; and UNITED NETWORK FOR ORGAN SHARING.<br><br>          Defendants. | Civil Action No. 5:23-CA-0381-JKP<br><br><br>**[PROPOSED]**<br>**THIRD AMENDED COMPLAINT**<br>**FOR VIOLATIONS OF:**<br><br>THE FEDERAL FALSE CLAIMS ACT<br><br>31 U.S.C. §§ 3729 *et seq.* |

**[PROPOSED] THIRD AMENDED COMPLAINT**

## I. __INTRODUCTION__

1.      Organ transplantation is one of the greatest medical achievements of the last century and has saved countless lives. However, this life-saving procedure has been hijacked by mismanaged organizations that enrich themselves with government funds, even when they are ostensibly not-for-profit. These organizations knowingly and systematically fail to protect patients, unnecessarily take non-viable organs in order to boost their reported statistics, and bill Medicare for unnecessary costs. These same organizations are tasked with overseeing themselves. Instead, they cover up for bad actors and allow rampant fraud to continue.

2.      This complaint seeks to shine a light on these bad acts and hold some of these bad actors accountable. Driving all of the fraud is an overarching goal to extract federal and state funds from a system meant to support organ donation and save lives. Instead, these funds support executive excess despite the consistent failure to effectively collect and distribute organs to patients in need.

3.      The United States pays for collecting organs from organ donors. The United States pays to ensure patients in need of an organ receive the testing necessary to be ready for transplantation and the care many of those patients need as they await an organ donation. The United States pays for the transplantation. The United States pays for the overhead of the organizations that collect and distribute organs. The United States pays for the organization that is responsible for overseeing all aspects of organ donation. But at all stages, the organizations involved fail to live up to the promises they make to federal healthcare, instead defrauding the United States for their own personal gain.

4.      Three types of organizations primarily perpetrate the fraudulent practices eroding the integrity of the American organ donation system:

    a.    First, transplant centers, mainly hospitals, are responsible for performing the transplants, caring for the patients on the waiting list, and choosing whether to accept organs for transplant. Unethical transplant centers unnecessary keep patients on the transplant list with no intention of accepting a transplant and double-bill federal healthcare programs.

    b.    Second, the Organ Procurement Organizations (OPOs) are responsible for collecting organs from organ donors, coordinating with transplant centers to place the organs, and transporting the organs to the hospitals that perform the transplants. *See* 42 U.S.C. § 273. Instead of increasing donation rates and successful donation approaches, unethical OPOs aggressively collect organs from donors that are unviable or falsely designated as "for research" even though they are not used, in order to maximize their reimbursement from CMS. They also include excessive costs on their cost report and buildup for their organ fees, such as unreasonably high executive compensation and luxury furnishings, while overworking the line-level staff who are working to save lives. Finally, they accept kickbacks from tissue processors with the effect of prioritizing tissue over organs.

    c.    Third, the United Network for Organ Sharing (UNOS) has always held the contract with the Department of Health and Human Services (HHS) to operate the Organ Procurement and Transplantation Network (OPTN), which is responsible

for managing the federal organ donation system — including providing recommendations on the policies and rules surrounding organ donation and transplantation, developing and maintaining technology that manages the organ transplant waiting list, and overseeing OPTN members — which includes the OPOs and transplant centers. *See* 42 U.S.C. § 274. Instead of safeguarding the system, UNOS ignored clear instances of wrongdoing and patient harm despite its obligations, double-charged transplant centers in order to maximize its revenue, and failed to comply with federal cybersecurity regulations concerning patient and donor privacy.

5.      This complaint seeks to hold seven of the worst organizations in organ donation accountable. Three transplant centers, Parkland Hospital Health and Hospital System, UT Southwestern Medical Center, and Trinity Health's Loyola University Medical Center; three OPOs, Southwest Transplant Alliance, New Jersey Sharing Network (NJ Sharing Network), and LiveOnNY; and UNOS. All of these organizations have engaged in this systematic scheme of fraud from at least March 2013 to the present.

6.      First, UT Southwestern Medical Center ("UT Southwestern") created a scheme to improperly pass over patients in need of organ transplants at the less affluent Parkland Health and Hospital System ("Parkland"). This allowed UT Southwestern, which controlled and billed for all transplant work at Parkland, to charge unnecessary and excessive fees for individuals at Parkland on the organ transplant waiting list. UT Southwestern never intended to provide transplants to these patients. Instead, UT Southwestern rejected viable organs for Parkland

patients and accepted the same organs for their UT Southwestern patients, leaving Parkland with almost no transplants.

7.      Second, Trinity Health's Loyola University Medical Center ("Loyola") regularly performed transplants for patients who were not eligible. Loyola's own psychologists and social workers determined the patients were not prepared for transplant but were continually overruled by Loyola's surgeons. Loyola's patients regularly experienced adverse incidents, including multiple cases of graft failures and deaths. Loyola tolerated these deaths under the cynical belief that "deaths still count as discharges," and continued these unsafe practices to maximize Medicare billings.

8.      Loyola also double billed Medicare, charging costs for pre-transplant services both directly to Medicare and including the costs on Loyola's cost report for reimbursement from Medicare.

9.      Finally, Loyola included other improper costs and inflated costs on Loyola's cost report to Medicare.

10.     The OPO Defendants — Southwest Transplant Alliance, LiveOnNY, and NJ Sharing Network — regularly include excessive and unnecessary costs on their own cost reports. This includes costs for procuring non-viable kidneys solely to include the procedure on their cost report, as well as other unnecessary costs such as excessive executive salaries and designer furniture for the OPOs' offices.

11.     The OPOs also fail to live up to their promise to try to recover every viable organ, instead improperly failing to recover organs from poorer and minority hospitals and then falsely inflating their organ recovery statistics by recovering non-viable organs to hide their fraud.

12.     The OPOs also improperly prioritized tissue collection over organ collection because they received kickback payments from tissue processors.

13.     These excesses can happen because the OPOs, which are all ostensibly non-profit organizations, are given monopolies by HHS in exchange for overseeing all aspects of organ donation. This has allowed OPOs, UNOS, and Transplant Centers to cover up problems so they can continue to improperly extract profits from the organ donation system.

14.     Finally, UNOS, which is supposed to oversee all of the OPOs and transplant centers, is instead protecting the bad actors and trying to ensure there is no real oversight of the industry. Instead of fixing problems when they are presented, UNOS attempts to bury problems to protect the various members of the organ procurement world. UNOS improperly uses its position of influence to charge an unnecessary fee for every organ listing.

15.     These failures have real life consequences. Every organ that is not procured, or is procured but thrown away, is a life that is not saved.

16.     UNOS itself estimates that as many as 28,000 viable organs do not make it to patients in need each year. UNOS also found that the OPOs could identify over 18,300 additional cases a year.

17.     In short, available organs outstrip demand, and there should be no organ donor waiting list for most organs. But the system is broken and focused on extracting money from federal healthcare programs rather than ensuring Americans have access to the lifesaving organs they deserve.

18.     As one transplant center consultant explained, "I don't think anything on the OPO side will improve until they feel like they can't get away with hiding things." This Complaint

seeks to stop the Defendants from hiding their fraud and force Defendants to face the consequences of their conduct.

## II.  **PARTIES**

19.    Relator Patrek Chase has worked in organ donation for roughly 15 years. He began his career in organ transplantation when he was hired to do hospital development for the Donor Network of Arizona, an OPO located in the State of Arizona. He went on to work for the OPOs in New York and New Jersey: LiveOnNY, formerly New York Organ Donor Network, and NJ Sharing Network.

20.    Chase transitioned to the transplant center side of organ donation when he was hired as Operations Manager for the Center for Liver Disease and Transplant for New York Presbyterian Hospitals Columbia and Weil Cornell Liver Transplant programs. He was ultimately recruited by Parkland Health and Hospital System in Dallas, TX, as the Administrative Director of Parkland's Kidney Transplant program in August 2019. He was improperly constructively discharged after uncovering Parkland's and UT Southwestern's fraud in September 2020.

21.    He was hired as the Executive Director for Loyola Medical Center's Solid Organ Transplant Programs and Outpatient Dialysis Clinic in October 2020.  At Loyola, he began raising concerns about increased organ transplant failures, deaths, infections, and return to operation room (OR) rates. These concerns were continuously dismissed for the sake of "increasing transplant volumes," and Chase was soon asked to resign from his position in May 2022 in retaliation for uncovering Loyola's fraud.

22.      UT Southwestern Medical Center is a hospital and organ transplant center based in Dallas, Texas.

23.      Parkland Health and Hospital System ("Parkland") is a hospital and organ transplant center based in Dallas, Texas. It is the only public hospital for Dallas County, and also serves as the primary teaching facility for UT Southwestern Medical Center.

24.      Trinity Health's Loyola University Medical Center ("Loyola") is a hospital and transplant center based in Maywood, Illinois.

25.      Southwest Transplant Alliance ("STA") is an OPO responsible for coordinating the recovery and allocation of organs and tissues for transplant in eastern Texas, serving over 270 hospitals across 89 counties in Texas and one in Arkansas. It is headquartered in Dallas, Texas.

26.      LiveOnNY (formerly known as the New York Organ Donor Network) is an OPO responsible for coordinating the recovery and allocation of organs and tissues for transplant throughout the greater New York City area, serving a population of 13 million people and nearly 100 hospitals across 12 counties. It is headquartered in New York City.

27.      NJ Sharing Network is an OPO responsible for coordinating the recovery and allocation of organs and tissues for transplant throughout the state of New Jersey. It is headquartered in New Providence, New Jersey.

28.      The United Network for Organ Sharing (UNOS) is a private non-profit organization that holds the contract with HHS to operate the OPTN, and oversees both OPOs and transplant centers across the country. It is headquartered in Richmond, Virginia.

## III.    **JURISDICTION AND VENUE**

29.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33 (FCA) as well as the various state False Claims Acts. *See infra* at ¶ 93.

30.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. §§ 3730(b)(1) and 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. Additionally, this Cout has supplemental jurisdiction over Relator's state law claims under 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy under Article III of the United States Constitution as Plaintiff-Relator's claims under the False Claims Act.

31.     Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint. Moreover, even had such a public disclosure occurred, Relator would qualify as an "original source" of the information in this Complaint. Relator made a pre-filing disclosure of evidence to the government on February 24, 2023.

32.     This Court has personal jurisdiction over each of the Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process. Moreover, each of the Defendants maintain minimum contacts with the United States, and they each reside in or transact business in this District. Further, each of the Defendants committed a tort that occurred, in whole or in part, in this State, and they each have recruited Texas residents for employment in this State. *See* Tex. Civ. Prac. & Rem. Code § 17.042(2)-(3).

33.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a) because Defendants can be found in and/or transact business in this District. At all times relevant to this Complaint, each of the Defendants regularly conducted business within

this District. Moreover, numerous acts violating 31 U.S.C. §§ 3729-3733 occurred in this District, and a substantial part of the events giving rise to the claims alleged herein occurred here.

## IV.    <u>ORGAN DONATION IN THE UNITED STATES</u>

### A.  Regulatory Structure of the National Organ Transplantation System

34.    Under the authority of the National Organ Transplant Act, HHS is tasked with overseeing organ donation in the United States. HHS delegates much of this oversight to the OPTN.

35.    The OPTN is responsible for managing the national organ donation system. This includes setting organ donation policy, managing the organ donation list, matching organs to needy patients, and overseeing the OPOs. *See* 42 C.F.R. §§ 121.4, 121.7, 486.320 (requiring OPOs and transplant centers to follow OPTN rules and requirements). The OPTN therefore has vast responsibility for both oversight and operation of the national organ donation system.

36.    The OPTN creates enforceable policies for organ donation. Every OPO and transplant hospital participating in Medicare and Medicaid must be a member of the OPTN. 42 C.F.R. § 121.3(b). As a member of the OPTN, they must follow the OPTN's policies. The OPTN board of directors must develop policies on organ allocation and donation, which become effective when approved by the Secretary of HHS. 42 C.F.R. § 121.4.

37.    The OPTN is responsible for overseeing the OPOs and investigating any problems in organ donation. *See* 42 C.F.R. § 121.10(b)(1)(iii). The OPTN serves as the clearinghouse for any problems or complaints related to OPOs. The OPTN receives, investigates, and decides on the best resolution for any OPO-related complaint. Additionally, the OPTN sets the guidelines and rules for how OPOs and Transplant Centers should operate.

38.    The OPTN therefore operates as a semi-government agency, with enforcement and guidance similar to a MAC (Medicare Administrative Contractor).

39.    The OPTN is also systematically responsible for running the U.S. Organ Transplant waitlist. Transplant centers pay the OPTN a fee to list their patients as eligible and in need of an organ. The OPTN also tracks all organs offered for donation. Finally, the OPTN manages the national system to match organs with those who need an organ transplant.

40.    The OPTN is run by a non-profit under a contract with the Health Resources Services Administration (HRSA) under HHS. Since 1986, UNOS has been the only entity to hold the OPTN contract.

41.    In 2023, the bipartisan "Securing the U.S. OPTN Act" was unanimously passed by Congress and signed into law. HRSA recently announced plans to break up the OPTN contract into multiple parts with the goal of having multiple different contractors.

42.    Prior to recent reforms, the OPTN and UNOS were effectively the same. They were governed by effectively the same board of directors: for example, during early 2023, only one OPTN board member did not serve on UNOS's board, and only two UNOS board members did not serve on the OPTN's board.

43.    Additionally, the board of directors at each organization is unusually large. Prior to reform of UNOS's board of directors, there were 41 members on the OPTN's board and 43 members on UNOS's board.

44.    Even though the OPTN is charged with oversight of the OPOs, previously in early 2023, eleven of the 41 voting OPTN board members were OPO executives:

a. Virginia McBride was both a member of the OPTN Board of Directors, as well as the Executive Director of OurLegacy, an OPO serving portions of Florida.

b. Meg Rodgers was both a member of the OPTN Board of Directors, as well as the Director of Transplant Center Relations of LifeSource Upper Midwest, an OPO serving Minnesota, North Dakota, South Dakota, and portions of Wisconsin.

c. Jan Finn was both a member of the OPTN Board of Directors, as well as the President and Chief Executive Officer of Midwest Transplant Network, an OPO serving Kansas and western Missouri.

d. Jeffrey Orlowski was both a member of the OPTN Board of Directors, as well as the Chief Executive Officer of LifeShare Transplant Donor Services of Oklahoma, an OPO across the state of Oklahoma.

e. Barry Massa was both a member of the OPTN Board of Directors, as well as the Executive Director of LifeCenter Organ Donor Network, an OPO previously serving portions of Indiana, Ohio, and Kentucky. He is currently the CEO of the Network for Hope, which formed from a merger of LifeCenter and the Kentucky Organ Donor Alliance. On July 22, 2025, he testified before the U.S. House of Representatives Committee on Energy and Commerce, Subcommittee on Oversight and Investigations in connection with a 2024 patient safety event where organs were nearly collected from a Kentucky donor who turned out to be alive.

f. Colleen McCarthy was both a member of the OPTN Board of Directors, as well as Vice President of Organ Tissue and Donation of Versiti, an OPO serving portions of Wisconsin.

g.  James Sharrock was both a member of the OPTN Board of Directors, as well as Chair of the Board of LifeShare Oklahoma Transplant Donor Services of Oklahoma, an OPO across the state of Oklahoma.

h.  Jonathan Fridell was both a member of the OPTN Board of Directors as well as the Advisory and Executive Boards of Indiana Donor Network, an OPO across the state of Indiana.

i.  Lloyd Ratner was both a member of the OPTN Board of Directors, and prior to his membership had served on the Board of Directors for three different OPOs including Chairman of the Board of Directors of LiveOnNY.

j.  Maryjane Farr was both a member of the OPTN Board of Directors as well as a member of the Advisory Board of LiveOnNY.

k.  Wendy Garrison was both a member of the OPTN Board of Directors as well as Director of Organ and Tissue Family Services as Lifesharing, an OPO serving San Diego and the surrounding area.

45.  Currently five of the 35 voting members are OPO executives:

a.  Kenneth Chavin is both a member of the OPTN Board of Directors as well as the Medical Advisory Board for Gift of Life Donor Program, an OPO serving portions of Pennsylvania, New Jersey, and Delaware.

b.  Samantha Endicott is both a member of the OPTN Board of Directors as well as the Senior Director of Organ Optimization at New England Donor Services, an OPO serving Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and portions of Vermont and Bermuda.

      c.   Darren Lahrman is both a member of the OPTN Board of Directors as well as the Executive Director of Lifelink Florida, an OPO serving the west central regions of Florida.

      d.   Kevin Lee is both a member of the OPTN Board of Directors as well as the President and Chief Executive Office of Mid-America Transplant, an OPO serving areas of Missouri, Illinois, and Arkansas.

46.     The OPTN did not have a different Board of Directors from UNOS until March 8, 2024, and this change was due to HRSA's initiatives.

47.     The current Chair of UNOS, Sue Dunn, was formerly the President and CEO of Donor Alliance, an OPO now under investigation by the U.S. Senate Finance Committee for financial conflicts of interest.

48.     UNOS has over $68 million in annual revenue, primarily from Federal Healthcare (Medicare, Medicaid, TRICARE, Federal Health Employee Benefits Plan, hereinafter Federal Healthcare). UNOS receives its funding through two means. First, HRSA pays UNOS a $6.5 million annual fee to act as the OPTN contractor. UNOS receives another roughly $57 million, primarily in fees from listing patients on the organ waitlist. Those fees are paid by transplant centers listing their patients, and then in turn paid by insurance — predominantly the federal government through Medicare.  Finally, UNOS receives roughly $1.6 million in contracts with other organizations, such as transplant centers and OPOs, to perform research, analytics, and other data and analysis work. Again, these contract fees are passed along to the United States for any patient with Federal Healthcare or on the OPOs' and transplant centers' cost reports.

49.     The $57 million in organ waitlist registration fees is from two separate fees. One fee is paid to the OPTN and passed along to UNOS. Another is charged directly by UNOS. Both are predominately reimbursed by Medicare. Both fees are for the same service of listing patients on the waitlist and performing the duties under the OPTN contract. Only the OPTN fee is legal.

50.     The OPTN fee through September 30, 2024 was $868 per patient, but was increased by the OPTN Finance Committee to $1,025 on October 1, 2025.



51.     UNOS charges a separate fee for listing patients on the organ waitlist. This charge is for the same work that UNOS already performs for the OPTN and for which the OPTN already charges transplant centers. UNOS describes this fee as "a monthly charge based on additional work to include analysis and data related services provided to all transplant community members that the Organization bills to those same member organizations that received an OPTN fee and is solely a UNOS based fee." Until October 2021, UNOS did not differentiate or inform transplant community members of this separate fee and included it on the

same invoice as the OPTN fee. The UNOS Fee is set each year and ultimately approved by the UNOS Board of Directors.

52.     The United States, through Federal Healthcare, is the largest payer of this $57 million in funding from organ waitlist registration fees. All of this $57 million is because of UNOS's role as the OPTN contractor. Without the OPTN contract, UNOS would have practically no source of revenue.

**B.  Structure and Operation of Individual OPOs**

53.     There are currently 55 OPOs that each cover a Donation Service Area (DSA). The CMS is responsible for assigning the DSAs. While OPOs' DSAs do not overlap, OPOs do consolidate and sometimes break up. Over the past ten years, there were as many as 58 OPOs covering 58 DSAs. Originally, there were over 128 separate OPOs operating in the United States.

54.     Some OPOs cover an entire state, such as the New Mexico Donor Services that covers all of, and only, New Mexico. Others split up a state, such as the Southwest Transplant Alliance, LifeGift, and Texas Organ Sharing, which divide Texas as well as part of Arkansas. But the OPO DSAs are arbitrary. For example, Southwest Transplant Alliance covers the Texas

panhandle, some of the gulf coast, and northeast Texas, as well as an entire county in Arkansas.



55.     By statute, CMS grants each OPO a monopoly on organ procurement in their

DSA. A condition for any hospital to receive reimbursement from Medicare or Medicaid is that

the hospital must have a contract with their local OPO for the OPO to collect organs from

clinically eligible patients who are being cared for at these hospitals. 42 U.S.C. §§ 1320b-

8(a)(1)(B), (C), (b)(2) (providing that a hospital or critical access hospital can only participate in

Medicare or Medicaid if it is a member of the OPTN and has an agreement with the local OPO,

and further providing that there shall only be one OPO per DSA).

56.     The OPOs are responsible for collecting organs from organ donors. This includes

both individuals who state a preference for organ donation before dying, such as on a driver's

license, and next of kin of the deceased who can authorize organ donation. As such, the OPOs

are expected to work with all of the hospitals in their DSA to talk to the families of the deceased so that they can evaluate potential organ donors, encourage organ donation, and collect viable organs for transplant.

57.     CMS certifies OPOs. In turn, the OPO can seek reimbursement from CMS for all of the OPO's costs for organ procurement related to Medicare patients. The OPOs submit a cost report to CMS, certifying that all of the costs on the cost report are reasonable, necessary, and allowed under CMS rules. The specific certification is:

> MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT.

> I HEREBY CERTIFY that I have read the above statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by [(Provider Name(s) and Number(s))] for the cost reporting period beginning [date] and ending [date], and that to the best of my knowledge and belief, it is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

*See* 42 C.F.R. § 413.24(f)(4)(iv)(A)(4), (B) (noting that OPOs are obligated to certify the above when submitting a cost report); *see also* Organ Procurement Organization Histocompatibility Laboratory General Data and Certification Statement, Part II, Form CMS-216-94.

### C.  An OPO's Success is Predicated on Collecting as Many Organs as Possible

58.    OPOs are evaluated based on their success in collecting as many organs as possible – both donors who have organs transplanted, and total number of organs transplanted. *See* 42 C.F.R. § 486.318(d). One donor can donate up to eight organs.

59.    Recently, OPOs were allowed to include pancreases procured for research in their count of donated organs. 42 C.F.R. § 486.302 (defining "donor" to include individuals where "only the pancreas is procured and is used for research or islet cell transplantation" and redefining "organ" to also include pancreata procured for islet cell transplantation and research). This has resulted in multiple OPOs collecting vastly increased numbers of pancreases in order to report a higher number of donors, despite the lack of a corresponding need from researchers.

60.    The OPOs are required to report the data necessary to calculate the metrics on which the OPOs are evaluated. *See* 42 C.F.R. § 486.328. OPOs must also implement a Quality Assessment and Performance Improvement (QAPI) plan. 42 C.F.R. § 486.348.

61.    Transplant centers are UNOS and CMS approved hospitals with the specialized experience necessary to perform organ transplantation. The transplant centers make the clinical decision regarding which patients are eligible for organ transplant and then place the eligible patients on their center's waitlist. Once patients are waitlisted, the transplant center is responsible for monitoring the patients and accepting and transplanting organs into these patients when an organ becomes available. There are currently 251 transplant centers.

62.    Transplant centers can only operate if they have a contract with an OPO. 42 U.S.C. § 121.9(a)(2)(i).

63.    OPOs receive reimbursement for the procurement of organs intended for transplant. 42 C.F.R. § 413.402(a). This includes organs that are subsequently determined to be unsuitable for transplant. *Id.* An organ is intended for transplant when it is designated as such by the OPO. 42 C.F.R. § 413.412(a)(1).

64.    CMS will reimburse fees related to organ transplant but will not reimburse fees considered unrelated. "Items or services that are not related or reasonable to acquire an organ for transplantation, non-allowable administrative and general costs, or costs that are not related to patient care, are not considered organ acquisition costs." 42 C.F.R. § 413.402(d)(1).

65.    Reasonable costs that are incurred in connection with a Medicare covered transplant are reimbursable. 42 C.F.R. § 413.404(a)(1). Because every kidney transplant is a Medicare covered transplant, anytime a kidney is procured, the costs of the organ recovery procedure become reimbursable.

66.    This is because anyone with end stage renal disease (ESRD) is automatically covered by Medicare. The only cure for ESRD is a kidney transplant. Absent a kidney transplant, a patient requires painful and costly dialysis to live. Dialysis is grueling for the patient (with most patients dying within five years on dialysis), and costly for the taxpayer (with Medicare payments for treatment of ESRD totaling $36 billion each year— roughly one percent of the entire federal budget). As of July 27, 2025, there are 116,639 people waiting for an organ transplant in the U.S., and about 99,389 of them are waiting for a kidney. Further, of the total 45,165 organ transplants in 2023, kidney transplants amounted to over three in five, totaling 28,142.

67.     For other organs, the reimbursements for transplant related costs are based on the organ recipient's healthcare. The United States will pay for organ procurement and transplant costs through the Federal Healthcare program for organ recipients with Federal Healthcare. If the recipient has private health insurance, the private health insurer will pay for the organ donation costs.

68.     Not all organs are viable. Some organs are not viable because of the donor. For example, someone with cancer cannot be an organ donor for fear of infecting the recipient with the donor's cancer. Some organs are not viable because they are damaged or otherwise will not survive; for example, if the organ does not receive blood for a certain amount of time, it will no longer be viable for transplant.

69.     Transplant centers are responsible for overseeing potential organ donation recipients. When they identify a patient in need of an organ that they are willing to list for a transplant, they will contact UNOS and pay fees to put that patient on the organ transplant list. The transplant center must then make the patient ready to receive an organ at a moment's notice if one becomes available. To do this, the transplant center must perform a battery of tests on the individual, often dozens of tests for each patient, and repeat the tests every six months to a year to keep the patient on the waitlist. If the patient is Medicaid or Medicare eligible, then all of the costs are reimbursed by Medicaid or Medicare.

70.     UNOS maintains the national organ donation waiting lists. When an OPO collects an organ, they will report the collection to prospective recipients based on the match run conducted through the UNOS UNet portal. The hospitals that are overseeing the patients in need of an organ will receive a notification with a short one-hour window in which to accept the

organ. If the hospital does not accept the organ, the organ is offered to the next person on the list. Whether the organ is accepted is ultimately determined by the doctor on the patient's behalf.

71.     OPOs charge transplant centers a standard acquisition charge (SAC) for each organ. 42 C.F.R. § 413.404. The kidney SAC is calculated as the "costs related to kidney acquisition that were incurred in the prior cost reporting period and dividing those costs by the number of usable deceased donor kidneys procured during that cost reporting period." 42 C.F.R. § 413.404(c)(2)(iii). Therefore, any non-useable kidney initially acquired and included on the cost report will increase an OPO's kidney SAC, because it will increase the costs related to kidney acquisition without increasing the number of useable kidneys the OPO procured.

72.     The OPO's cost report must follow the standard cost reporting rules. 42 C.F.R § 413.420(e)(1). This includes the use of reasonable allocation of cost methodology, accurate data, and the certification in paragraph 60 *supra*. 42 C.F.R. § 413.24.¶

73.     OPO costs are also subject to the normal principles of cost reasonableness. 42 C.F.R. § 413.420(a)(1).

74.     The OPOs collectively have roughly $3 billion in revenue a year. The OPOs' revenue comes primarily from three sources. First, CMS reimburses all kidney procurement costs. Second, transplant centers pay SAC fees to the OPOs for the organs that the transplant centers accept. For any Federal Healthcare patient -- including individuals on Medicaid or TRICARE -- these fees are reimbursed by Federal Healthcare. Third, the OPOs get fees from tissue processing centers for procuring HCT/Ps, or "human cells, tissues, or cellular or tissue-based products.

**D. OPTN and UNOS are Responsible for Overseeing Organ Procurement Operations by OPOs**

75.     The OPTN has a Membership and Professional Standards Committee (MPSC) responsible for reviewing any complaints about OPOs. First, UNOS staff reviews the complaint and determines whether to refer the complaint to the MPSC. The MPSC may refer the matter to a working group, such as the OPO working group. If the MPSC substantiates the problem, the MPSC can issue a warning, require a peer review, or make a formal probation referral to CMS. Only probation findings are publicly disclosed.

76.     Though the MPSC is intended to exercise oversight over the OPOs, multiple members of the MPSC are prominent directors from OPOs:

    a.   Bradley L. Adams is currently a representative on the MPSC and is also the President and CEO of Southwest Transplant Alliance.

    b.   Chad E. Ezell is an At-Large representative on the MPSC and is also currently the Chief Operating Officer of the Louisiana Organ Procurement Agency, an OPO serving the State of Louisiana. Ezell formerly worked at LiveOnNY.

    c.   Richard Hasz is an At-Large representative on the MPSC and is also the President and Chief Executive Officer of the Gift of Life Donor Program, an OPO serving portions of the State of Pennsylvania and the State of New Jersey.

    d.   Kyle Herber is an At-Large representative on the MPSC and is also the President and CEO of LiveOn Nebraska, an OPO serving the State of Nebraska and one county in Iowa.

> e. Kamyar Afshar is an At-Large representative on the MPSC and is also a Medical Advisory Committee member of Lifesharing, an OPO serving San Diego and surrounding counties.

77. The MPSC views its jurisdiction as very limited to violations of OPTN bylaws. Further, the MPSC views its directive as limited to addressing the problem and organization referred to in the complaint and does not recommend broader industry or OPTN changes.

78. The OPTN also has an Operations and Safety Committee (OSC). The OSC is responsible for recommending broader changes to OPTN policy and requirements. However, the OSC does not get referrals from the MPSC and only looks at de-identified aggregate data.

79. In sum, though the OPTN and UNOS are intended to oversee the provision of organ donation services by the OPOs, the structure has traditionally been designed so that OPO executives can steer the oversight process and the oversight committees are ultimately toothless. Accordingly, no actual oversight occurs.

**E.     Tissue Donation Overlaps with Organ Donation**

80. Organ donors also often donate tissue. Human tissue can be vital for life-saving or enhancing surgeries, such as in skin grafts for burn victims or reconstructive surgeries for victims of physical trauma.

81. Corneas, bones, skin, veins, heart valves, ligaments, and tendons are all human tissue recovered from donors.  Human tissue has multiple uses, among them joint repair, dental bone grafts, and skin allografts used to heal severe burns.

82. The exact method of tissue collection varies between each jurisdiction, but over thirty OPOs also handle tissue. Therefore, in those instances where the OPO does not refer the

donor to a tissue procurement recovery team after collecting the organs, a tissue recovery team from the OPO will then collect tissues from the donor.

83.     OPOs must "have arrangements to cooperate with tissue banks for the retrieval processing, preservation, storage, and distribution of tissues as may be appropriate to assure that all usable tissues are obtained from potential donors." 42 U.S.C. § 273(b)3)(I). However, unlike organs, OPOs are not mandated to recover tissue themselves. Instead, the OPOs' mandate, monopoly over their DSA, and payments by Federal Healthcare are only for organ collection. However, given this government implemented monopoly, OPOs have a unique access to potential tissue donors.

84.     The National Organ Transplant Act, which prohibits the sale of human organs, also includes tissues such as "cornea, eye, bone, and skin or any subpart thereof." 42 U.S.C. §§ 274e(a), (c)(1). Any charges associated with tissue collection must be limited to "reasonable payments associated with the removal, transportation, implantation, processing, preservation, quality control, and storage" of that tissue. Donations of human tissues are also governed by the Uniform Anatomical Gift Act, which is a model piece of legislation that has been adopted in some form by all States and the District of Columbia. It also permits only very limited "reasonable" recompense for the "removal, processing, preservation, quality control, storage, transportation, implantation, or disposal of a part."

85.     Donated tissue, unlike organs, is regulated by the Food and Drug Administration (FDA) and can be used to create HCT/Ps, or "human cells, tissues, or cellular or tissue-based products. *See* 21 C.F.R. § 1271.

86.    Tissue recovery does not have a government regulated formula for calculating a standard acquisition charge under federal regulations. Instead, costs for tissue are subject to market forces and ultimately can sell for thousands of dollars. Tissues collected from one donor can generate up to $80,000 in revenue.

87.    The federal National Organ Transplant Act, and states' adoption of the Uniform Anatomical Gift Act, is intended to remove profit and money-making from organ and tissue donation, so donors and their families are not economically coerced into selling organs or tissue. The Uniform Anatomical Gift Act explicitly prohibits the knowing purchase or sale of "a part for transplantation or therapy if removal of a part from an individual is intended to occur after an individual's death."

88.    However, because there is no corresponding prohibition on selling HCT/Ps after tissue is collected and processed, something free is collected and turned into thousands of dollars of profit for private entities.

89.    When OPOs recover tissue, the tissue processor pays for the tissue and then cleans and packages the tissue. Though by law this is only supposed to be a "reasonable fee" intended to cover costs like collection and storage, tissue processors pay OPOs handsomely for the recovered tissue, providing the OPOs with an additional stream of revenue.

90.    Tissue processors market these human tissues and are paid by the end users: the pharmaceutical companies, hospitals, dentists, and doctors who need HCT/Ps to provide adequate life-saving or life-enhancing patient care.

91.    Unlike OPOs, tissue processors and tissue banks may operate as for-profit companies. Tissue companies in the United States make more than $1 billion a year. Executives from OPOs may, and actively do, sit on the boards of tissue processing companies.

## V.    THE FALSE CLAIMS ACT

92.    The FCA provides for civil liability for "any person who (A) knowingly present, or causes to be presented, a false or fraudulent claim for payment or approval; [or] (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1).

93.    Likewise, the "Reverse False Claims" provision of the FCA imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

94.    An entity acts "knowingly" under the FCA when it: (1) has actual knowledge; (2) acts in deliberate ignorance of the truth or falsity; or (3) acts in reckless disregard of the truth or falsity. It is not necessary to prove a specific intent to defraud. 31 U.S.C. § 3729(b)(l). This Complaint uses "knowing" to describe all three definitions of knowing in the FCA.

95.    The term "material" means having a natural tendency to influence, or being capable of influencing, the payment or receipt of money or property. 31 U.S.C. § 3729(b)(4).

96.    Various states, the District of Columbia, and the Commonwealth of Puerto Rico also maintain their own analogues to the federal FCA. These "state False Claims Acts" are modelled off the federal FCA and also permit private individuals to recover when Defendants

defraud state governments, including when they fraudulently submit or cause the submission of fraudulent claims to Medicaid. *See, e.g.,* Tex. Hum. Res. Code Ann. §§ 36.001-.132; 740 Ill. Comp. Stat. 175/1–175/8; N.J. Stat. Ann. §§ 2A:32C-1 to -18; N.Y. State Fin. Law §§ 187–194.

## VI.    ANTI-KICKBACK STATUTE

97.    The Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b(b)(1), prohibits the knowing and willful solicits or receives remuneration — be it "directly or indirectly, overtly or covertly, in cash or in kind," — in return for "arranging for" any service payable by federal healthcare programs such as Medicare or Medicaid.

98.    Patient harm is not required to establish an AKS violation.

99.    A claim tainted by a violation of the AKS is *per se* material. Accordingly, compliance with the AKS is a precondition to a healthcare provider's participation in Medicare or Medicaid. *See* 42 C.F.R. §§ 1001.201, 1001.951; *see also supra* ¶ 41.

100.    There are a limited number of exceptions to the AKS, including a payment between an employer and employee, and a rebate agreed and written in advance. *See* 42 U.S.C. § 1320a-7b(b)(3).

## VII.    UT SOUTHWESTERN LISTED PARKLAND PATIENTS WITH NO INTENT TO TRANSPLANT

### A.  UT Southwestern Doctors Ran Organ Transplant at Parkland

101.    Parkland is a hospital in Dallas that primarily serves a less affluent and more diverse population. It is a teaching hospital for UT Southwestern. UT Southwestern is an academic medical hospital in Dallas that primarily serves a more affluent population.

102.    Parkland entered into a contract with UT Southwestern, whereby UT Southwestern provided physician support and testing for Parkland's patients, including in

Parkland's Kidney Acquisition Clinics. The contract also allows UT Southwestern to provide management and other medical services that UT Southwestern Clinicians may request for Parkland's Kidney Acquisition Clinic.

103.    In practice, UT Southwestern provided all services and support for Parkland's transplant patients. Parkland patients had their human leukocyte antigen (HLA) tests and other pre-transplant testing conducted at UT Southwestern laboratories, which provided laboratory clinical services and storage of patients' samples. HLA tests are a necessary part of the organ donation process. HLA tests ensure that the donor and recipient have compatible organs and tissues for transplantation, minimizing the chance that the patient rejects the implanted organ. UT Southwestern would charge for these services on a monthly basis.

104.    UT Southwestern provides the doctors who oversee transplant patients at Parkland. These doctors decide whether Parkland will accept an organ to transplant into a Parkland patient. Specifically, while Relator was at Parkland, UT Southwestern Drs. MacConmara and Hwang were on call for both the UT Southwestern and Parkland patients. They would decide whether to accept an organ when it was offered to either a UT Southwestern or Parkland patient. One of the two doctors was always on call in case an organ became available.

105.    UT Southwestern was not providing services in the Parkland patients' best interest. Instead, UT Southwestern regularly rejected organs for Parkland patients only to later accept the same organs for UT Southwestern patients.

106.    These same doctors also oversaw UT Southwestern transplant patients. Therefore, these doctors were often offered the same organ for two different patients at two different

hospitals. Given the nature of organ donation, sometimes the delay between an organ being offered to a Parkland patient and a UT Southwestern patient would mean the organ was rejected by one doctor for a Parkland patient and accepted by the other for a UT Southwestern patient. However, the two doctors closely coordinated and were expected to share notes on the patients and the organs.

107.    UT Southwestern did this to maximize its own profit from Parkland patients and had no intention of transplanting Parkland patients when they listed the Parkland patients for organ donation. Every organ it improperly rejected meant the Parkland patient would have to continue to go to UT Southwestern for testing as well as regular checkups to remain eligible for a transplant.

108.    UT Southwestern maximized the money it charged Parkland for keeping patients on the transplant list. UT Southwestern charged Parkland a monthly "technical fee" per patient for every month the patient languished on the transplant list. UT Southwestern also charged Parkland a "Professional Fee" based on the types of testing UT Southwestern required the patients to get.

109.    But the United States was harmed well beyond the additional fees to UT Southwestern. Every patient at Parkland who was listed meant that Parkland needed to pay a listing fee to the OPTN in order to list the patient on the waiting list, and also UNOS's additional fee. Further, because all of these Parkland patients required continued dialysis while they continued to wait for a kidney after they were passed over by UT Southwestern physicians, Medicare incurred additional and unnecessary costs for their dialysis and chronic kidney disease (CKD) treatments.

110.    The following are examples of the organs UT Southwestern improperly rejected.

111.    KG was a 50-year-old male. On October 20, 2019, he was 15th in line for a kidney. UT Southwestern doctors, Drs. MacConmara and Hwang, passed up a kidney for KG due to supposedly poor organ quality. Drs. MacConmara and Hwang also passed over four other patients at Parkland for the same organ, RP, a 60-year-old male who was 23rd on the list, LR, a 54-year-old female who was 24th on the list, ME, who was 37th on the list, and MA, who was 44th on the list.

112.    Doctors at UT Southwestern later accepted the organ for a UT Southwestern patient. There is no reason why the organ would be rejected because of organ quality and then accepted by the same doctors for different patients. Federal Healthcare should not have paid for the costs of transplant for the UT Southwestern patient after UT Southwestern improperly passed over KG.

113.    Drs. MacConmara and Hwang passed on organs for KG two more times, rejecting an organ because of poor organ preservation when KG was 16th on the list, and rejecting another organ because of poor organ biopsy findings when KG was 13th on the list.

114.    Yet each time, the organ was later accepted by the same doctors for a UT Southwestern patient. The same problems with organ preservation and organ biopsy would still exist when the same doctors accepted the organ for the UT Southwestern patient. Federal Healthcare should not have paid for the costs of transplant for the UT Southwestern patients after UT Southwestern improperly passed over KG.

115.    There is no reasonable explanation why an organ would be rejected for organ preservation or organ biopsy reasons for one patient and then accepted for another. Instead, Drs. MacConmara and Hwang were improperly favoring UT Southwestern patients.

116.    KG was kept on the organ transplant waiting list and continued receiving dialysis and CKD treatments. This allowed UT Southwestern to continue to order tests for KG and bill those tests to Medicare. KG was transplanted only after Relator raised with Dr. MacConmara and Patricia Shirey the fact that KG was continually passed over for organs that Drs. MacConmara and Hwang later accepted for a UT Southwestern patient.

117.    From January 2019 to November 2019, 80 organs were turned down by UT Southwestern for Parkland patients because of concerns with donor quality, meaning the UT Southwestern doctors thought there was a problem with the organ that made the doctors unwilling to accept the organ for transplant. The UT Southwestern doctors made the specific determination that these organs were not viable for transplant into the Parkland patients. However, 29 of those same organs were later transplanted at UT Southwestern despite UT Southwestern doctors' prior determination that these organs were not viable for transplant. Federal Healthcare should not have paid for the costs of transplant for the UT Southwestern patients after UT Southwestern improperly passed over the Parkland patients.

118.    From January 2019 to November 2019, nine organs were turned down by UT Southwestern for Parkland patients because the doctors believed the organ was not properly preserved (i.e. it was not properly kept cold or had been out of the donor for too long). The UT Southwestern doctors made the specific determination that these organs were not viable for transplant into the Parkland patients. Three of those same organs were later transplanted at UT

Southwestern despite UT Southwestern doctors' prior determination that the organ was not viable. Federal Healthcare should not have paid for the costs of transplant for the UT Southwestern patients after UT Southwestern improperly passed over the Parkland patients.

119.    From January 2019 to November 2019, seven organs were turned down by UT Southwestern doctors for Parkland patients because the doctors found a specific problem with the organ that they thought made it unsuitable for transplant. The UT Southwestern doctors made the specific determination that these organs were not viable for transplant into the Parkland patients. Two of those same organs were later transplanted at UT Southwestern despite UT Southwestern's prior determination that the organs were not viable. Federal Healthcare should not have paid for the costs of transplant for the UT Southwestern patients after UT Southwestern improperly passed over the Parkland patients.

120.    From January 2019 to November 2019, two organs were turned down by UT Southwestern doctors for Parkland patients because the doctors found specific damage or defects with the organs that made them not viable. The UT Southwestern doctors made the specific determination that these organs were not viable for transplant into the Parkland patients. But one of those same organs was later transplanted at UT Southwestern despite UT Southwestern's prior determination that the organ was not viable. Federal Healthcare should not have paid for the costs of transplant for the UT Southwestern patients after UT Southwestern improperly passed over the Parkland patients.

121.    From January 2019 to November 2019, 5 organs were turned down by UT Southwestern for Parkland patients because the doctors believed the organ was from a donor that posed an "increased risk" of an undetected disease, specifically HIV, hepatitis B, or hepatitis C.

The UT Southwestern doctors made the specific determination that these organs were not viable for transplant into the Parkland patients. One of those same organs was later transplanted at UT Southwestern despite UT Southwestern's prior determination that the organ was not viable. Federal Healthcare should not have paid for the costs of transplant for the UT Southwestern patients after UT Southwestern improperly passed over the Parkland patients.

122.    In total, between January and November 2019, doctors at UT Southwestern declined 45 organs for Parkland patients that they later transplanted at UT Southwestern. UT Southwestern declined a total of 127 organs for Parkland patients. UT Southwestern doctors only conducted transplants for 6 Parkland patients from July 1, 2020, to June 30, 2021. Meanwhile, UT Southwestern conducted transplants for 215 UT Southwestern patients during the same period. In 2021, UT Southwestern performed 424 heart, lung, kidney, and liver transplants. Similarly, between July 1, 2018, and June 30, 2019, UT Southwestern doctors only conducted transplants for 6 Parkland patients compared to 111 transplants for UT Southwestern patients.

123.    In 2019 and 2020, a total of 78 patients were removed by UT Southwestern doctors from Parkland's transplant waitlist because they deteriorated past the point of transplant. Seven patients died while waiting for a transplant, and 56 became too sick to receive a transplant. Overall, in 2019, 78% of the patients removed from the waitlist were removed because they were either too sick to transplant, died, were transplanted at another center, or for "other" reasons. In 2020, 85% of patients removed from the waitlist were removed for the same reasons. Meanwhile, in 2013, only 48% of the patients removed from the waitlist were removed for the same reasons.

124.    The following patients are among those who suffered due to UT Southwestern's policies:

   a.   RG, a 29-year-old male, RP, a 63-year-old male, and JC, a 50-year-old male, were removed from the waitlist because they died while waiting to receive a transplant.

   b.   CH, a 40-year-old male, was one of those patients whose health declined so severely that he became unable to receive a transplant.

   c.   MB, a 53-year-old female, and two other patients were removed from the waitlist because they were transferred to another center after UT Southwestern doctors did not provide them with the care they needed at Parkland.

125.    If UT Southwestern had properly accepted organs for Parkland, these patients could have received the lifesaving treatment they were seeking.

126.    Additionally, UT Southwestern overcharged Parkland for tests and surgeries. Under the contract between Parkland and UT Southwestern, UT Southwestern charged 100% of Medicare reimbursement for certain tests and 133% for others. Notably, UT Southwestern required the most expensive laboratory tests were run in their laboratories, in particular all HLA testing and other expensive tests like left heart catheter testing, as opposed to Parkland, even though the blood draw for the tests happened at Parkland. Some of these charges, and all of those charges related to kidney transplants, were reimbursable by Medicare.

127.    Further, a patient can find their own organ donor by identifying a living individual that matches their blood type and agrees to donate their organ – usually a single kidney or portion of their liver. This individual is called a "living donor." Living donors are usually the patient's relatives.

128.    Because the patient identifies the donor and the donor is often only willing to donate to the patient, the patient, rather than the doctors, dictates who will receive the organ. Unlike organs from the normal organ donation process that UT Southwestern steered to UT Southwestern patients, UT Southwestern could not dictate that the living donor's organ, found by the Parkland patient, went to a UT Southwestern patient.

129.    However, UT Southwestern insisted on an inefficient process for these living donations in order to maximize UT Southwestern's billing. UT Southwestern insisted that the organ recoveries were performed at UT Southwestern instead of Parkland, even though Parkland is properly equipped to remove the organ from the living donor. UT Southwestern then charged Parkland for the full price of the surgery, rather than charging Parkland at cost. This resulted in much higher expenses than if the organ recovery was performed at Parkland. The organ, and the UT Southwestern doctors, then had to be transported from UT Southwestern to Parkland for the actual transplant. If the organ recovery was conducted at Parkland, then the organ and the doctors would merely need to move from one operating room to another.

130.    Parkland is only allowed to bill its cost of services. Therefore, if Parkland tested and performed living donor surgery for its patients in house, Parkland could only charge its own cost of the test. Similarly, UT Southwestern can only charge costs for testing its own patients. However, Parkland's cost for using UT Southwestern is what UT Southwestern charges Parkland. UT Southwestern did not simply charge Parkland at cost, but included a 33 percent markup for their Living Donor Surgical cases because UT Southwestern refused to perform the operation at Parkland.

131.     Similarly, by creating the scheme to keep the transplant patients at Parkland and use the UT Southwestern lab for expensive tests, UT Southwestern is able to inflate the charges to 133 percent of the Medicare costs and fraudulently increase their claims to Medicare.

**B.  Parkland executives refused to hire doctors when confronted with the fraud scheme**

132.     Relator Chase suggested that Parkland hire its own doctors to remove UT Southwestern's influence on Parkland's organ transplants. Chase made the proposal to Ambulatory Chief Medical Officer, Dr. Joseph Chang, and VP of Ambulatory, Patricia Shirey. Both agreed and a meeting with the senior leadership of both UT Southwestern and Parkland was scheduled to discuss the findings. Chase then presented his proposal to Parkland's Capital Planning Review Committee (CPRC) — which was attended by Dr. Chang and other key individuals involved in Parkland's financial decision making — and the proposal was approved during the committee meeting.

133.     Chase was then asked to present the proposal at the Chief's Meeting, which is attended by Parkland's top executives, including its CEO. However, Chase was later told by Patricia Shirley that Jessica Hernandez, SVP of Population Health, would instead go to the Chief's Meeting in Relator's place. Chase was later informed by Patricia Shirley that the Parkland executives denied his proposal, despite it being approved by the CPRC. It is highly irregular for the Chief's meeting to not approve a decision previously approved by the CPRC.

134.     Chase requested a meeting with Yvette Chapman of Southwest Transplant Alliance and requested to see the organ acceptance criteria for Parkland patients and UT Southwestern. In a conversation with Chapman in roughly January 2020 or late 2019, Chapman

told Patrek that, "everyone knows that this," referring to the practice of passing over Parkland

patients, "has been happening for years."

135.    Chase received the information and passed it along to Parkland leadership.

Despite presenting this documentation to Parkland leadership, UT Southwestern and Parkland

failed to address the manipulation.

## VIII.   LOYOLA ENGAGED IN AGGRESSIVE PRACTICES THAT HARMED PATIENTS AND DEFRAUDED FEDERAL HEALTHCARE.

136.    During his tenure at Loyola, Chase directly witnessed that Loyola was also not

running a safe transplant program. Instead, it wanted to get as much volume as possible to

increase reimbursement from Medicare, even if it meant improperly transplanting patients who

were not eligible for an organ transplant. In mid-2021, Loyola had three deaths in its operating

rooms within six weeks, at least one of which was a kidney patient. There were also multiple

deaths among kidney transplant patients.

137.    Loyola created what it claimed was a specialty in particularly sick patients. It

developed relationships with area hospitals and had those hospitals transfer their sickest patients

to Loyola for transplant. Loyola would then list these patients on the organ donor list as status

1A, meaning the patient was unlikely to live more than a few days without a transplant. This put

the patient at the top of the donation list, and they were regularly able to match with the needed

organ.

138.    Loyola, however, did not properly screen and did not actually care if these

patients' lives would be saved by the donation. Instead, Loyola focused on the billing and

profitability of these patients. Loyola would receive reimbursement for the patient's discharge,

even if the reason for "discharge" was death. Further, if the patient was actually discharged and

then had complications because the transplant did not actually improve the patient's condition, the patient would return to Loyola for post-transplant complications. Loyola could then bill for these costly complications.

139.    Many of the patients died soon after Loyola provided these improper transplants. This fraudulent conduct put at least two lives in jeopardy: First, the Loyola patient who died from the improper transplant; and second, the patient on the organ donor waitlist who could have received a life-saving organ transplant, had Loyola not improperly transplanted the organ.

140.    Loyola regularly ignored psychosocial "red flags" raised by both social work and psychiatric teams determining whether a patient was ready for transplant. Loyola surgeons would regularly overrule the social workers and psychiatric teams in order to transplant the patients.

141.    For example, a patient who has liver failure due to alcohol-related substance use disorder is only eligible for a liver transplant if they are able to show a period of sobriety or if a social work team believes that the risk of recurrence is low. If the patient relapses, they will damage the new liver and likely require an additional transplant.

142.    In one instance, Loyola transplanted a liver into a patient with alcoholic liver disease and unresolved alcohol use problems. The patient did not get better and stayed in the hospital for 128 days. The patient was on Medicare, and all 128 days of the hospital stay were paid for by Medicare. If Loyola had not done the transplant, the patient would not have needed the 128-day hospital stay.

143.    Relator discussed this patient's 128-day hospital stay with Loyola's Inpatient Chief Medical Officer, Dr. Kevin Smith. Dr. Smith stated that "to increase transplant volume we

need to be willing to take risks," explicitly stating Loyola's view that patient risk was acceptable for Loyola to increase its transplant billings.

144.    In 2022, XynQAPI did a report on liver graft failures at Loyola. It found that in four of the five cohorts it studied, liver graft failures were higher than expected. This includes graft loss and death after a liver transplant.

145.    Loyola kept three sets of books to hide this fraud. First, Loyola kept the real data on organ donation failure rates in CareDX and used this data for internal reports. Second, Loyola kept even more details in an Excel file. The Chief of Abdominal Transplant Surgeon, Dr. Luis Fernandez, instructed the Quality Manager, Deborah Parilla, to create a separate dashboard that both she and Relator were told explicitly "not to share with anyone externally."

146.    But Loyola had different data on organ donation failure rates in their Electronic Medical Record (EMR), Epic. The Epic data showed either fake or less detailed information that hid the true high rate of organ donation failure at Loyola.

147.    For example, if Loyola did a failed transplant where the patient died in the operating room, the internal records would call it a graft failure and transplant related death. However, Loyola did not record this as an official transplant death in Epic, claiming the transplant "technically never worked or achieved anastomosis." This allowed Loyola to report data outside of Loyola that hid the true problems with Loyola's transplant program.

148.    In another example, two liver transplant patients died post-transplant within a week of each other. One of the patients was living an otherwise healthy life before the transplant, including running on a treadmill the day of the transplant. He had scar tissue from a previous stomach tap that caused him to bleed out during the operation. When the surgeons were asked

why they did not stop when they saw the scar tissue, they responded cavalierly, "once you open them up, you can't stop."

149.    Loyola frequently saw patients with State Medicaid insurance. Between 12 and 17 percent of its organ transplant patients covered by Medicaid.

150.    Despite these frequent deaths and other critical failures, Loyola failed to perform root cause analyses to determine the cause of death and ensure they did not happen again. Loyola's committee that discussed the multiple deaths was made up of only liver transplant surgeons who all covered up each other's mistakes.

151.    Loyola chair of abdominal surgery, Dr. Luis Fernandez, was eager to grow Loyola's transplant center and wanted to improve Loyola's statistical rankings. He knew he could do this by taking more risks. However, Loyola did not invest in the experienced staff necessary to take these risks. It therefore took some of the riskiest patients using inexperienced doctors with deadly results.

152.    Loyola's own internal quality metrics showed an alarmingly high rate of graft failures and deaths. These metrics compared Loyola with peer institutions. Loyola was regularly well above the expected number of graft failures and deaths and in the lowest or second lowest tier among its peers.





153.    In response to a separate Quality Assessment report from CareDx — which identified significant gaps in Quality and Patient Safety — Ryan Mayhew, the Regional Physician Quality Officer for Loyola, wrote, "we essentially don't have a functioning quality program in the transplant realm and it's a major vulnerability."



154.    Loyola's internal Surgical Morbidity and Mortality Cases tracker recorded any serious complication or death related to transplants. These included post-surgical infections, returns to the operating room post-procedure during the same hospital admission, graft failure, and death. For the period March 1, 2022 to April 17, 2022, a period of 48 days, Loyola recorded 60 separate incidents. Surgeon Raquel Garcia-Roca was involved in 33 separate incidents. Surgeon David Lee was involved in 23 separate incidents.

155.    Relator Chase raised his concerns with the number of transplant patient deaths in the OR with Loyola's Vice President of Finance, Manmeet Taneja. Taneja responded that "deaths still count as discharges" implying that Loyola's interests were still met as Loyola still received payment if the patient died.

156.    Additionally, Loyola fraudulently double-billed Medicare. Loyola would both put its costs on Loyola's cost report submitted to Medicare, and would also bill the services directly to Medicare. Loyola was thus getting reimbursement from Medicare twice for the same costs.

157.    Loyola did this through a knowingly faulty process. Relator Chase laid out this process in a March 7, 2022 email:



**From:** Patrek Chase
**Sent:** Monday, March 7, 2022 10:36 AM
**To:** Edwin McGee                              Luis Fernandez
**Cc:** Timothy Carrigan                          Kevin R. Smith
**Subject:** Transplant Quality/Transplant Finance positions

2.  Currently Greg Daniels, our Transplant Financial Administrator, supports all Organ Acquisition, procurement billing and cost report reconciliation for government reimbursement. The Cost Report work queues alone require a manual review of an average 9,500 tests per day for the Medicare Cost Report. I propose converting Amanda's vacant position to a Transplant Financial Analyst who can take over the MCR work queues. My fear is that if we don't get Greg the support he needs we might lose him as well. That would be a huge loss to the program and finding a candidate with his transplant financial background would be difficult.

158.    One employee in transplant, Greg Daniels, received a daily report of every test from the Loyola system for potential transplant patients. Daniels would go through the report and identify tests that he believed were related to transplant and put the cost of those tests on Loyola's cost report.

159.    However, Chase soon realized that Daniels was not reporting back to the parts of the Loyola system which tests he was including on Loyola's cost reports. Therefore, the parts of Loyola's system that performed the tests did not know Loyola was including the costs of the test on the cost reports and instead billing the tests to the patient's healthcare, including Medicare and State Medicaid programs.

160.    These pre-transplant costs included any test or other procedure that was necessary for a patient to be listed for transplant. While pre-transplant testing varied by patient, their health history, and their organ needs, the tests regularly included colonoscopies, mammograms, HLA testing, blood work, echocardiogram, and cardiology testing.

161.    This meant that every test Loyola had included on its cost report was double billed to the patient's primary healthcare. For many patients, this healthcare was either Medicare or Medicaid.

162.    Loyola also inflated its cost report to Medicare to obtain funds to which it was not entitled by inflating time studies to improperly charge more staff time to Medicare. Through this, Loyola was able to put over half of its staff salary on its cost report and receive reimbursement from Medicare.

163.    Loyola hired a contractor, Transplant Solutions, LLC, to review Loyola's transplant program and financial operations in December 2021. While the contractor was careful not to explicitly accuse Loyola of fraud, there are numerous references to problems with Loyola's cost reports.

164.    Transplant Solutions noted Loyola's faulty double-billing process, specifically noting:

## Section III:  Registration and Billing

*TSLLC* met with staff both responsible for *LUMC* patient registration and billing systems for transplant to discuss the special needs of a transplant program. We discussed at length the requirements for Kidney, Heart, Liver, Lung and Pancreas transplant.  The leadership for these areas declined the invitation to participate.

It is important to control the registration process for pre-transplant, because Medicare requires the transplant center to report all costs associated with the pre-transplant evaluation process on the Medicare Cost Report and to help assure that patients and Medicare are not billed inappropriately. To achieve this, it is critical that each patient receiving pre-transplant evaluation services be registered in such a manner that the charges for hospital services can be "logged" for inclusion on the cost report by organ type. However, our understanding is that patients in the evaluation process were recently being registered based on the contract with their normal payer – and that they are registered with a global guarantor or in the "normal manner."  The normal manner is to register whomever their current payer is, Medicare or other insurance. Donor evaluations are billed to the appropriate program and not to their payer.  We were also told that registration for the physician consultations followed hospital registration, which is to the primary payer for the patient.

165.    Transplant Solutions specifically recommended that Loyola not use its current

process: "TSLLC does not recommend that the payer for Kidney pre-transplant services be billed

for evaluation services unless the center has adequate resources to assure proper billing and

follow up and that the patient is not billed for the services or for deductibles and coinsurance."

166.    Transplant Solutions noted the risk that Loyola was committing Medicare fraud:

"In our experience, very few programs have the resources to manage this complex billing process correctly, **including the look-back process to ensure there is no double dipping to Medicare at the time of transplant**, which is why TSLLC does not recommend it. Currently the dialysis units are being incentivized to refer patients for evaluation for listing. The program is experiencing a large increase in referrals. Treating all the patients as Medicare primary will expedite the evaluation process as well as minimize the chance of continuing billing issues. We are not aware of anything in regulation that allows for physician billing for kidney evaluation services to any payer, including non-Medicare third party payers for both living donors and recipients. We therefore recommend that the physician bill the transplant program for all evaluation services, including physician services covered by non-Medicare payers. If a patient has Medicare as the secondary payer, the patient is still a Medicare Beneficiary." (emphasis added)

167.     Transplant Solutions specifically noted "that it appears that there are currently registration and billing issues."

168.     Transplant Solutions went on to find

1.  Medicare regulations indicate that if an End Stage Renal Disease ("ESRD") patient is Medicare Entitled, the patient is not to be billed for pre-transplant evaluation services, since an evaluation is neither diagnosis nor treatment.  Additionally, the regulations indicate that the potential living donor for the Medicare Entitled potential recipient is not to be billed for any living donor evaluation services (even if the donor is not used), the inpatient stay for the donation, or for hospital services for complications related to the organ donation.  They also indicate that physician evaluation services are not to be billed to Medicare for ESRD patient or Medicare Beneficiaries for non-renal transplant patient evaluations.

    Staff reported that patients have been and are being billed for these services. Additionally, costs reported on the Medicare Cost Report show little physician pre-transplant evaluation cost. Hospital Billing Manual Section 90.1.1 indicates that pre-transplant evaluation services for Medicare Patients are not to be billed to Medicare.  This concern was reported to *LUMC* compliance during our visit and, with the concurrence of compliance, was not confirmed by *TSLLC*.

    It appears that the informed consent/patient education documents are indicating that the patient may be billed for deductible and coinsurance for the evaluation process.  As indicated in other sections of this report, this is inappropriate, and these documents should be modified.

169.     In short, Transplant Solutions found double billing, told Loyola it conferred with "compliance during our visit and, with the concurrence of compliance, [the finding] was not confirmed by [Transplant Solutions]." Loyola deliberately buried its head in the sand to the Medicare fraud it was actively committing.

170.     Chase understood that this practice had been going on for years and that Loyola had submitted tens to hundreds of millions of double billed tests.

171.     Chase had a meeting with Janice Wolfe about the double billing in roughly July 2021. The issue was raised all the way up to the Chief Financial Officer, but Relator Chase was excluded from the meeting. When Chase subsequently followed up about the issue with Jim Zuran and Emily Huizenga after that meeting, he was brushed off and told the issue was fixed.

172.    But Chase never saw anything that would in fact confirm the issue was fixed. Instead, soon after Loyola fired Chase.

173.    Transplant Solutions also noted specific concerns with time and therefore cost allocations. In short, Transplant Solutions found that Loyola was inflating the time it allocated to Medicare on the cost report. Specifically, it stated the following cost centers "raised questions" in an internal report.

   a.    "Nurse Administration is allocated based on RN FTEs [full time employees] (probably modified) and is only allocated to Liver Acquisition. The Departmental has costs that should be allocated to all of the OACC [organ acquisition cost center] departments."

   b.    Further, "Clinical Pastoral Education [the primary method of training hospice chaplains] is based on Time Spent and is only allocated to Lung Acquisition. If the process is part of the Live Donor evaluation process or the pre-transplant evaluation process, it may be allowable. However, it is questionable."

   c.    Finally, the "Pharmacy Residency Program is based on Program FTE's and is allocated to Heart and Lung acquisition only. Please review for appropriateness."

## IX.    OPO FRAUD

174.    The three OPO defendants, NJ Sharing Network, LiveOnNY, and Southwest Transplant Alliance, are all defrauding the United States by charging for unnecessary kidneys, including costs on their cost report that are not reasonable or necessary, and accepting kickbacks for tissue collection beyond reasonable costs. NJ Sharing Network is also collecting and billing Medicare for pancreases for research with no actual intention to perform research.

175.    OPOs are rated into three Tiers based on the OPOs' success in collecting organs. Tier 1 are OPOs at or above the top 25% performance rate for the prior year. Tier 2 are OPOs at the median performance rate based on the prior year. Tier 3 are OPOs below the median threshold for the prior year. Because every OPO could meet the highest tier, the tier system allows a calculation of how many additional organs, and thereby deaths, an OPO could prevent if it was performing up to standards.

176.    This ranking scheme was first finalized in a final rule on December 2, 2020 (*see* 85 Fed. Reg. 77901-14) and implemented on March 31, 2021. At the time of implementation, this rule was supported on a bipartisan basis by the U.S. Senate Committee on Finance, five former HHS Chief Technology Officers, economists, patient advocacy groups, and medical trade associations like the American Society of Nephrology.

177.    LiveOnNY covers Long Island, New York City, and southern New York.  In 2023, it was a "Tier 3 – Failing OPO" and the fourth worst performing OPO in the country. Had LiveOnNY met Tier 1 standards, it could have avoided an estimated 369 preventable deaths. Currently, as of July 30, 2025, LiveOnNY is a "Tier 1 – Passing OPO."

178.    Southwest Transplant Alliance is considered a "Tier 2 – Underperforming OPO" and is ranked in the middle of all OPOs at 24. Had Southwest Transplant Alliance met Tier 1 standards, it could have avoided an estimated 33 preventable deaths.

179.    Only NJ Sharing Network, which covers Northern and Central New Jersey, is considered a "Tier 1 – Passing OPO." However, NJ Sharing Network is one of the worst performing OPOs in the country at recovering organs from black donors.

**A.  Charging for Unnecessary Kidneys**

180.    Because kidneys are 100% covered by Medicare, any procurement that involves a kidney is covered by Medicare. If a transplant does not involve a kidney, then the procurement is covered by the eventual recipient's insurance, which may be Federal Healthcare.

181.    Medicare covers all kidney procurements, even if, after procurement, a medical professional determines the kidney is not viable. If other viable organs are procured, Medicare will cover the proportionate cost for Medicare recipients.

182.    Given the guaranteed reimbursement for kidneys, OPOs, including Defendant OPOs, instruct their staff to procure the kidney even when the OPO knows the kidney is not viable.

183.    OPOs can often tell that a kidney will not be viable. Either the body has been dead for too long and the kidney does not have enough blood, the donor has a problem such as cancer or another disease that makes them an ineligible donor, or the surgeon can tell the kidney is not viable from a visible inspection of the body, such as cuts or other damage. In these instances, the surgeons or OPOs are instructed to procure the kidney and then throw it in the trash. Because it is technically collected, the OPO then claims it on their cost report and gets reimbursement from Medicare. This all occurs while over 21.3 percent of collected kidneys are not even transplanted into recipients waiting for a life-saving kidney transplant.

184.    As one example, OPOs often seek donations after cardiac death (DCD) even when they know the donor will not have viable organs. The OPO will convince the family of someone who is on life support but will not recover to take the person off life support and donate the organs after they die. However, often the OPO knows the organs are either already damaged from the person's physical state (i.e. a bad car crash) or the person will not die within 60-90

minutes of coming off life support, and therefore their organs will deteriorate too significantly to be viable. Even if the person dies more than 90 minutes after being taken off life support, the OPO will still collect their organs to charge for the extraction, but ultimately discard the organs as non-viable.

185.    However, Medicare only pays for medically necessary procedures, and when the surgeon knows the kidney is not viable but harvests it anyway, the procedure is not medically necessary.

186.    Additionally, the OPOs will recover organs even if the donor has been dead for too long and the organ is therefore not viable for transplant. The OPOs will still collect the organs and ultimately discard them to increase their statistics and improperly bill Medicare.

187.    Chase worked at both LiveOnNY and NJ Sharing Network. Chase also regularly interacted with Southwest Transplant Alliance while employed at Parkland and was hired by STA before his offer was rescinded in retaliation for reporting Parkland and UT Southwestern's fraud. Chase therefore personally experienced LiveOnNY, NJ Sharing Network, and Southwest Transplant Alliance pulling non-viable kidneys.

188.    Southwest Transplant Alliance's organ procurement staff was so aggressive that they eroded the confidence of Parkland's emergency room staff in Southwest Transplant Alliance's commitment to its stated mission, who began to derisively refer to Southwest Transplant Alliance's recovery teams as "vultures" due to their aggressive approach practices.

189.    In one egregious example, on or about November 29, 2019, Southwest Transplant Alliance took a Parkland patient identified as an organ donor to the operating room to be prepared for organ recovery. However, while Southwest Transplant Alliance wanted to recover

the patient's organs, the patient was not actually deceased. Luckily, Parkland doctors overruled Southwest Transplant Alliance, stopped the recovery, and the patient was able to recover and live. Chase identified this instance in a later presentation to Parkland Executive Safety Event Committee.

190.    Chase previously interviewed with Southwest Transplant Alliance for a position while he was employed by Parkland. In a discussion with a representative from Southwest Transplant Alliance during an interview, a Southwest Transplant Alliance employee told Chase they viewed their mission as recovering every organ from a donor regardless of suitability.

191.    However, Chase understood from these conversations Southwest Transplant Alliance's goal was not to save as many lives as possible through recovering as many organs as possible but rather to maximize billings by recovering organs Southwest Transplant Alliance could bill Federal Healthcare, whether or not the organs were ultimately viable. In conversations with former CEO and President Niles, she stressed Southwest Transplant Alliance's job was procure organs even if they were not viable for transplant. She further stressed that Southwest Transplant Alliance's success was the number of kidneys Southwest Transplant Alliance recovered, not the number of *viable* kidneys Southwest Transplant Alliance recovered.

192.    This crucial distinction meant that Southwest Transplant Alliance was not boosting the number of organs it collected only by focusing its limited resources on increasing the number of organ donors or higher quality collection and handling processes. Instead, Southwest Transplant Alliance was content to collect a higher number of organs, regardless of the size of the donor pool or the quality of those organs.

193.    Chase had similar conversations at both LiveOnNY and NJ Sharing Network. For example, the director of Quality Control was told by the CEO of LiveOnNY to "fudge their data" in order to cover up the number of non-viable kidneys LiveOnNY recovered.

194.    Further, both LiveOnNY and NJ Sharing Network prioritized "consents" from potential donors, rather than viable kidneys. Meaning that at both LiveOnNY and NJ Sharing Network gave an increased rating if a non-viable kidney was procured and a decreased rating if a consent was not achieved for a non-viable kidney. Both LiveOnNY and NJ Sharing Network knew these policies would lead to an increased procurement in non-viable kidneys.

195.    NJ Sharing Network also aggressively procures kidneys, sometimes even storing kidneys that it obtains in a medical-grade freezer, which make the kidney unviable for transplant. NJ Sharing Network still codes the kidneys as collected "with the intent to transplant" in order to fraudulently bill Medicare. However, at the time NJ Sharing Network collected the kidneys and placed them in the freezer, it had no intention to transplant the kidneys, only to collect them to bill Medicare.

196.    The rates of kidney discard for all of the OPO Defendants exceed those for all other organs. For example, in 2024:

      a.    NJ Sharing Network recovered a total of 565 kidneys for transplant. A total of 177 kidneys, or roughly 31%, were discarded because they were not viable. By contrast, only one heart out of a total of 76 hearts collected from donors in the same time period was discarded.

      b.    Southwest Transplant Alliance recovered a total of 1,037 donated kidneys for transplant. A total of 358 kidneys, or 34%, were discarded because they were not

viable. By contrast, only one heart out of a total of 205 hearts recovered for transplant was discarded.

    c.   LiveOnNY recovered a total of 1,074 kidneys for transplant. A total of 344 kidneys, or 32% were discarded because they were not viable. By contrast, only two hearts out of a total of 110 hearts were discarded.

197.    Notably, kidneys have the longest timeframe for transplantation, lasting from 24-36 hours outside the body with proper preservation methods. Hearts, by contrast, have some of the shortest, lasting only 4-6 hours. Yet all of the OPO Defendants discard kidneys at a wildly higher rate than hearts.

**B. Charging for Excessive Costs**

198.    CMS reimburses OPOs directly for any cost related to a Medicare patient. This includes all costs related to kidneys. However, OPOs are only responsible for organ procurement, rather than organ transplant. Because any donor will most likely have more than one organ, the OPOs' work will necessarily require splitting costs between the Medicare covered portion and the non-Medicare covered portion.

199.    OPOs neither properly allocate charges to Medicare nor limit their charges to only those that are reasonable and necessary.

200.    For example, LiveOnNY has an office space with similar designs to a high-end law firm with expensive New York real estate. However, the costs for this design and real estate are primarily billed to CMS.

201.    As another example, in the 2010-2013 timeframe, LiveOnNY's CEO bragged that while they were at risk of decertification from CMS, they were going to fight CMS and would be

suing CMS with CMS's own money. When LiveOnNY did beat decertification, the CEO received a $250,000 bonus.

202.    Southwest Transplant Alliance built its own medical facility so it could perform the procurements itself and put all of the fees on its own cost report. An OPO building a medical facility creates an inefficient process because the donor body needs to be transported from the hospital to the transplant center for procurement.

203.    However, it does allow Southwest Transplant Alliance to greatly increase its billings to Medicare, because it can now bill for the office space and all of the costs associated with the procedure rather than paying those costs to the hospital.

204.    Further Southwest Transplant Alliance spared no expense when building its medical facility, as Southwest Transplant Alliance knew they could charge the costs back to Medicare. Southwest Transplant Alliance bought its own land, built state of the art facilities, built its own office building, and had state of the art offices on site. Upon information and belief these costs were included on STA's cost reports but would not be reasonable and necessary.

205.    Southwest Transplant Alliance built this facility, in part, to avoid any oversight from the hospitals of the donors, which allowed Southwest Transplant Alliance to procure even more non-viable organs to further inflate their cost report.

206.    Former Southwest Transplant Alliance President and CEO Patricia Niles would regularly hold lunches with surgeons and, upon information and belief, include the cost of the lunches on Southwest Transplant Alliance's cost report for reimbursement from Medicare.

207.    Southwest Transplant Alliance would also send an excessive number of staff to conferences. For example, Southwest Transplant Alliance regularly sent 8 to 12 staff to various

conferences, such as the annual Association of Organ Procurement Organizations (AOPO) conference, UNOS Transplant Management Forum, and the Regional Transplant meetings. Southwest Transplant Alliance representatives would often number the most of any organization, when many of the staff were not necessary at the conference. Upon information and belief, both the time and expense of the attendance would be included on Southwest Transplant Alliance's cost report.

208.    LiveOnNY and NJ Sharing Network also regularly paid lobbyists. Upon information and belief, those lobbying costs were improperly included on the cost reports and reimbursed by CMS. Lobbying costs fall plainly outside those costs which can be properly reimbursed through CMS.

209.    Further, the OPOs provide excessive salaries and bonuses, particularly to their executives.

210.    At the end of the year, before each OPO submits its cost report, the staff reviews its costs to ensure that the costs have increased from the year before. If they are not, the OPO will incur unnecessary charges, including salary increases and bonuses, unnecessary furniture, and other expenses, to ensure their budgets are going up and the OPO will receive more funding the next year.

211.    The operating costs are exorbitant. For example, the former President and CEO of Southwest Transplant Alliance, Patricia Niles, made $762,269 in 2019, the former CEO of NJSharing Network, Joseph Roth, made $727,598 in 2020, and the former CEO of LiveOnNY, Helen Irving, made $479,444 in 2020.

212.     The share of executive compensation at LiveOnNY ballooned from 4.7% of total expenses in 2021 to 7.1% of total expenses in 2023, or from $2,336,116 to $5,946,125 – an increase of nearly 155%. In 2023 alone, LiveOnNY CEO Leonard Achan made $1,110,396 in W-2 compensation while the OPO simultaneously had a loss of $1,978,941.

213.     These excessive costs drive up the actual cost of organ donation. Between 1996 and 2014, the cost of acquiring organs increased by 253 percent, but the volume of donors increased by only 57 percent, and the volume of transplants increased by only 45 percent.

214.     Further, the excessive costs are generally focused on the top executives at the OPOs. The line level staff responsible for the actual work of the OPOs are often paid at or below market rates for their expertise and instead sold on the OPOs mission. This leads to the OPOs not fulfilling their mission to collect every viable organ because the staff responsible for the work is underpaid and overworked to compensate for the excessive costs for the OPOs executives.

215.     The excessive costs not only improperly inflated the costs included on the cost reports but improperly increased the SAC charged for each organ the OPO Defendants procured. The inflated SAC cost was then passed on to the transplant recipient's ultimate healthcare provider, including Federal Healthcare.

**C.  OPOs Fail to Attempt to Recover Every Organ**

216.     OPOs are required to try to recover every organ possible. *See* 42 C.F.R. § 486.322. This is because any recovered organ means a life saved.

217.     However, OPOs regularly fail to try to recover every organ. OPOs regularly fail to go to hospitals that service low-income or minority populations under the mistaken belief that these patients will not consent to organ donation. Further, OPOs fail to attempt to recover organs

from older donor candidates who may only have one viable organ. They refer to these as "low yield candidates." But even one recovered organ can mean one saved life.

218.    In fact, the OPOs specifically instruct certain hospitals to not refer potential organ donors. If the donors are not referred, then they will not count toward the OPO's statistics for failing to recover an organ.

219.    For example, LiveOnNY does not try to recover from patients who only have one kidney available because it will lower their yield rate: if they only recover one kidney, their organ per donor is lower. So, if a donor only has one kidney, even though that kidney could be transplanted, LiveOnNY does not ask the donor's family to donate. This practice is also done by other OPOs.

220.    Further, LiveOnNY and NJ Sharing Network are located in some of the most densely populated areas of the United States. As such, they have some of the most opportunities for organ collection anywhere in the United States. But both OPOs generally transplant more organs than they collect because they do not put the time and effort into collection that they are required to.

221.    The OPOs also control how their statistics are reported. So, when an OPO fails to respond to a potential donor, they can simply fail to put that potential donor into their electronic health record and put in a fake reason for why the potential donor was not contacted. The OPOs hide their failings through this false data. While the metrics were changed in 2022 so that the OPOs have less control over how their statistics are reported, the OPOs still try to game the system so that they appear to perform better than they actually are performing.

**D.  The OPO Defendants Prioritize Tissue Collection Over Organ Collection Due to Kickbacks**

222.    Payment from tissue processors for tissue collection more than the limited amount permitted under law is a kickback in violation of the AKS.

223.    While tissue processors can use their own staff to collect tissue, they use OPOs' staff given the OPOs' unique access to potential donors. Every hospital is mandated to report potential organ donors, who all are potential tissue donors, to the OPO in their DSA. The OPOs collect the tissue for free and make a profit when they are paid by the tissue processors. Part of that payment by the tissue processors is a kickback for the OPOs' access to organ donors, procedures that are paid by Federal Healthcare.

224.    Tissue recovery and processing may be conducted by for-profit entities and, other than limited FDA regulation over the manufacture and use of HCT/Ps, is highly underregulated. Even though the OPO Defendants are non-profit organizations, tissue procurement provides them with a significant source of revenue. For example, LiveOnNY earned $8,533,536 in revenue from tissue procurement efforts in 2023.

225.    Chase directly witnessed and discussed with doctors, nurses, and ICU staff that Southwest Transplant Alliance staff prioritized tissue collection over organ recovery.

226.    Additionally, while at both LiveOnNY and NJ Sharing Network, Chase was regularly part of meetings with the tissue processors where management stressed that LiveOnNY and NJ Sharing Network staff should prioritize tissue collection. The tissue processors maintained a very close relationship with both LiveOnNY and NJ Sharing Network, sponsoring seminars and charity walks.

227.    One of these tissue processors was MTF Biologics, a large tissue processing company organized as a 501(c)(3) organization. The President & CEO of NJ Sharing Network currently sits on the Donation Board of Trustees for MTF Biologics.

228.    Upon information and belief, the ultimate payment by the tissue processors to the OPO Defendants was for more than the cost of collection. This means tissue processors effectively paid the OPO Defendants a profit, which is a kickback for the OPO Defendants' access to the patients through organ collection paid for by Federal Healthcare.

229.    Further, upon information and belief, the OPO Defendants would improperly include the costs for tissue donation on their cost reports and SAC fee buildup, improperly inflating both their cost report reimbursements and SAC fee paid by Federal Healthcare.

**E.  LiveOnNY Prioritizes NY Area Hospitals Over Patients on the Waitlist**

230.    Through the relevant time period, LiveOnNY has struggled with mismanagement leading it to fail its mission of successfully transplanting organs: it used undertrained staff, failed to effectively approach and get consent from prospective donors, and failed to address racial disparities in organ donation in their DSA, particularly low rates of donation from Black donors.

231.    In October 2018, an unrelated OPO, Gift of Life, was commissioned to perform an assessment of LiveOnNY. Gift of Life concluded that, though the "population diversity in New York City will always account for some degree of underperformance… [i]t is out strong opinion that none of these factors, either in isolation or collectively, account for the degree of underperformance at LiveOnNY."

232.    The report from Gift of Life also identified the following institutional problems:

a. Executives of LiveOnNY were "aware of certain performance issues but….[fail] to address them," leading "to the culture lacking accountability." At the same time, the training offered to employees was called "inadequate and under-resourced"

b. Gift of Life stated that "[t]he organizational structure at LiveOnNY is not aligned for effective management of the organ donation process," resulting in each separate staff discipline (for example, Transplant Coordinators and Family Services Coordinators) effectively functioning as "independent practitioners under the oversight of multiple leaders."

233.    LiveOnNY did not implement many of the changes identified in the 2019 report, even though it knew of the clear deficiencies in the organization. Instead, LiveOnNY deliberately continued with business as usual.

234.    Instead of focusing on these core ongoing problems, LiveOnNY instead has focused on an illicit process to prioritize transplant centers that are part of the Greater NY Hospital System Association, by improperly classifying organs as "rush cases" so that NY area hospitals can accept these organs out-of-order from the transplant list. These "rush cases" rely on LiveOnNY depicting the organ as in worse quality as it actually is, and using a bypass code to bypass DonorNet for allocation.

235.    The President of the for-profit arm of the Greater NY Hospital Association is Lee Pearlman. Pearlman also previously served as the Chairman of LiveOnNY.

236.    Instead of investing in additional staff and training for employees as advised in various external reports, LiveOnNY decided to use its limited funds for an "employee incentive

bonus program" which directly tied line-level employees' compensation to the number of organs transplanted and donors obtained.

237.    LiveOnNY forces all departing employees to sign a non-disclosure agreement in order to shield themselves from scrutiny or criticism by former insiders.

**F.  NJ Sharing Network Hoards Unused Pancreases Originally Collected for Research**

238.    Procuring pancreases (pancreata) from donors for medical research contributes to life-saving medical research. However, NJ Sharing Network games the CMS regulatory loophole for pancreata collected for the purpose of research in order to artificially inflate its performance.

239.    Because the vast majority of medical researchers decline to use NJ Sharing Network's offered pancreata, NJ Sharing Network stores them on-site at what it calls its "research facility." This "research facility" is actually just a refrigerated room or medical freezer that has no connection to research. In short, NJ Sharing Network collects pancreata with no intention of anyone performing any research but instead to place the pancreata in a freezer and bill Medicare.

240.    The following image shows pancreases stored on the bottom shelf and kidneys stored in a box on the top self in a freezer operated by NJ Sharing Network.



241.    Though there are legitimate use-cases for the collection of pancreata and the

storage of pancreata under cryopreservation, on information and belief, NJ Sharing Network

obtained these pancreata from donors even though it knew there was no research need and had

no intention of anyone performing any research. Instead, NJ Sharing Network only claimed a

need for research in order to bill Federal Healthcare.

242.    Additionally, in guidance issued in 2024, CMS clarified that "procurement for

purposes of potential pancreatic islet cell research alone is insufficient for the organ to count, nor

donors of unused pancreata to count as donors, if the pancreata are not used as prescribed." *See*

CMS Policy QSO-24-04-[OPO].

243.    As a result of NJ Sharing Network's fraudulent procurement of pancreata, its observed organ specific yield rate for pancreases vastly exceeds projections. From January 1, 2023 through December 31, 2024, NJ Sharing Network recovers 7.2 pancreases per 100 donors, even though it is only expected to recover 4.1 pancreases per 100 donors. There is no similarly large discrepancy between expected and observed organ yield rates for any other organs.



244.    Similarly, data from 2018 through 2023 reveals that NJ Sharing Network dramatically increased the number of pancreata it procured for research, going from a sole pancreas in 2018 to 113 in 2023:



245.    NJ Sharing Network also did not disclose that it suffered a major ransomware attack on its EMR, resulting in a shutdown of all information systems on May 1, 2022. Rather than disclosing the attack, NJ Sharing Network instructed employees to not inform UNOS or transplant centers of the attack.

## X.    UNOS'S FAILURES

### A.    UNOS Contract Requirements

246.    UNOS is required to operate the OPTN. The OPTN "must operate and monitor an equitable system for allocating organs, maintain a waiting list of potential recipients, match potential recipients with donor organs, and work to increase the supply of donated organs." The OPTN further "establishes and maintains training and experience criteria for designated transplant personnel" and further "establishes, maintains, and monitors compliance with federal laws and OPTN policies[.]" Finally "the OPTN must also collect, analyze, and routinely publish donation and transplant data."

247.    UNOS is not allowed to take credit for OPTN work and instead must refer to everything as the OPTN rather than as UNOS or UNOS/OPTN.

248.    The contract lists 10 major objectives and 10 functions. These include requirements that the OPTN contractor, UNOS, must:

a.    "provide and implement a system for monitoring patient safety and evaluating member compliance with federal regulations, OPTN Bylaws, and policies.";

b.    "conduct[] reviews and evaluations of OPTN members and taking actions consistent with the OPTN final rule and the OPTN Bylaws for OPTN member non-compliance, including referring matters to the Secretary.";

c.    "collect[], analyz[e], and publish[] organ donation and transplantation data."

249.    The contract is primarily funded by an OPTN registration fee to "cover the Contractor's [UNOS's] share of this contract." The contract further specifies that the fee "shall not be expended for any purpose other than to support contract activities[.]"

250.    The fee is based on 5 factors: "1. The historical pattern of fees and fee revisions; 2. Changes in scope or amount of work required to perform the contract; 3. The number of patient registrations projected; 4. Changes in costs of providing services; and 5. The accumulation of appropriate capital and operating reserves for the OPTN."

251.    OPTN data is broadly defined as "all data by the Contractor pursuant to regulatory requirements (e.g., 42 CFR 121.11) and to fulfill its obligations under this contract."

252.    UNOS is required to "develop and implement a plan to collect official OPTN data through direct electronic data submission" as well as "identify available external data sources to address research questions important to organ donation, procurement, and transplantation,

identified by HRSA and/or the OPTN, requiring data beyond those collected by official PTN data collection."

253.    UNOS must "make official OPTN data (as defined in Task 3.5) available to the Secretary (including HRSA), the SRTR [(Scientific Registry of Transplant Recipients)] Contractor, OPTN members, researchers and members of the public as specified by the OPTN final rule (including 121.11(b)). The Contractor shall provide manuals, forms, flow charts, operating instructions, or other explanatory materials as necessary to understand, interpret, and use the information accurately."

254.    UNOS further must make the data available publicly and "respond to OPTN member requests for data needed to manage and improve OPTN member operations. The Contractor shall made available member data to that OPTN member without charge according to Final Rule 121.11, the OPTN, as appropriate, shall provide data to an OPTN member, without charge, that has been assembled, stored, or transformed from data originally supplied by that member." (internal quotation omitted).

255.    UNOS also must provide education and "shall develop and disseminate through the OPTN website materials in English and Spanish intended to educate the public, patents, donor families, potential donors, and potential transplant candidates on the OPTN system, organ donation (including living donation and KPD [(kidney paired donation)]), organ matching, OPTN policy development (including public comment), OPTN data collection, and system performance information produced by the Contractor s well as by the SRTR."

256.    UNOS is required to have a Data Advisory Committee (DAC) "to review and make recommendations to the BOD [(Board of Directors)] regarding the collection of official

OPTN data that are pertinent to the operation of the OPTN, necessary for the development of evidence-based OPTN policies, and to support analytic work undertaken by the OPTN Contractor or the SRTR contractor."

257.    UNOS must "develop and implement a plan to provide structured education to members of the OPTN BOD, operating committees, policy development committees/groups, and to OPTN regional members about the legislative and regulatory requirements of NOTA [(National Organ Transplant Act)] and the OPTN final rule to facilitate informed OPTN policy making."

258.    The OPTN Board is required to annual submit an attestation that "they may not take into consideration any responsibilities they may have to the Contracting organization and any other organizations as they carry out their OPTN BOD responsibilities. By signing this attestation document, they are agreeing to carry out the responsibilities of the OPTN authorized by NOTA and the OPTN final rule, to follow the OPTN Charter and Bylaws, and to work with the OPTN Contractor as it carriers out the requirements of the OPTN Contract."

259.    UNOS Is further required to "support and maintain an MPSC to maintain membership criteria and monitor OPTN members for compliance with OPTN membership criteria; OPTN Bylaws, policies, and the OPTN final rule. The Contractor shall support the MPSC in reviewing the performance of OPTN members as described in task 3.6, and address events identified as presenting a risk to patient safety and public health. The Contractor shall include the COR [(Contracting Officer Representative)] and COR-designated HRSA staff in all MPSC deliberations."

260.     UNOS further must "monitor OPTN member performance, including threats to patient health and public safety, maintain and develop efforts to improve OPTN member performance, and impose sanctions when warranted."

### B. UNOS double-charges transplant centers in addition to the OPTN fee, which is passed on to Federal Healthcare.

261.     UNOS double-charges transplant centers a fee in addition to the OPTN fee for listing donors, even though the UNOS fee does not entitle transplant centers to any additional services beyond those already provided by the OPTN.

262.     Previously, this fee was included on the exact same invoice that included the OPTN fee. Only in October 2021 did UNOS, as the contractor for the OPTN, begin charging transplant centers the OPTN fee separate from the UNOS fee. According to the OPTN Finance Committee Meeting on December 6, 2021, this was to emphasize that the UNOS fee was "voluntary." However, the invoice does not state that the fee is voluntary.

263.     Prior to October 2021, the UNOS fee was included on the same invoice as the OPTN fee, causing transplant centers to believe the UNOS fee was part of the mandatory OPTN fee. Transplant centers incur the fee whenever they placed a new donor on the waitlist, and passed the costs on to Federal Healthcare.

264.     UNOS claims the fee is a monthly charge based on additional work to include analysis and data related services provided to all transplant community members that the Organization bills to those same member organizations that received an OPTN fee and is solely a UNOS based fee

265.     However, UNOS, through the OPTN, is already required to provide analysis and data to all transplant community members. Further, UNOS does not have any data because all

data is for the OPTN as provided by UNOS's contract with HHS. Instead, UNOS is fraudulently billing transplant centers, who in turn bill Federal Healthcare, for work UNOS is already being paid for in its role as OPTN Contractor.

### C.  UNOS Fails to Oversee OPOs

266.    UNOS has failed to oversee OPOs and organ donation in the way required by the law, regulation, and its contract with the United States. Instead, UNOS has conspired with the membership it is supposed to oversee to hide issues from HHS and attempt to avoid accountability for the widespread fraud in organ donation.

267.    Chase directly experienced UNOS's catch and kill activity. Chase compiled the statistics on UT Southwestern doctors passing over Parkland patients for UT Southwestern patients and reported the issue to UNOS on or about February 18, 2020.

268.    UNOS reviewed the data and asked for an explanation from Parkland concerning ten specific incidents on March 18, 2020. The UT Southwestern doctors working at Parkland drafted Parkland's response, and provided their stated explanation for declining the organs in a formal response sent on April 1, 2020. The explanations all made the organs seem unusable owing to what they claimed was a "conservative approach to kidney offers" even though the doctors ultimately used the organs at UT Southwestern. There was no individualized explanation provided addressing why the organs were later accepted at UT Southwestern.

269.    UNOS failed to properly exercise its oversight capabilities and failed to identify the fraud. Instead of comprehensively investigating the issue, on or about April 30, 2020, it sent correspondence confirming it accepted Parkland's explanations and failed to refer the report to the MPSC. Without a referral to the MPSC, the issue had no way of being reported to HHS.

270.    Instead of performing their duties under the contract to oversee OPOs, UNOS protected industry insiders by accepting the perfunctory explanation raised in response to Chase's complaint. Rather than conducting a fulsome investigation, it failed to investigate, escalate, and remediate this fraud.

271.    Chase's experience is not an isolated incident. Rather it is part of a pattern by UNOS to ignore reported instances of misconduct. For example, a bipartisan Senate investigation found that:

  a.  The OPTN is failing to provide adequate oversight of the nation's OPOs, resulting in fewer organs available for transplant.

  b.  The lack of oversight by UNOS causes avoidable failures in organ procurement and transplantation resulting in risks to patient safety. These failures include testing procedure errors, transportation issues resulting in life saving organs being lost or destroyed in transit, and process and procedure failures.

  c.  UNOS lacks technical expertise to modernize the OPTN IT system, resulting in risk of system interruption or technical failure with the potential to harm patients across the country.

272.    UNOS receives complaints on behalf of the OPTN. These complaints are not properly vetted by UNOS and reported to the OPTN MPSC. The MPSC is made up of volunteer staff. But complaints are only referred to the MPSC staff once vetted by OPTN staff. UNOS will not refer a complaint if the issues are outside of what UNOS views as OPTN authority or do not violate a policy.

273. Even more glaring, OPO violations are first referred to a working group of the MPSC that is made up of MPSC members who work at OPOs. Currently, four members of the MPSC board, more than one in ten board members, are current OPO executives. One of these members is Chad E. Ezell, the current President of LOPA and the former Chief Operating Officer for Defendant LiveOnNY from July 2019 through July 2023. In essence, UNOS gives the MPSC OPO members the chance to spike any investigation before it even starts.

274. UNOS received 1,118 complaints against all 57 OPOs between 2010 and 2020. UNOS referred less than half of the complaints to the MPSC, only referring 444 of the 1,118 complaints.

275. 104 of those complaints were for testing procedure errors, such as donor blood type mix ups, not identifying infectious diseases in the organ donor, or failing to perform the required blood and urine tests on the donor. These problems led to actual issues for donor recipients. 211 donors transmitted disease and 249 recipients developed diseases from the donated organs. 70 of those 249 recipients died because of the disease they received. UNOS only referred 30 percent of these testing procedure complaints to the MPSC.

276. 109 of those complaints were for not following the allocation procedure. LifeGift was reported multiple times between 2018 and 2019 for not following the heart and lung allocation procedures, which resulted in at least one unnecessary discarded heart. UNOS only referred 17 percent of these recovery procedure complaints to the MPSC.

277. 53 of the complaints were for transportation failures, which would negatively impact the organ's quality or expected arrival time to the transplant center. UNOS only referred 6 percent of these transportation failures to the MPSC.

278.    When UNOS does refer a case to the MPSC, it does so in a way to limit the action the MPSC takes. Of the 444 cases referred to the MPSC, only one case resulted in probation. Three resulted in a peer visit, 63 resulted in a letter of warning, 298 were uncontested or resulted in a letter of noncompliance, and 68 were closed without any action.

279.    Only probation cases are publicly disclosed. Therefore, by ensuring that the MPSC does not take action, both through not providing referrals and downplaying the problems, UNOS is able to hide the problems in the organ transplant system. Further, UNOS does not follow up with the person who submitted the complaint.

280.    Brian Shepard, the former CEO of UNOS, understood the MPSC failed to perform its stated functions but nonetheless did not meaningfully reform the MPSC. Commenting on the presence of transplant sector insiders in the oversight process, he described the MPSC as "like putting up your kids' artwork at home. You value it because of how it was created rather than whether it's well done."

On Mar 1, 2018, at 11:57 AM, Brian M. Shepard <​███████████████​> wrote:

I know you agree, but this whole thing drives me nuts. I don't know how to fill important positions with people who know what they're doing.

Allowing the community to fill these jobs increases the community's belief in the validity of the outcomes. Even while it make MPSC more variable, or allocation policy less coherent. It's like putting your kids' artwork up at home. You value it because of how it was created rather than whether it's well done. Only in this case, we persuade ourselves that it's well done anyway.

281.    UNOS does not view the MPSC's role as addressing broader trends in OPO non-compliance. Instead, the MPSC refers any broader issues to the OPTN OSC. However, the OSC does not review any individual cases but only de-identified data.

282.    In essence, UNOS views the MPSC as not responsible for systematic problems and the OSC as not responsible for looking into any individual OPOs. Thus, the systemic problems with OPOs are never addressed as UNOS has set up a system where no one is responsible for reviewing and addressing the problems.

283.    This is unsurprising, as the OPTN is filled with many prominent members of some of the most problematic OPOs and other friends of the OPOs who have a vested interest in the status quo.

284.    For example, the Organ Procurement Organization Committee of the OPTN "considers issues relating to organ procurement organizations and their role in increasing the number of organs recovered and allocated efficiently and effectively. The Committee considers medical, scientific, and ethical aspects of organ procurement as they pertain to the purview and responsibilities of the OPTN." The committee has 17 voting members excluding the UNOS liaison, of which 13 are OPO representatives.

285.    UNOS knows that the United States will not catch its failures as HHS instead relies on UNOS to operate the OPTN. Before HRSA began OPTN modernization, there are only 3-4 employees at HRSA responsible for overseeing the OPTN contract. And, as UNOS knows, HHS splits the monetary and policy oversight. While HRSA is responsible for organ transplant policy, CMS is responsible for reimbursement. While organ donation receives billions of dollars, it is dwarfed by other Medicare spending and therefore is considered small and specialized so that it receives little oversight from CMS. UNOS knows this diverse and limited staff that oversees organ transplant has to rely on UNOS, and UNOS therefore believes it can get away

with covering up the problems in organ donation to keep the cash from the United States flowing.

286.     For example, over twelve years, not one OPO has ever had its cost report audited.

287.     UNOS also retaliates against those who report problems. It is widely known in the industry that if someone raises a complaint to UNOS, they are likely to be frozen out of the organ donation world entirely. Therefore, UNOS discourages any complaints in the first place.

288.     UNOS takes advantage of this split oversight. UNOS's position is that the OPTN is not authorized to review or enforce CMS coverage decisions. Therefore, UNOS does not review OPO costs or investigate unallowed cost expenditures by OPOs. In essence, UNOS, through the OPTN, has been given the oversight authority of a MAC but disclaims any responsibility for the actual expenditure of CMS funds.

289.     UNOS recognizes its role in oversight, stating on its FAQs that: "There are three steps in oversight. As the OPTN, UNOS manages the first two – self reporting and peer review. UNOS provides data reports, tools and coaching to help members improve and avoid the third step, which is regulatory. Centers for Medicare & Medicaid Services (CMS) provides regulatory oversight."

290.     However, after the United States Senate Finance Committee began investigating UNOS, UNOS added to its website to claim "many people think UNOS oversees every facet of the transplant process. We don't […] UNOS is a forum for organ donation and transplant professionals to come together and determine how the national system should work."

291.     This is exemplified by the fact that, despite the major failures of the U.S. organ transplant system, no OPO has ever lost its government contract.

292.     Instead, oversight operates as a catch and kill operation, whereby UNOS and the

OPOs retaliate against anyone who raises concerns. As one transplant consultant explained, "if I

had a complaint, I probably wouldn't go anywhere. The messenger usually gets shot, so knowing

what I know, I wouldn't go to UNOS or CMS."

293.     The following are representative examples of UNOS failing to perform its

oversight function.

<u>LifeGift</u>

294.     UNOS received a complaint from a hospital that LifeGift improperly allocated a

heart and lungs recovered from a donor. The hospital noted this was the second time that a

patient seeking organs from LifeGift died before receiving a transplant when they should have

received an organ.



295.     In both instances, LifeGift initially matched the lungs to a different patient before

matching the heart. However, per OPTN policy, when a heart-lung candidate is allocated a heart,

the lung must go to the same candidate. In both instances, the transplant center that received the

heart requested their patient also receive the lungs, but LifeGift refused to give the lungs. In both

cases, the patient in need of the heart died before transplant and the recovered heart was

discarded.

296.     UNOS inquired with LifeGift and LifeGift responded, blaming the entire incident on the hospital. UNOS notified LifeGift that it had committed a policy violation. LifeGift violated the same policy again a month later.

297.     LifeGift resisted UNOS's efforts to investigate. The incidents were eventually referred to MPSC. Throughout the investigation, MSPC staff noted that board members who were affiliated with OPOs pushed to protect LifeGift and did not advocate for heart-lung transplant candidates and OPTN policy.

| | | |
|---|---|---|
| ▬▬▬ | | |
| welcome! I'm pissed though. | | 11:41 |
| ▬▬▬ | | |
| I know, but lots of OPO peeps in here. | | 11:42 |
| strong opinions | | 11:42 |
| ▬▬▬ | | |
| No joke. Poor outnumbered thoracic peeeps | | 11:43 |
| Policy clearly says "must." There are hardly any policies that say "must." | | 11:43 |
| ▬▬▬ | | |

298.     The MPSC recommended a notice of noncompliance, but the case was ultimately closed with no action. MPSC staff indicated that it was the OPO board members, such as Alex Glazier, the President and CEO of New England Donor Services, who pushed for the case to be closed with no action.

Thought you might be interested in reading the 3rd and final reviewer's comments for TXGC's HR/LU allocation policy violation. ▮ and ▮ ▮ both said NON (with no additional comments, unfortunately). Here's Alex Glazier's:                                                                          11:46

needing lungs requested the OPO rescind the prior lung offer? This seems like an inappropriate request by the ctr. Will that behavior be addressed by the MPSC? My question for the OPO is, in these circumstances where heart allocation has to resume after lungs have been placed, why is the OPO offering a heart to a candidate listed as needing heart/lungs? If the lungs are no longer available, those candidates should be screened off to avoid this type of frustrating ▮ I think this case should be closed with no action and I think there should be correspondence back to the Ctr about making requests for OPOs to rescind offers. "                                    11:46

Wait let's try that again:                                                                    11:46

Glazier: "I am not clear why this is a policy violation at all? The sequence of allocation appears to be that the OPO appropriately allocated lungs and then later in the allocation process the ctr with a heart candidate needing lungs requested the OPO rescind the prior lung offer? This seems like an inappropriate request by the ctr. Will that behavior be addressed by the MPSC? My question for the OPO is, in these circumstances where heart allocation has to resume after lungs have been placed, why is the OPO offering a heart to a candidate listed as needing heart/lungs? If the lungs are no longer available, those candidates should be screened off to avoid this type of frustrating ▮ I think this case should be closed with no action and I think there should be correspondence back to the Ctr about making requests for OPOs to rescind offers. "                                    11:47

▮▮ ▮▮

ok, so by that logic, the next time I am allocating a kidney and the candidate needs a heart, go ahead and give it to them. And when the lung people start asking about a heart, I should just tell them, "tough toenails!! Already placed that!                                    11:49

This is goddamn bananas                                                                    11:49

▮▮ ▮▮

How does an attorney not read that policy and see a violation of it?                          11:50

### Donor Network West

299.    On or around December 22, 2020, Donor Network West (CADN) recovered organs from a teenage donor who died from gunshot wounds. The donor's blood type was determined incorrectly. Three of the people that received organs from the donor experienced graft rejections and their immune systems attacked the donated organs. Three out of four of the recipients nearly died.

300.    CADN relayed serious concerns to UNOS pre-transplant, but UNOS ignored the

concerns, provided incorrect advice, and told CADN to put "something in…big and bold" and

"you should be okay."



12-21-2020
17:45

United Network for Organ Sharing (UNOS) – CALL TRANSCRIPTION

▪   ██████ Organ Center, this is ██████

•   Hi ██████ my name is ██████ ██████ I work for Donor Network West in California. I have a question regarding, I guess, UNOS Policy (question mark). I really don't know how I am going to ask, but I am going to try. A patient we are currently working up for organ donation, this patient unfortunately came in, was admitted and had an emergent thoracotomy in the ED and was massively transfused. He received over 30 units of products.

•   ██████ Right, ok, so if you take a look at, actually the policy that is going to cover this is 2.5 and 2.6. 2.5 and, basically 2.5 covers hemodilution assessment. So, what it states (reads policy 2.5). 2.6 covers a little bit more in depth what needs to be done to determine blood type so I'm guessing you have two samples drawn on two separate occasions, different collection times, submitted separately (██████ yes, uh huh). Ok, the best thing that I can tell you to do, because what it's also saying here is that documentation is needed to showing blood type determination is conducted according to your own written protocol, and a complete history of all blood products received by the donor since admission needs to be in the donor's medical record. So, as long as all of that is there, you should be okay; but because this is such a unique situation, I would definitely recommend putting something in donor highlights, big and bold, so that everybody sees it. I would, when you go notify primary centers that should be the first thing that you let them know. You know, just be very above board about everything. But as long as the documentation is there of received blood products and the two ABO source

documents and hemodilution worksheet and all that, as long as all that is in there, you should be okay.

301.    CADN self-reported to UNOS that they assigned the wrong blood type. UNOS staff recommended referring the case to MPSC.

Life Connection of Ohio

302.    Life Connection of Ohio (OHLC) received an organ referral for a patient with a brain bleed. OHLC conducted a medical record review on March 29, 2020, and started looking for organ matches on March 31, 2020. On April 1, 2020, the donor was deemed brain dead and OHLC transplanted the patient's organs. The donor hospital received a surgical pathology report from a brain biopsy, that had a received date two days before brain death and a signature eleven hours before the brain death, which indicated that the patient had a malignant brain tumor.



303.    OHLC was not informed of the brain biopsy until April 22, 2022. At that time OHLC notified the transplant centers that received the organs. OHLC also learned there was a mention of the tumor in the hospital chart.

304.    On June 4, 2020, UNOS received a complaint that OHLC failed to identify that the donor's cause of death was cancer. Transplanting an organ from a donor with cancer creates

the risk that the transplant recipient could die within 3 years. UNOS opened a review and found

that OHLC had records that stated the radiologist could not rule out a brain mass.



305.    On July 31, 2020, UNOS informed OHLC that they were not forwarding the case

to the MPSC.



Dear ▮▮▮▮▮:

The United Network for Organ Sharing (UNOS) serves as the Organ Procurement and Transplantation Network (OPTN) under contract with the Health Resources and Services Administration (HRSA) of the U.S. Department of Health and Human Services. Under that contract, UNOS staff continuously review reported or identified patient safety and/or public health related concerns.

UNOS Member Quality appreciates your response to the inquiry letter sent to Life Connection of Ohio (OHLC) on June 22, 2020. Specifically, this inquiry involved the malignancy evaluation and disclosure by OHLC for donor ▮▮▮▮.

At this time, UNOS Member Quality is requesting no additional information and will not forward this matter to the Membership and Professional Standards Committee (MPSC) for review. Please be aware UNOS could submit this matter to the MPSC should additional information become available in the future.

## Nevada Donor Network

306.    A kidney recipient died six days post-transplant from a rare bacterial infection on

July 13, 2017. The Centers for Disease Control and Prevention (CDC) learned about this incident

on July 19, 2017, and contacted UNOS. However, UNOS had learned of the incident five days

prior from a Nevada Donor Network (NVLV) self-report submitted on July 14, 2017. UNOS did not share this information with the CDC.

Printed 7/17/2017 8:48:49 AM

## Improving Patient Safety

### Safety Situation Details
**Situation ID** ▮▮▮▮▮                                    **Reported 07/14/2017**

The goal of the Improving Patient Safety system is to collect information about safety related incidents occurring system-wide, in order to increase organ utilization and decrease the morbidity and mortality of transplant patients.

⚠ **What is a Safety Situation?**
A situation or activity that affected or could have affected patient safety.

**What to report:**
- Any patient safety situation
- Any other situation that causes a safety concern from a transplantation, donation, and/or quality perspective.

**Please report such situations in a timely manner.**

**Situation Information**

**Reporting Institution:** ✳    **NVLV-Nevada Donor Network-Independent OPO(Member)**

307.    Instead, UNOS labeled the NVLV self-report "low priority."

308.    The infection was identified as tularemia, a rare infectious disease. It is important to report and contain diseases like tularemia and ensure that these diseases are not passed to the vulnerable population that needs organs. UNOS failed to follow its policy to escalate incidents that related to a threat to public health.

309.    The CDC, in a July 19, 2017, email, expressed concerns to UNOS and asked if they received any reports about the transplant recipients' deaths. UNOS did not inform the CDC about NVLV's self-report.

Exhibit E.45

Sent from my iPhone
On Jul 19, 2017, at 2:50 PM, ████████████████████████████████ @cdc.gov> wrote:

Dear all,
We just received a call from our bacterial diseases group at CDC as they were notified of two patients (in CA and NV) who have confirmed tularemia infection – both were recipients of kidneys from a common donor.  One (NV) recipient has died.

Have you (UNOS) received a report on this? CDC obviously will accept the investigation.  We do not know yet if there are other organ recipients or tissues were recovered.

Please let us know as soon as you hear back about this
I am available at all times at below contact information

████

████ █ ████████████
████

Office of Blood, Organ, and Other Tissue Safety
Division of Healthcare Quality Promotion
Centers for Disease Control and Prevention

### Mississippi Organ Recovery Agency

310.    UNOS received a report of two instances where kidneys were delayed in transit, resulting in extended cold ischemic time, which degrades the organ's quality, for two kidneys and a third kidney that had to be discarded. UNOS requested further information and received a response from Mississippi Organ Recovery Agency (MORA), but the case was closed with no action and MPSC did not review the case.



**Situation Information**

| Reporting Institution: ✳ | AZMC-Mayo Clinic Hospital-Transplant Hospital(Member) |
|---|---|

AZMC is reporting two instances where NGL (Network Global Logistics) was used as the transportation courier service and the organs did not arrive to the airport in time to make the flight. This resulted in 3 cancelled kidney transplants due to prolonged cold ischemic time. 2/25/17- UNOS ID: ████ Match ID: ████ AZMC accepted the left kidney. Second case was from 12/17/16. UNOS ID ████ Match ████ AZMC had accepted both the right and left kidney.

### Donor Alliance

311.    Donor Alliance (Colorado/Wyoming OPO) filed a patient safety event report regarding Sterling Courier services and UNOS after Sterling Courier failed to pick up a kidney

and UNOS communication failures resulted in extended delays for the transportation of that kidney.

| | |
|---|---|
| **Date Event Occurred:** ✳    03/20/2018 | |
| **Detailed Description of the Event:** ✳ | A kidney for transplant was left at the Donor Alliance Recovery Center by Sterling Courier. According to their paperwork, they were to only pick up the left kidney. There was a data entry error by Sterling Courier that led to the right kidney not being added to the job with the left kidney. There was additional miscommunication between UNOS and NYRT on acceptance of the right kidney and arranging transport of the right kidney. Donor Alliance was never made aware that the right kidney was not picked up with the left kidney. DA was also not notified when alternate arrangements were supposed to be made by UNOS for right kidney to NYRT. UNOS did not have proper handoff between shifts and to DA. The consequence of the errors in communication is that a transplantable organ had to be discarded and a recipient who was expecting to receive that kidney was not going to get a transplant. |

312.    UNOS conducted a review and found there was a "lack of clear or complete communication during hand off from one shift to the next" and recommended corrective actions.

| | |
|---|---|
| **Please specify additional details regarding the RCA:** | RCA by Sterling found: The data the Customer Service Representative entered into QuickTrak (Sterling's internal shipment tracking system) did not save to the job, as the Customer Service Representative neglected to hit the correct key upon exiting. The action eliminated any awareness of the additional organ to the Customer Service Representatives who were involved as the shipment progressed. RCA by UNOS found: Lack of clear or complete communication during hand off from one shift to the next. CA measures include: 1. We have reviewed and discussed this case in detail at yesterday's staff meeting to re-educate on our processes, and discuss best practices with clear and proactive communications. 2. We have decided to pilot a process of putting active transportation cases on our electronic "Active Cases" dashboard to eliminate gaps when staff change shifts. RCA by Donor Alliance found: DA organ staff needs to communicate with the tissue staff when an organ is to be picked up by a courier company. CA is to implement a communication process (white board and log for communication between organ and tissue teams). |

313.    However, UNOS never conducted any additional inquiries or investigations and never referred the matter to MPSC.

Good Morning 

█████ forwarded my team your email regarding closure of an event submitted by CORS in April 2018. Our protocol is to send formal closure correspondence for events when we've first sent an inquiry to request additional information (and sometimes RCAs, CAPs) from a member. I've just reviewed the case and see that UNOS didn't send an inquiry, so no closure letter would've been sent. I'm attaching the Acknowledgement letter that was sent when your team submitted the event to the system. This will be the only correspondence to CORS for this case. Please let me know if you have questions about this.

Kind regards,



*Safety Analyst*

UNITED NETWORK
FOR ORGAN SHARING

### Jackson Memorial Hospital Transplant Center

314.    Jackson Memorial Hospital Transplant Center in Miami made a report to UNOS after a kidney was discarded after it was lost in transit. The kidney came from We Are Sharing Hope (SCOP). American Airlines lost the kidney, and only found the kidney after it was no longer usable. UNOS reviewed the case and contacted SCOP who noted that the problem was the result of transportation and courier issues. UNOS never sent the case to MPSC.

| From: | ████████████ @lifepoint-sc.org> |
|---|---|
| Sent: | Wednesday, October 14, 2015 1:05 PM |
| To: | ████████ |
| Cc: | ██████ |
| Subject: | Request for Information -Donor AC |

█████

Here is a time line of the transportation issues that we had with the right kidney on █████ We use Network Global Logistics (NGL) for out of state courier services. NGL normally uses Delta Airlines as primary and United Airlines as secondary on all jobs. On this particular day, Delta's systems were down and could not accept shipments. United did not have a flight that arrived in Miami before the American Airlines flight. Therefore, we used American for this shipment.

The package was in the custody of American Airlines when it was lost. Since the shipment agreement was between NGL and American Airlines, we have not been in direct contact with the airline. I spoke to ████████, Escalations Manager at NGL, who spoke to American Airlines about the lost package. The airline told him that the package was misplaced after it was scanned in upon arrival at Miami Airport. A search of the plane and immediate area around the ramp was unsuccessful. A more extensive search of the entire ramp/cargo/luggage area was conducted and the package was .

315.    This was one of three transportation errors at SCOP between 2015-2017.

| 9/25/15 | SCOP | | ███ | | | Transport issues/decline |
|---------|------|--|-----|--|--|--------------------------|
| 3/1/16 | ███ | | ███ | | | Courier dropped off wrong KI |
| 3/15/16 | ███ | | ███ | | | KI Laterality Courier |
| 3/21/16 | ███ | | ███ | | | Chain of custody |
| 6/2/16 | ███ | | ███ | | | Pancreas forgotten at airport |
| 6/10/16 | SCOP | | ███ | | | Courier dropped off wrong KI |
| 6/13/16 | ███ | | ███ | | | Transportation |
| 6/30/16 | ███ | | ███ | | | Pancreas missed flight |
| 8/2/16 | ███ | | ███ | | | Courier left organ |
| 8/5/16 | ███ | | ███ | | | Air transport kidney |
| 8/10/16 | ███ | | ███ | | | Transportation TTM |
| 9/21/16 | ███ | | ███ | | | Courier kidney |
| 2/27/17 | ███ | | ███ | ███ | | Missed flight |
| 2/27/17 | ███ | | ███ | ███ | | Missed flight |
| 3/6/17 | SCOP | | ███ | | | Missed flight |

Indiana Donor Network

316.    UNOS received a tip from an anonymous caller about Indiana Donor Network (INOP) regarding a donor that was still alive when his organs were recovered and that the surgeon — who initially declared death — proceeded with organ recovery after it was clear the donor did not die until ten minutes into the organ recovery.

Caller wished to remain anonymous, so did not obtain name or number. Did not want UNOS to contact and even asked if he was speaking on a recorded line. He just said that he had heard things that had been weighing on him and he wanted to ensure that UNOS knew and looked into it.

Donor ID: ███████ (INOP)
DCD Donor
Date of event: 2/23/2017

Concerns:
- Donor was alive when he was opened to recover organs.
- Support was withdrawn in the OR and the team monitored the HR for 5 minutes.
- Donor was opened.
- After the donor was opened, a heartbeat was identified. Heart rate was again monitored, and ten minutes later the donor died.
- Sources have told the reporter that the recovering surgeon was the physician who declared death, then proceeded with organ recovery.
- The attending may have been in the room the whole time, but reporter says he is privy to information that says otherwise and that the recovering surgeon declared the patient dead.
- He wants to ensure that we review the DCD vitals in the attachments and take note of times.

Thanked him for calling, again assured him that he would be anonymous, but that we would be investigating this case. He had no desire to have me contact him, and said he might call the week after next—he didn't even want to share information with other safety analysts by calling the MRL next week if he had any updates.

317.    A UNOS analyst marked this a "medium" case and checked "no" for a question asking if there was direct harm to a patient. UNOS closed the case without referral to MPSC.



318.    At the same time this tip was reported, INOP was under review by UNOS and CMS for INOP's failure to properly record donors' brain death declaration and documentation, and was serving probation.

As President of the Organ Procurement and Transplantation Network (OPTN) and United Network for Organ Sharing (UNOS), I am writing to inform you of an adverse action taken by the OPTN/UNOS Board of Directors in response to its review of Indiana Donor Network (INOP).

At its meeting on December 5-6, 2016, the Board of Directors placed INOP on Probation. The Board adopted the following resolution:

> RESOLVED, that the Board of Directors places Indiana Donor Network on Probation based violation of Policy 2.2 (OPO Responsibilities), effective December 6, 2016.

The Board approved this resolution by a vote of 34 For, 0 Against, and 0 Abstentions.

### Life Alliance Recovery Organization

319.    Life Alliance Organ Recovery Organization (LAORA, formerly FLMP) recovered organs from a donor before the donor's heart stopped and against the family's wishes. The donor was declared brain dead and the family consented to transplantation following cardiac death, but they withdrew their consent prior to the recovery.

320.    MPSC reviewed the case and LAORA's submission, which stated that the root cause of the issue was the emotional state of the donor's mother.



Late entry Mother ▮ and brother ▮ arrived at the Hosital just minutes before OR , we briefly gathered in patient's room to make the pertinent arrangements for the WDLS process. When required, we escorted patient's bed to the OR. Personalized Moment of Honor was read and then patient was extubated. We exited the OR and mom became very distraught. I deemed appropriate stay with them for family support and I was able to address their concerns about next steps since they are planning a viewing in ▮. Around 18:00 mom decided to leave and politely asked me to call them once OR finished. Received a notification from DMC ▮ with the OR outcomes. A call was placed to Brother ▮ who was very grateful for our communication.

321.    CMS also conducted a complaint survey about the case, and approved LAORA's corrective measures and found LAORA compliant. However, MPSC issued LAORA a letter of warning for violation of policy and expressed concerns about the culture of the OPO in its decision.

The MPSC appreciated FLMP's presentation, but still has concerns regarding the OPO's Quality Assurance and Performance Improvement (QAPI) program and its culture and leadership. The committee was also concerned by FLMP's decision to re-approach the donor's mother after the recovery to gain documentation of authorization for brain-death recovery, and believed this may have caused additional, unnecessary emotional injury to the donor family.

Based on its review, the MPSC approved the following:

> RESOLVED, that the Membership and Professional Standards Committee issues a Letter of Warning to Life Alliance Organ Recovery Agency for violation of Policy 2.15.H (Organ Recovery).

### D. UNOS Cybersecurity Issues

322.    In their role as the facilitator of organ procurement matching, UNOS manages an online platform, UNet, to match donors with organs across the country. As the current OPTN contractor, UNOS is responsible for the safety, security, and efficiency of this system.

323.    Parties within the organ donation and procurement world, such as OPOs, transplant centers, and hospitals, rely on UNet to match patients with donors.

324.    UNet is comprised of four subsystems:

    a.    UNet Waitlist, which adds eligible transplant candidates to the national waitlist and stores their health data;

    b.    UNet DonorNet, which stores the health data for eligible organ donors and matches transplant patients with donors;

    c.    UNet TransNet, which is responsible for the packaging and labeling of organs to ensure they reach their intended patient efficiently; and,

    d.    UNet TIEDI, which maintains records for transplant patients and donors. That collected data is used to support the implementation of performance improvement initiatives.

325.    However, UNOS fails to safeguard the cybersecurity of this system and shirks its obligation to protect patients' confidential health information.

326.    This failure is evidenced by numerous data breaches that have exposed patient information. Most recently, owing in part to UNOS's lax oversight, a data breach of UNOS's systems in December 2023 exposed over 1.2 million patient records.

327.    These security breaches in 2022 and 2023 exposed personal identifiable information and protected health information, including social security numbers, patient treatment information, and medical diagnoses of over one million people.

328.    HRSA is responsible for overseeing UNOS's cybersecurity. It has a Chief Information Security Officer whose job it is to ensure that whoever holds the OPTN contract, which has always been UNOS, has adequate cybersecurity controls in place.

329.    HHS officials have admitted that they do not have an "in-depth IT staff" in place to effectively assess UNOS' cybersecurity practices. This leaves HRSA unable to effectively audit and monitor UNOS's technologies.

330.    An Office of the Inspector General (OIG) audit found that until 2018, the OPTN contract had no cybersecurity requirements in place and HRSA conducted limited oversight over UNOS' technology. Even after federal cybersecurity requirements were implemented in 2018, OIG still found oversight was lacking and UNOS was not in compliance with federal standards.

331.    Additionally, UNOS uses outdated technology and stores their backend data in physical data centers. Both of these practices make patients' personal data especially vulnerable to hacking or external physical damage.

332.    One leading healthcare technology executive described UNOS' technology practices as "literally duct tape" due to their outdated technologies and vulnerabilities. UNOS has even had its system crash for a total of 17 days since 1999.

333.    In February 2022, the Senate Finance Committee warned Department of Homeland Security officials and intelligence agencies of the system's vulnerability to cyberattacks, and stated they have "no confidence" in the system's security.

334.    UNOS is aware of these vulnerabilities, but refuses any changes to their code and has denied the federal government access to audit their technologies nearly 100 times.

335.    Former UNOS CEO Brian Shepard has represented publicly that UNOS' system is secure and effective and criticized a report by the United States Digital Service for "read[ing] more like an op-ed".

336.    Despite these clearly documented issues, UNOS safeguards its shoddy system and claims it is a "trade secret" worth $55 million.

## XI.    PARKLAND RETALIATED AGAINST RELATOR CHASE

337.    As discussed above, Relator Chase repeatedly reported the Parkland fraud, including raising the fraud with UNOS.

338.    Relator Chase had always met or exceeded expectations in his performance reviews before reporting the fraud.

339.    Relator Chase had also applied for, and was offered, a position with the Southwest Transplant Alliance. Southwest Transplant Alliance revoked the job offer on the same day that UNOS closed its investigation.

340.    Relator Chase's direct supervisor at Parkland, Patricia Shirey, then informed Relator Chase that she had to give Relator Chase a written warning. The stated reason for the warning was for Relator Chase's need to manage his emotions, body language, and tone with staff and improve his communications.

341.    However, Shirey told Relator Chase that she "didn't agree with it but senior leadership was forcing her to and if she didn't write him up her job would be on the line also." Shirey stated that she informed Yvonne Alsbury, who worked in Parkland's human resources team, that Relator Chase had done nothing wrong, and there had been no prior coaching she could reference in a write up, so Alsbury instructed Shirey to "make something up."

342.    This written warning was in direct retaliation for Relator Chase's protected activity.

343.    Relator Chase understood that Parkland intended to continue to retaliate against him and eventually terminate him. Parkland's actions operated as a constructive discharge and Relator Chase therefore left Parkland to find new employment.

## XII.    CLAIMS FOR RELIEF

**Claim for Relief I**
**Violations of False Claims Act (31 U.S.C. § 3729(a)(1)(A))**
**Presentation of False Claims**
**(All Defendants)**

344.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth therein.

345.    Through the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment.

346.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the Government and/or to contractors, grantees, or other recipients of Government funds used to advance Government interests, materially false and fraudulent claims for payment.

347.    The Government paid claims and incurred losses, and/or contractors, grantees, or other recipients of Government funds used to advance Government interests paid claims and incurred losses, as a result of Defendants' wrongful conduct.

348.    The Government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, paid and continues to pay claims that the Government would not have paid but for Defendants' illegal conduct.

349.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities throughout the United States. Relator has no control over, or dealings with, such entities and has no access to the records in their possession.

350.    By reason of such false and/or fraudulent claims, the Government has been damaged in a substantial amount to be determined at trial and is entitled to three times its damages plus a civil penalty as required by law for each violation.

**Claim for Relief II**
**Violations of False Claims Act (31 U.S.C. § 3729(a)(1)(B))**
**Use of False Statements**
**(All Defendants)**

351.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth therein.

352.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements material to false or fraudulent claims to the Government and/or to contractors, grantees, or other recipients of Government funds used to advance Government interests.

353.    The Government paid claims and incurred losses, and/or contractors, grantees, or other recipients of Government funds used to advance Government interests paid claims and incurred losses, as a result of Defendants' wrongful conduct.

354.    Relator cannot at this time identify all of the false statements material to false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities throughout the United States. Relator has no control over, or dealings with, such entities and has no access to the records in their possession.

355.    By reason of such false and/or fraudulent statements, the Government has been damaged in such a substantial amount to be determined at trial and is entitled to three times its damages plus and civil penalty as required by law for each violation.

**Claim for Relief III**
**Violations of False Claims Act (31 U.S.C. § 3729(a)(1)(G))**
**Reverse False Claims**
**(All Defendants)**

356.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth therein.

357.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, made, used, or caused to be made or used, false records and/or statements

material to an obligation to pay or transmit money to the Government and/or to contractors, grantees, or other recipients of Government funds used to advance Government interests.

358.    As a result of Defendants' wrongful conduct, the Government incurred losses, and/or contractors, grantees, or other recipients of Government funds used to advance Government interests incurred losses, because an obligation to transmit money was avoided.

359.    Relator cannot at this time identify all of the avoided claims for payment that were caused by Defendants' conduct. The avoided claims were presented by numerous separate entities across the United States. Relator has no control over, or dealings with, such entities, and has no access to the records in their possession.

360.    By reason of such false and/or fraudulent claims, the Government has been damaged in a substantial amount to be determined at trial and is entitled to three times its damages plus a civil penalty as required by law for each violation.

### Claim for Relief IV
### Violations of False Claims Act (31 U.S.C. §3730(h))
### Retaliation
### (Parkland Health and Hospital System)

361.    Relator incorporates by reference herein each of the preceding paragraphs as if fully set forth in this paragraph.

362.    Relator engaged in protected activity under the FCA by investigating and reporting Defendant Parkland's false or fraudulent practices internally, including issues related to the unjustified rejection of organs for Parkland patients in need of transplant in favor of those same organs being transplanted into UT Southwestern Patients.

363.    Defendant Parkland had knowledge of Relator's protected activity.

364.    Following Relator's protected activity, Relator was removed from his position, harassed by Defendant, and eventually forced out of his job due to Defendant's retaliatory conduct.

365.    The False Claims Act provides that the Relator is entitled to two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorney's fees.

<b>Claim for Relief V<br>California False Claims Act<br>Cal. Gov't Code §§ 12650–12656</b>

366.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth in this paragraph.

367.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of California and/or to contractors, grantees, or other recipients of the State of California funds used to advance the State of California's interests, false and fraudulent claims for payment.

368.    The State of California paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of California funds used to advance the interests of the State of California paid claims and incurred losses, as a result of Defendants' wrongful conduct.

369.    By reason of such false and/or fraudulent claims, the State of California has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

370.    Pursuant to Cal. Govt. Code § 12651(a), the State of California is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every

false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by Defendants.

371.    Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented by numerous separate entities across the State of California. Relator has no control over or dealings with such entities and has no access to the records in their possession.

372.    The State of California, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that the State of California would not have paid but for Defendants' illegal conduct.

373.    By reason of Defendants' acts, the State of California has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

374.    Additionally, the State of California is entitled to a statutory penalty for each and every violation alleged herein to be determined by the Court in accordance with the relevant statutes.

375.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of California pursuant to Cal. Gov't Code § 12652(c)(1).

### Claim for Relief VI
### Colorado False Claims Act
### Cal. Gov't Code §§ 12650–12656

376.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

377.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Colorado and/or to

contractors, grantees, or other recipients of the State of Colorado funds used to advance the interests of the State of Colorado, false and fraudulent claims for payment.

378.    The State of Colorado paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Colorado funds used to advance the interests of the State of Colorado paid claims and incurred losses, as a result of Defendants' wrongful conduct.

379.    By reason of such false and/or fraudulent claims, the State of Colorado has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

380.    Pursuant to Col. Rev. Stat. § 25.5-4-305, the State of Colorado is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by Defendants.

381.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Colorado pursuant to Colo. Rev. Stat § 25.5-4-306(2).

**Claim for Relief VII**
**Connecticut False Claims Act**
**Conn. Gen. Stat. §§ 4-274 to -289**

382.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

383.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Connecticut and/or to contractors, grantees, or other recipients of the State of Connecticut funds used to advance the interests of the State of Connecticut, false and fraudulent claims for payment.

384.    The State of Connecticut paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Connecticut funds used to advance the interests of the State of Connecticut paid claims and incurred losses, as a result of Defendants' wrongful conduct.

385.    By reason of such false and/or fraudulent claims, the State of Connecticut has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

386.    Pursuant to Conn. Gen. Stat. § 4-275, the State of Connecticut is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by Defendants.

387.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Connecticut pursuant to Conn. Gen. Stat. § 4-277.

**Claim for Relief VIII**
**Delaware False Claims and Reporting Act**
**Del. Code Ann. tit. 6, §§ 1201–1211**

388.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

389.    Defendants knowingly, or acting with deliberate ignorance and/or reckless Disregard of the truth, presented and/or caused to be presented, to the State of Delaware and/or to contractors, grantees, or other recipients of the State of Delaware funds used to advance the interests of the State of Delaware, false and fraudulent claims for payment.

390.    The State of Delaware paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Delaware funds used to advance the interests of the State of Delaware paid claims and incurred losses, as a result of Defendants' wrongful conduct.

391.    By reason of such false and/or fraudulent claims, the State of Delaware has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

392.    Pursuant to Del. Code Ann. tit. 6, § 1201(a), the State of Delaware is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by Defendants.

393.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Delaware pursuant to Del. Code Ann. tit. 6, § 1203(b).

**Claim for Relief IX**
**Florida False Claims Act**
**Fla. Stat. §§ 68.081–.09**

394.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

395.    This is a claim for treble damages and penalties under the Florida False Claims Act.

396.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Florida and/or to contractors, grantees, or other recipients of the State of Florida funds used to advance the interests of the State of Florida, false and fraudulent claims for payment.

397.    The State of Florida paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Florida funds used to advance the interests of the State of Florida paid claims and incurred losses, as a result of Defendants' wrongful conduct.

398.    By reason of such false and/or fraudulent claims, the State of Florida has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

399.    Pursuant to Fla. Stat. Ann. § 68.082, the State of Florida is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

400.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Florida pursuant to Fla. Stat. § 68.083.

**Claim for Relief X**
**Georgia False Medicaid Claims Act**
**Ga. Code Ann. §§ 49-4-168 to -168.6**

401.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

402.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Georgia and/or to contractors, grantees, or other recipients of the State of Georgia funds used to advance the interests of the State of Georgia, false and fraudulent claims for payment.

403.    The State of Georgia paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Georgia funds used to advance the interests of the State of Georgia paid claims and incurred losses, as a result of Defendants' wrongful conduct.

404.    By reason of such false and/or fraudulent claims, the State of Georgia has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

405.    Pursuant to Ga. Code Ann. § 49-4-168.1(a), the State of Georgia is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

406.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Georgia pursuant to Ga. Code Ann. §49-4-168.

**Claim for Relief XI**
**Hawaii False Claims Act**
**Haw. Rev. Stat. §§ 661-21 to -31**

407.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Hawaii and/or to contractors, grantees, or other recipients of the State of Hawaii funds used to advance the interests of the State of Hawaii, false and fraudulent claims for payment.

408.    The State of Hawaii paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Hawaii funds used to advance the interests of the State of Hawaii paid claims and incurred losses, as a result of Defendants' wrongful conduct.

409.    By reason of such false and/or fraudulent claims, the State of Hawaii has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

410.    Pursuant to Haw. Rev. Stat. § 661-21(a), the State of Hawaii is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

411.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Hawaii pursuant to Haw. Rev. Stat. § 661-25.

**Claim for Relief XII**
**Illinois False Claims Act**
**740 Ill. Comp. Stat. 175/1–175/8**

412.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

413.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Illinois and/or to contractors, grantees, or other recipients of the State of Illinois funds used to advance the interests of the State of Illinois, false and fraudulent claims for payment.

414.    The State of Illinois paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Illinois funds used to advance the interests of the State of Illinois paid claims and incurred losses, as a result of Defendants' wrongful conduct.

415.     By reason of such false and/or fraudulent claims, the State of Illinois has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

416.     Pursuant to 740 Ill. Comp. Stat. § 175/3(a), the State of Illinois is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

417.     Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Illinois pursuant to 740 Ill. Comp. Stat. 175/4(b).

**Claim for Relief XIII**
**Indiana Medicaid False Claims and Whistleblower Protection Act**
**Ind. Code §§ 5-11-5.5-7 to -18**

418.     Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

419.     Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Indiana and/or to contractors, grantees, or other recipients of the State of Indiana funds used to advance the interests of the State of Indiana, false and fraudulent claims for payment.

420.     The State of Indiana paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Indiana funds used to advance the interests of the State of Indiana paid claims and incurred losses, as a result of Defendants' wrongful conduct.

421.    By reason of such false and/or fraudulent claims, the State of Indiana has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

422.    Pursuant to Ind. Code § 5-11-5.7-2(b), the State of Indiana is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

423.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Indiana pursuant to Ind. Code § 5-11-5.7-4(a).

**Claim for Relief XIV**
**Iowa False Claims Act**
**Iowa Code §§ 685.1–.7**

424.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

425.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Iowa and/or to contractors, grantees, or other recipients of the State of Iowa funds used to advance the interests of the State of Iowa, false and fraudulent claims for payment.

426.    The State of Iowa paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Iowa funds used to advance the interests of the State of Iowa paid claims and incurred losses, as a result of Defendants' wrongful conduct.

427.     By reason of such false and/or fraudulent claims, the State of Iowa has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

428.     Pursuant to Iowa Code § 685.2, the State of Iowa is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

429.     Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Iowa pursuant to Iowa Code § 685.3(2).

**Claim for Relief XV**
**Louisiana Medical Assistance Programs Integrity Law**
**La. Rev. Stat. Ann. §§ 46:437–:440**

430.     Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

431.     Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Louisiana and/or to contractors, grantees, or other recipients of the State of Louisiana funds used to advance the interests of the State of Louisiana, false and fraudulent claims for payment.

432.     The State of Louisiana paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Louisiana funds used to advance the interests of the State of Louisiana paid claims and incurred losses, as a result of Defendants' wrongful conduct.

433.    By reason of such false and/or fraudulent claims, the State of Louisiana has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

434.    Pursuant to La. Rev. Stat. Ann. § 46:438.6, the State of Louisiana is entitled to three times the amount of actual damages plus the maximum penalty and fine allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

435.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Louisiana pursuant to La. Rev. Stat. Ann. § 46:439.1.

**Claim for Relief XVI**
**Massachusetts False Claims Act**
**Mass. Gen. Laws ch. 12, §§ 5A–5O**

436.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

437.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the Commonwealth of Massachusetts and/or to contractors, grantees, or other recipients of the Commonwealth of Massachusetts funds used to advance the interests of the Commonwealth of Massachusetts, false and fraudulent claims for payment.

438.    The Commonwealth of Massachusetts paid claims and incurred losses, and/or contractors, grantees, or other recipients of the Commonwealth of Massachusetts funds used to advance the interests of the Commonwealth of Massachusetts paid claims and incurred losses, as a result of Defendants' wrongful conduct.

439. By reason of such false and/or fraudulent claims, the Commonwealth of Massachusetts has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

440. Pursuant to Mass. Gen. Law. ch. 12, § 5B, the Commonwealth of Massachusetts is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

**441.** Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the Commonwealth of Massachusetts pursuant to Mass. Gen. Laws. ch. 12, § 5C(2).

**Claim for Relief XVII**
**Michigan Medicaid False Claims Act**
**Mich. Comp. Laws §§ 400.601–.615**

442. Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

443. Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Michigan and/or to contractors, grantees, or other recipients of the State of Michigan funds used to advance the interests of the State of Michigan, false and fraudulent claims for payment.

444. The State of Michigan paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Michigan funds used to advance the interests of the State of Michigan paid claims and incurred losses, as a result of Defendants' wrongful conduct.

445.     By reason of such false and/or fraudulent claims, the State of Michigan has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

446.     Pursuant to Mich. Comp. Laws § 400.612, the State of Michigan is entitled to a civil penalty equal to the full amount received by the person benefiting from the fraud, three times the amount of actual damages, plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement presented or caused to be presented by the Defendants.

447.     Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Michigan pursuant to Mich. Comp. Laws § 400.610a.

**Claim for Relief XVII**
**Minnesota False Claims Act**
**Minn. Stat. §§ 15C.01–.16**

448.     Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

449.     Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Minnesota and/or to contractors, grantees, or other recipients of the State of Minnesota funds used to advance the interests of the State of Minnesota, false and fraudulent claims for payment.

450.     The State of Minnesota paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Minnesota funds used to advance the interests of the State of Minnesota paid claims and incurred losses, as a result of Defendants' wrongful conduct.

451. By reason of such false and/or fraudulent claims, the State of Minnesota has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

452. Pursuant to Minn. Stat. § 15C.02(a), the State of Minnesota is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

453. Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Minnesota pursuant to Minn. Stat. § 15C.05.

**Claim for Relief XIX**
**Montana False Claims Act**
**Mont. Code Ann. §§ 17-8-401 to -413**

454. Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

455. Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Montana and/or to contractors, grantees, or other recipients of the State of Montana funds used to advance the interests of the State of Montana, false and fraudulent claims for payment.

456. The State of Montana paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Montana funds used to advance the interests of the State of Montana paid claims and incurred losses, as a result of Defendants' wrongful conduct.

457.    By reason of such false and/or fraudulent claims, the State of Montana has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

458.    Pursuant to Mont. Code Ann. § 17-8-403, the State of Montana is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

459.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Montana pursuant to Mont. Code Ann. § 17-8-406.

### Claim for Relief XX
### Nevada Submission of False Claims to State or Local Government
### Nev. Rev. Stat. §§ 357.010–.250

460.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

461.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Nevada and/or to contractors, grantees, or other recipients of the State of Nevada funds used to advance the interests of the State of Nevada, false and fraudulent claims for payment.

462.    The State of Nevada paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Nevada funds used to advance the interests of the State of Nevada paid claims and incurred losses, as a result of Defendants' wrongful conduct.

463.    By reason of such false and/or fraudulent claims, the State of Nevada has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

464.    Pursuant to Nev. Rev. Stat. § 357.040(1), the State of Nevada is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

465.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Nevada pursuant to Nev. Rev. Stat. § 357.080.

**Claim for Relief XXI**
**New Jersey False Claims Act**
**N.J. Stat. Ann. §§ 2A:32C-1 to -18**

466.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

467.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of New Jersey and/or to contractors, grantees, or other recipients of the State of New Jersey funds used to advance the interests of the State of New Jersey, false and fraudulent claims for payment.

468.    The State of New Jersey paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of New Jersey funds used to advance the interests of the State of New Jersey paid claims and incurred losses, as a result of Defendants' wrongful conduct.

469.    By reason of such false and/or fraudulent claims, the State of New Jersey has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

470.    Pursuant to N.J. Stat. Ann. § 2A:32C-3, the State of New Jersey is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

471.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of New Jersey pursuant to N.J. Stat. Ann. § 2A:32C-5.

**Claim for Relief XXII**
**New Mexico Medicaid False Claims**
**N.M. Stat. Ann. §§ 27-14-1 to -15**

472.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

473.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of New Mexico Medicaid program and/or to contractors, grantees, or other recipients of the State of New Mexico funds used to advance the interests of the State of New Mexico Medicaid program, false and fraudulent claims for payment.

474.    The State of New Mexico Medicaid program paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of New Mexico Medicaid program funds used to advance the interests of the State of New Mexico paid claims and incurred losses, as a result of Defendants' wrongful conduct.

475.     By reason of such false and/or fraudulent claims, the State of New Mexico Medicaid program has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by the New Mexico Medicaid False Claims Act for each violation.

476.     Pursuant to N.M. Stat. Ann. § 27-14-4, the State of New Mexico is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

477.     Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of New Mexico pursuant to N.M. Stat. Ann. § 27-14-8.

**Claim for Relief XXIII**
**New Mexico Fraud Against Taxpayers Act**
**N.M. Stat. Ann. §§ 44-9-1 to -14**

478.     Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

479.     Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of New Mexico and/or to contractors, grantees, or other recipients of the State of New Mexico funds used to advance the interests of the State of New Mexico, false and fraudulent claims for payment.

480.     The State of New Mexico paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of New Mexico funds used to advance the interests of the State of New Mexico paid claims and incurred losses, as a result of Defendants' wrongful conduct.

481.    By reason of such false and/or fraudulent claims, the State of New Mexico has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

482.    Pursuant to N.M. Stat. Ann. §44-9-3(C), the State of New Mexico is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

483.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of New Mexico pursuant to N.M. Stat. Ann. § 44-9-5.

**Claim for Relief XXIV**
**New York False Claims Act**
**N.Y. State Fin. Law §§ 187–194**

484.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

485.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of New York and/or to contractors, grantees, or other recipients of the State of New York funds used to advance the interests of the State of New York, false and fraudulent claims for payment.

486.    The State of New York paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of New York funds used to advance the interests of the State of New York paid claims and incurred losses, as a result of Defendants' wrongful conduct.

487.     By reason of such false and/or fraudulent claims, the State of New York has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

488.     Pursuant to N.Y. State Fin. Law § 189(1), the State of New York is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

489.     Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of New York pursuant to N.Y. State Fin. Law § 190(2).

**Claim for Relief XXV**
**North Carolina False Claims Act**
**N.C. Gen. Stat. §§ 1-605 to -618**

490.     Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

491.     Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of North Carolina and/or to contractors, grantees, or other recipients of the State of North Carolina funds used to advance the interests of the State of North Carolina, false and fraudulent claims for payment.

492.     The State of North Carolina paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of North Carolina funds used to advance the interests of the State of North Carolina paid claims and incurred losses, as a result of Defendants' wrongful conduct.

493.    By reason of such false and/or fraudulent claims, the State of North Carolina has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

494.    Pursuant to N.C. Gen. Stat. § 1-607(a), the State of North Carolina is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

495.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of North Carolina pursuant to N.C. Gen. Stat. § 1-608(b).

**Claim for Relief XXVI**
**Oklahoma Medicaid False Claims Act**
**Okla. Stat. tit. 63, §§ 5053–5053.7**

496.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

497.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Oklahoma and/or to contractors, grantees, or other recipients of the State of Oklahoma funds used to advance the interests of the State of Oklahoma, false and fraudulent claims for payment.

498.    The State of Oklahoma paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Oklahoma funds used to advance the interests of the State of Oklahoma paid claims and incurred losses, as a result of Defendants' wrongful conduct.

499.    By reason of such false and/or fraudulent claims, the State of Oklahoma has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

500.    Pursuant to 63 Okla. Stat. § 5053.1(B), the State of Oklahoma is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

501.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Oklahoma pursuant to Okla. Stat. tit. 63, § 5053.3.

**Claim for Relief XXVII**
**Rhode Island False Claims Act**
**R.I. Gen. Laws §§ 9-1.1-1 to -9**

502.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

503.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Rhode Island and/or to contractors, grantees, or other recipients of the State of Rhode Island funds used to advance the interests of the State of Rhode Island, false and fraudulent claims for payment.

504.    The State of Rhode Island paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Rhode Island funds used to advance the interests of the State of Rhode Island paid claims and incurred losses, as a result of Defendants' wrongful conduct.

505.    By reason of such false and/or fraudulent claims, the State of Rhode Island has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

506.    Pursuant to R.I. Gen. Laws § 9-1.1-3, the State of Rhode Island is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

507.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Rhode Island pursuant to R.I. Gen. Laws § 9-1.1-4(b).

**Claim for Relief XXIII**
**Tennessee Medicaid False Claims Act**
**Tenn. Code Ann. §§ 7-5-181 to -185**

508.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

509.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Tennessee and/or to contractors, grantees, or other recipients of the State of Tennessee funds used to advance the interests of the State of Tennessee, false and fraudulent claims for payment.

510.    The State of Tennessee paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Tennessee funds used to advance the interests of the State of Tennessee paid claims and incurred losses, as a result of Defendants' wrongful conduct.

511.    By reason of such false and/or fraudulent claims, the State of Tennessee has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

512.    Pursuant to Tenn. Code § 71-5-182(a)(1), the State of Tennessee is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

513.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Tennessee pursuant to Tenn. Code Ann. § 71-5-183(b).

**Claim for Relief XXIX**
**Texas Medicaid Fraud Prevention Law**
**Tex. Hum. Res. Code Ann. §§ 36.001–.132**

514.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

515.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Texas and/or to contractors, grantees, or other recipients of the State of Texas funds used to advance the interests of the State of Texas, false and fraudulent claims for payment.

516.    The State of Texas paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Texas funds used to advance the interests of the State of Texas paid claims and incurred losses, as a result of Defendants' wrongful conduct.

517.    By reason of such false and/or fraudulent claims, the State of Texas has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

518.    Pursuant to Tex. Hum. Res. Code Ann. § 36.052, the State of Texas is entitled to the full amount received by the person benefiting from the fraud, two times the amount of actual damages, plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

519.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Texas pursuant to Tex. Hum. Res. Code Ann. § 36.101.

**Claim for Relief XXX**
**Vermont False Claims Act**
**Vt. Stat. Ann. tit. 32, §§ 630–642**

520.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

521.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Vermont and/or to contractors, grantees, or other recipients of the State of Vermont funds used to advance the interests of the State of Vermont, false and fraudulent claims for payment.

522.    The State of Vermont paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Vermont funds used to advance the interests of the State of Vermont paid claims and incurred losses, as a result of Defendants' wrongful conduct.

523.     By reason of such false and/or fraudulent claims, the State of Vermont has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

524.     Pursuant to 32 V.S.A. §§ 631-32, the State of Vermont is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

525.     Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Vermont pursuant to Vt. Stat. Ann. tit. 32, § 632(b)(1).

**Claim for Relief XXXI**
**Virginia Fraud Against Taxpayers Act**
**Va. Code Ann. §§ 8.01-216.1 to .19**

526.     Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

527.     Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the Commonwealth of Virginia and/or to contractors, grantees, or other recipients of the Commonwealth of Virginia funds used to advance the interests of the Commonwealth of Virginia, false and fraudulent claims for payment.

528.     The Commonwealth of Virginia paid claims and incurred losses, and/or contractors, grantees, or other recipients of the Commonwealth of Virginia funds used to advance the interests of the Commonwealth of Virginia paid claims and incurred losses, as a result of Defendants' wrongful conduct.

529.    By reason of such false and/or fraudulent claims, the Commonwealth of Virginia has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

530.    Pursuant to Va. Code Ann. § 8.01-216.3(A), the Commonwealth of Virginia is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

531.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the Commonwealth of Virginia pursuant to Va. Code Ann. § 8.01-216.5(a).

**Claim for Relief XXXII**
**Washington State Medicaid Fraud False Claims Act**
**Wash. Rev. Code §§ 74.66.005–.130**

532.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

533.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the State of Washington and/or to contractors, grantees, or other recipients of the State of Washington funds used to advance the interests of the State of Washington, false and fraudulent claims for payment.

534.    The State of Washington paid claims and incurred losses, and/or contractors, grantees, or other recipients of the State of Washington funds used to advance the interests of the State of Washington paid claims and incurred losses, as a result of Defendants' wrongful conduct.

535.    By reason of such false and/or fraudulent claims, the State of Washington has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

536.    Pursuant to Rev. Code Wash. § 74.66.020(1), the State of Washington is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

537.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the State of Washington pursuant to Wash. Rev. Code § 74.66.050.

### Claim for Relief XXXIII
### The District of Columbia False Claims Law
### D.C. Code §§ 2-381.01 to .09

538.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

539.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the District of Columbia and/or to contractors, grantees, or other recipients of the District of Columbia funds used to advance the interests of the District of Columbia, false and fraudulent claims for payment.

540.    The District of Columbia paid claims and incurred losses, and/or contractors, grantees, or other recipients of the District of Columbia funds used to advance the interests of the District of Columbia paid claims and incurred losses, as a result of Defendants' wrongful conduct.

541.    By reason of such false and/or fraudulent claims, the District of Columbia has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

542.    Pursuant to D.C. Code Ann. § 2-381.02, the District of Columbia is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

543.    Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the District of Columbia pursuant to D.C. Code § 2-308.15(b)(1).

**Claim for Relief XXXIV**
**False Claims to Government of Puerto Rico Programs, Contracts, and Services Act**
**P.R. Laws tit. 32 § 2934 *et. seq.* (2020)**

544.    Relator realleges and incorporates by reference all foregoing allegations as though fully set forth herein.

545.    Defendants knowingly, or acting with deliberate ignorance and/or reckless disregard of the truth, presented and/or caused to be presented, to the Commonwealth of Puerto Rico and/or to contractors, grantees, or other recipients of Commonwealth of Puerto Rico funds used to advance the interests of the Commonwealth of Puerto Rico, false and fraudulent claims for payment.

546.    The Commonwealth of Puerto Rico paid claims and incurred losses, and/or contractors, grantees, or other recipients of the Commonwealth of Puerto Rico funds used to advance the interests of the Commonwealth of Puerto Rico paid claims and incurred losses, as a result of Defendants' wrongful conduct.

547. By reason of such false and/or fraudulent claims, the Commonwealth of Puerto Rico has been damaged in a substantial amount to be determined at trial and is entitled to a civil penalty as required by law for each violation.

548. Pursuant to P.R. Laws tit. 32 § 2934(1)(d), the Commonwealth of Puerto Rico is entitled to three times the amount of actual damages plus the maximum penalty allowed by law for each and every false or fraudulent claim, record or statement made, used, presented or cause to be made, used or presented by the Defendants.

549. Relator has standing as a *qui tam* relator to bring this cause of action on behalf of the Commonwealth of Puerto Rico under P.R. Laws tit. 32 § 2934A(2)(a).

## Demand for Jury Trial

550. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

## Prayer for Relief

WHEREFORE, Relator Patrek Chase, acting on behalf of and in the name of the United States, demands and prays that judgment be entered in favor of the United States against the specified Defendants on Counts I, II, and III of the Complaint as follows:

A. For treble the amount of the United States' damages, plus civil penalties for each false claim;

B. For all costs and fees of this civil action including attorneys' fees;

C. That Relator be awarded the maximum amount allowed under the FCA; and,

D. For pre- and post-judgment interest and for such other and further relief as the Court deems just and equitable.

MOREOVER, Relator Patrek Chase, acting on his own behalf, demands and prays that judgment be entered in Relator's favor against the Defendants on Count IV as follows:

E. Economic damages for lost wages and benefits, including two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the retaliation and reprisal;

F. Compensatory (non-economic) damages, including but not limited to damages for emotional distress and loss of reputation;

G. Punitive damages to punish Defendants for their malicious acts of retaliation and to deter the Defendants from undertaking similar retaliatory conduct against other employees and/or contractors who engage in protected activity, in an amount to be determined at trial;

H. For all costs and fees of this civil action including attorneys' fees; and,

I. Such other and further relief that this Court may deem just and equitable;

MOREOVER, Relator Patrek Chase, acting on his own behalf, demands and prays that judgment be entered in Relator's favor against the Defendants for the state False Claims Act counts, Counts V-XXXIV, as follows:

J. For double or treble the amount of the respective State Plaintiff's damages, whichever is the maximum penalty provided by law, plus civil penalties for each false claim;

K. For all costs and fees of this civil action including attorneys' fees;

L.      That Relator be awarded the maximum amount allowed under the various state FCAs; and,

M.      For pre- and post-judgment interest and for such other and further relief as the Court deems just and equitable.

Dated: September 11, 2025                 **BUFFONE LAW GROUP, PLLC**

                                          **By:** _/s/ Samuel J. Buffone, Jr._
                                               **Samuel J. Buffone Jr.**

                                          Samuel J. Buffone, Jr. (D.C. Bar No. 1721688)
                                          Admitted *pro hac vice*
                                          Buffone Law Group
                                          4301 Connecticut Ave. NW, Suite 452
                                          Washington, D.C. 20008
                                          Telephone: (202) 997-8562
                                          Sam@buffonelawgroup.com

                                          John F. Carroll
                                          SBN: 03888100
                                          Attorney at Law
                                          1802 Blanco Rd.
                                          San Antonio, Texas 78212
                                          Telephone: (210) 223-2627

                                          Chris Flood
                                          Flood & Flood
                                          Texas Bar No. 07155700
                                          914 Preston St., Suite 800
                                          Houston, TX 77002-1832
                                          (713) 223-8877
                                          Fax: (713) 223-8879

                                          ***Attorneys for Plaintiff-Relator Patrek Chase***