UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

UNITED STATES, EX REL; AND
STATE OF TEXAS,

    *Plaintiffs*,

PATREK CHASE,

*Relator,*

                                    Case No.  SA-23-CV-00381-JKP

v.

PARKLAND HEALTH AND HOSPI-
TAL SYSTEM, TRINITY HEALTH'S
LOYOLA UNIVERSITY MEDICAL
CENTER, SOUTHWEST TRANS-
PLANT ALLIANCE, LIVEONNY,
NEW JERSEY SHARING NETWORK,
UNITED NETWORK FOR ORGAN
SHARING,

    *Defendants*.


<u>**MEMORANDUM OPINION AND ORDER**</u>

    Before the Court is Defendant Southwest Transplant Alliance Inc.'s (STA) Motion to Dismiss for Failure to State a Claim. *ECF Nos. 65,88*. Plaintiff/Relator Patrek Chase responded. *ECF No. 76*. Upon consideration, the Motion to Dismiss is **GRANTED**.

### FACTUAL BACKGROUND

    On March 28, 2023, Relator Patrek Chase filed this qui tam action alleging violation of the False Claims Act (FCA) in the name of the United States and many individual states. *ECF No. 1*. In the Second Amended Complaint, Chase names as Defendants entities in the organ do-nation and transplant system which includes transplant centers, Organ Procurement Organiza-

tions (OPOs), and the United Network for Organ Sharing (UNOS).[1] *ECF No. 37*. In general terms, Chase alleges these named Defendants fraudulently billed Medicare and Medicaid (Federal Healthcare) and accepted illegal kickbacks in the process of procuring kidneys for transplant to patients in need. *Id. at par. 5*.

In this kidney-procurement system, OPOs hold exclusive territorial rights over specific geographic regions to recover organs in that area. *Id. at pars. 53-55*. As a condition to participate in Federal Healthcare, every hospital must contact the OPO in the region in which it sits to obtain potential organs for a patient in need. *Id. at par. 55*; 42 U.S.C. §§ 1320b-8(a)(1)(B), (C). Federal Healthcare reimburses each OPO for kidneys procured and intended for transplant, even if the kidney is later determined unusable; however, Federal Healthcare will not compensate an OPO for a kidney the OPO knows is not viable at the time of procurement. 42 C.F.R. § 413.402(a). Because much of an OPO's costs are covered by Federal Healthcare, OPOs submit to Federal Healthcare a cost report which contains a certification attesting the expenses are allowed and accurate. *Id*. Further, OPOs can charge a standard acquisition cost fee for organs to the organ recipient's Medicaid healthcare. *Id*. Therefore, the OPOs' costs are also passed on to Medicaid patients through the standard acquisition cost fee. *Id. at par. 67*. However, OPOs can only charge costs that are reasonable and related to patient care. 42 C.F.R. § 413.402(d); *see also* 42 C.F.R. § 413(b). In general terms, Chase alleges these named entities procured known, non-viable kidneys and subsequently fraudulently billed Federal Healthcare for the procurement. Chase alleges the OPOs submitted non-allowed costs on their cost report that were not reasonable nor related to patient care.

---

[1] Chase named numerous entities and persons in the original Complaint. However, the only remaining Defendants are: LiveOnNY, New Jersey Sharing Network, Parkland Health and Hospital System, Southwest Transplant Alliance, Trinity Health's Loyola University Medical Center, and United Network for Organ Sharing.

Particular to this Motion, Southwest Transplant Alliance is an OPO responsible for coordinating the recovery of organs and tissues for transplant for a large part of Texas. Chase alleges that to increase billings to Federal Healthcare, Southwest Transplant Alliance submitted specific cost reports containing costs that are unallowed, unreasonable, and unnecessary, including those associated with building "an excessive medical facility." *ECF No. 37, pars. 186-89*. Further Chase alleges Southwest Transplant Alliance improperly sent an excessive and unnecessary number of staff to conferences and included the costs, including unallowed meals, on its cost reports; Southwest Transplant Alliance padded its costs by paying unnecessary bonuses, exorbitant executive salaries, and by incurring unnecessary expenses to ensure its budget increased every year. *Id. at pars. 189-194*. Chase alleges these improper costs are passed on to 29 State Medicaid programs through the standard acquisition cost. *Id. at par. 199*.

Although Chase filed this qui tam action on March 28, 2023, on June 20, 2025, the United States declined to intervene in this action. *ECF No. 25*. On June 25, 2025, the State of Texas and all other Plaintiff states declined to intervene in this action. *ECF No. 27*. This Court unsealed this action. On August 1, 2025, this Court permitted Chase to file the live Second Amended Complaint; due to the age of the case at that time, this Court cautioned Chase no further amendments would be allowed. *ECF Nos. 33,37*.

In the Second Amended Complaint, Chase asserts FCA violations relating to Southwest Transplant Alliance and the other Defendants that occurred in different geographic areas: a portion of Texas, New York, New Jersey, and the Chicago area. Parsing the allegations and construing the Complaint liberally, Chase contends Southwest Transplant Alliance committed the following violations: (1) non-viable kidney procurement; (2) submission of excessive costs; (3) false inflation of statistics and failure to attempt to recover every possible organ; (4) receipt of

improper kickbacks; (5) improper reverse False Claims Act violation; and (6) mirror causes of action under various state laws. Southwest Transplant Alliance now files this Motion to Dismiss for Failure to State a Claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

## LEGAL STANDARD

To provide opposing parties fair notice of the asserted cause of action and the grounds upon which it rests, every pleading must contain a short and plain statement of the cause of action which shows the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To satisfy this requirement, the Complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555-558, 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The focus is not on whether the plaintiff will ultimately prevail, but whether that party should be permitted to present evidence to support adequately asserted causes of action. *Id.*; *Twombly*, 550 U.S. at 563 n.8. Thus, to warrant dismissal under Federal Rule 12(b)(6), a Complaint must, on its face, show a bar to relief or demonstrate "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Fed. R. Civ. P. 12(b)(6); *Clark v. Amoco Prod. Co.,* 794 F.2d 967, 970 (5th Cir. 1986). Dismissal "can be based either on a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Frith v. Guardian Life Ins. Co.,* 9 F.Supp.2d 734, 737–38 (S.D.Tex. 1998). "Thus, the court should not dismiss the claim unless the plaintiff would not be entitled to relief under any set of facts or any possible theory that he could prove consistent with the allegations in the complaint." *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999); *Vander Zee v. Reno,* 73 F.3d 1365, 1368 (5th Cir. 1996).

In assessing a Motion to Dismiss under Federal Rule 12(b)(6), the Court's review is limited to the Complaint and any documents attached to the Motion to Dismiss, which are also referred to in the Complaint and central to the plaintiff's claims. *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014). When reviewing the Complaint, the "court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)(quoting *Jones*, 188 F.3d at 324).

A complaint should only be dismissed under Federal Rule 12(b)(6) after affording every opportunity for the plaintiff to state a claim upon which relief can be granted, unless it is clear amendment would be futile. *Foman v. Davis,* 371 U.S. 178, 182 (1962); *Hitt v. City of Pasadena,* 561 F.2d 606, 608–09 (5th Cir. 1977); *DeLoach v. Woodley,* 405 F.2d 496, 496-97 (5th Cir. 1968). Consequently, when it appears a more careful or detailed drafting might overcome the deficiencies on which dismissal is sought, a Court must allow a plaintiff the opportunity to amend the Complaint. *Hitt,* 561 F.2d at 608–09. A court may appropriately dismiss an action with prejudice without giving an opportunity to amend if it finds that the plaintiff alleged his best case or amendment would be futile. *Foman,* 371 U.S. at 182; *DeLoach*, 405 F.2d at 496–97.

## DISCUSSION

Southwest Transplant Alliance contends this suit against it should be dismissed because Chase fails to allege any plausible claim under the False Claims Act and fails to plead any claim with sufficient particularity as required by Federal Rule 9(b). In addition, Southwest Transplant Alliance contends Chase fails to state a plausible claim for fraud under Federal Rule 8 because Chase fails to plead a fraudulent scheme with particularity. Southwest Transplant Alliance contends Chase fails to allege the elements of scienter and materiality, and if so construed, fails to allege these elements with sufficient particularity.

The FCA imposes liability on any person who knowingly submits or causes to be submitted a false claim for payment of Government funds, knowingly makes or causes to be made a false record or statement material to a false claim or conspires to commit any such violation. 31 U.S.C. § 3729(a)(1)(A)–(C). The FCA also imposes liability on any person who knowingly makes or causes to be made a false record or statement material to an obligation to transmit money to the Government or knowingly conceals an obligation to transmit money to the Government (reverse FCA cause of action). *Id.* § 3729(a)(1)(G). Thus, the elements of liability under the FCA are: "'(1) there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due….'" *United States ex rel. Porter v. Magnolia Health Plan, Inc.*, 810 F. App'x 237, 240 (5th Cir. 2020) (quoting *Abbott v. BP Expl. & Prod., Inc.*, 851 F.3d 384, 387 (5th Cir. 2017)). Thus, a "false claim" in the FCA context consists of a demand for money that induces the government to disburse funds or otherwise suffer immediate financial detriment. *U.S. ex rel. Shupe v. Cisco Sys., Inc.*, 759 F.3d 379, 385 (5th Cir. 2014), abrogated by *Wisconsin Bell, Inc. v. United States ex rel. Heath*, 145 S. Ct. 498 (2025). "'In a reverse false claims suit, the defendant's action does not result in improper payment by the government to the defendant but instead results in no payment to the government when a payment is obligated.'" *United States ex rel. Hendrickson v. Bank of Am., N.A.*, 343 F. Supp. 3d 610, 618 (N.D. Tex. 2018), *aff'd*, 779 F. App'x 250 (5th Cir. 2019) (quoting *United States ex rel. Bain v. Ga. Gulf Corp.*, 386 F.3d 648, 653 (5th Cir. 2004)). Therefore, a reverse false claim is where any person "us[ing], or caus[ing] to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G); *see United States ex rel. Frey v. Health Mgmt. Sys., Inc.*, No. 4:21-CV-2024, 2023 WL 2563239, at *4 (S.D. Tex. Feb. 10, 2023), report and recommendation adopted, 2023 WL 2564342 (S.D. Tex. Mar. 17, 2023). "The FCA may be enforced not just through litigation brought by the Government itself, but also through civil qui tam actions that

are filed by private parties, called relators, in the name of the Government." *Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter*, 575 U.S. 650, 653 (2015)(quotations omitted).

### Legal Standard of Pleading in FCA Cases

A complaint filed under the FCA must meet the heightened pleading standard of Federal Rule 9(b), which requires a relator to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009); *United States ex rel. Integra Med Analytics, L.L.C.*, 816 Fed. App'x. 892, 896 (5th Cir. 2020). "What constitutes 'particularity' will necessarily differ with the facts of each case, 'at a minimum 'Rule 9(b) requires the who, what, when, where, and how to be laid out.'" *Grubbs*, 565 F.3d at 185; *Bowles v. Mars, Inc.*, No. 4:14-CV-2258, 2015 WL 3629717, at *3 (S.D. Tex. June 10, 2015) (quoting *Benchmark Electronics, Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir.), *opinion modified on denial of reh'g*, 355 F.3d 356 (5th Cir. 2003)). This standard imposed in FCA cases ensures the complaint "provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims then attempting to discover unknown wrongs." *Grubbs*, 565 F.3d at 190.

To meet this pleading requirement, a relator's complaint that does not allege "the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable details that present a strong inference those claims were actually submitted, such as dates and descriptions of recorded, but unprovided, services and a description of the billing system that the records were likely entered into. *Grubbs*, 565 F.3d at 190-91. This pleading requirement must be imposed less stringently when the alleged fraud occurred over an extended period and consists of numerous acts. *U.S. ex rel. Ruscher v. Omnicare, Inc.*, No. 4:08-CV-3396, 2014 WL 2618158, at *10 (S.D. Tex. June 12, 2014), *on reconsideration in part*, 2014 WL 4388726 (S.D. Tex. Sept. 5, 2014) (quoting *United States ex rel. Foster v. Bristol–Myers Squibb Co.*, 587 F.Supp.2d 805, 821 (E.D. Tex. 2008)). However, even under this "relaxed" standard, the plaintiff must adhere to the basic rule that the complaint must

include a sufficient factual basis to support the relator's belief that a defendant engaged in a fraudulent scheme. *Ruscher*, 2014 WL 2618158, at *11 (quoting *Foster*, 587 F. Supp. 2d at 822); *see also Frey*, 2023 WL 2563239, at *7.

**APPLICATION**

Because the Second Amended Complaint does not allege the details of any individual false claim, but alleges fraud that occurred over an extended period of time and consists of numerous acts, the Court analyzes Chase's allegations under the *Grubbs* standard to determine if Chase sufficiently alleges a scheme to submit false claims, paired with reliable details, to present a strong inference those claims were actually submitted. This alleged scheme must include details such as dates and descriptions of each of the six specified theories and/or a description of the billing system that records of these improper charges were likely entered into. *See Grubbs*, 565 F.3d at 190-91.

**I.      Causes of Action of Violation of the False Claims Act**

      **(1) Liability Theory of Procurement of Non-viable Kidneys**

In the Second Amended Complaint, pertinent to this alleged theory of liability, Chase alleges:

a)  "[t]he three OPO defendants, NJ Sharing Networking, LiveOnNY, and Southwest Transplant Alliance, are all defrauding the United States by charging for unnecessary kidneys…." *ECF No. 37, p. 43*;

b)  the OPO Defendants "instruct their staff to procure the kidney even when the OPO knows the kidney is not viable." *ECF No. 37, p. 44*;

c)  in instances in which it is clear a kidney is not going to be viable, "the surgeons or OPOs are instructed to procure the kidney and then throw it in the trash." *ECF No. 37, p. 45*.

d)  "As one example, OPOs often seek donations after cardiac death (DCD) even when they know the donor will not have viable organs. The OPO will convince the family of someone who is on life support but will not recover to take the person off life support and donate the organs after they die. However, often the OPO knows the organs are either already damaged from the person's physical state (i.e. a bad car crash) or the person will not die within 60-90 minutes of coming off life support, and therefore their organs will deteriorate too significantly to be viable. Even if the person dies more than 90 minutes after being taken off life sup-

port, the OPO will still collect their organs to charge for the extraction, but ultimately discard the organs as non-viable." *Id*.

e) "the OPOs will recover organs even if the donor has been dead for too long and the organ is therefore not viable for transplant." *Id*.

f) Chase "regularly interacted with Southwest Transplant Alliance …. Chase therefore personally experienced . . . Southwest Transplant Alliance pulling non-viable kidneys." *Id. at pp. 45-46*;

g) "Southwest Transplant Alliance's organ procurement staff was so aggressive" that hospital staff referred to them as "vultures." *Id. at p. 46*;

h) "In one egregious example, on or about November 29, 2019, Southwest Transplant Alliance took a Parkland patient identified as an organ donor to the operating room to be prepared for organ recovery. However, while Southwest Transplant Alliance wanted to recover the patient's organs, the patient was not actually deceased. Luckily, Parkland doctors overruled Southwest Transplant Alliance, stopped the recovery, and the patient was able to recover and live." *Id*.;

i) "In a discussion with a representative from Southwest Transplant Alliance during an interview, a Southwest Transplant Alliance employee told Chase they viewed their mission as recovering every organ from a donor regardless of suitability." *Id*.;

j) In conversations with former CEO and President Niles, she stressed Southwest Transplant Alliance's job was procure organs even if they were not viable for transplant. She further stressed that Southwest Transplant Alliance's success was the number of kidneys Southwest Transplant Alliance recovered, not the number of viable kidneys Southwest Transplant Alliance recovered. *Id. at pp. 46-47*;

k) In 2024, "Southwest Transplant Alliance recovered a total of 1,037 donated kidneys for transplant. A total of 358 kidneys, or 34%, were discarded because they were not viable. By contrast, only one heart out of a total of 205 hearts recovered for transplant was discarded." *Id. at p. 48*.

### a.    Particular Details of the Alleged Scheme

The Court first analyzes Southwest Transplant Alliance's arguments that pertain to elements one and four of Chase's FCA cause of action, that is whether Chase sufficiently plead: (1) Southwest Transplant Alliance made a false statement or engaged in a fraudulent course of conduct, and (4) that caused the government to pay out money.

First, the pleading requirements of Federal Rule 9(b) must be satisfied as to each named Defendant. Therefore, a pleading that contains allegations of a scheme pertinent to a group of Defendants or that alleges general conduct performed by a group of defendants does not satisfy the heightened pleading requirements of Federal Rule 9(b). *In re Parkcentral Glob. Litig.*, 884 F.Supp.2d 464, 470-71 (N.D. Tex. 2012). Attributing discrete actions to all defendants without explaining the basis for the grouping or distinguishing between the relevant conduct of each de-

fendant is insufficient to meet the pleading requirement of Federal Rule 9(b) for allegations of violation of the FCA. *U.S. v. Lakeway Reg'l Med. Ctr.*, Case No. A-19-CV-00945, 2020 WL 6146571, at *2 (W.D. Tex. Feb. 13, 2020). Rather, the complaint must segregate the alleged wrongdoing of each of the named defendants. Allegations of scienter may be averred generally, but simple allegations of fraudulent intent will not suffice. *In re Parkcentral Glob. Litig.*, 884 F. Supp.2d at 471.

Because allegations (a) through (e) are generalized allegations of a scheme pertinent to "the OPO Defendants" group, and these excerpts allege general conduct performed by this group of defendants without explanation of the basis for the grouping or differentiation between the relevant conduct of each defendant, these allegations do not satisfy the heightened pleading requirements of Federal Rule 9(b). Consequently, these allegations, individually and collectively, cannot serve as basis for a violation of the FCA. *Id*. at 470-71; *U.S. v. Lakeway Reg'l Med. Ctr.*, 2020 WL 6146571, at *2.

The excerpted allegations specific to Southwest Transplant Alliance are (f), (g), (h) and (i). These allegations fail to provide sufficient particularity even under a relaxed standard because Chase fails to identify a person involved in the alleged fraudulent procurement scheme (the "who"). The allegations (f) – (i) lack necessary details regarding the "what" and "how" of the alleged schemes, and instead, assert generalized, conclusory allegations. *U.S. ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*, 519 F. App'x 890, 895 (5th Cir. 2013) (quotation marks and citations omitted). Chase does not provide any "representative examples of specific fraudulent acts conducted pursuant to" the schemes alleged. *U.S. ex rel. Bennett v. Medtronic, Inc.*, 747 F. Supp. 2d 745, 768 (S.D. Tex. 2010) (quoting *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 509–10 (6th Cir. 2007)). For each of the actions or schemes alleged in excerpts (f), (g), (h) and (i), the information Chase provides is limited to a conclusory description of the alleged scheme yet provide no details regarding how the alleged scheme was in fact carried out or specific examples of when it was carried out. *see also United States ex rel. King v. Alcon Labs., Inc.*, 232 F.R.D. 568, 572 (N.D. Tex. 2005). Finally, while these excerpts allege egregious and

potential fraudulent acts, Chase falls short in alleging specifically that Southwest Transplant Alliance did, in fact, bill any known, non-viable procured kidneys for reimbursement from Federal Healthcare, nor does Chase describe how such fraudulent billing occurred.

While Chase did provide an example in excerpt (h), this example does not amount to a scheme of fraudulent billing for procurement of a non-viable kidney. Excerpt (h) describes only an example of egregious, overly aggressive procurement behavior. In excerpt (i), Chase describes a conversation with an unnamed and untitled employee of Southwest Transplant Alliance who describes "their mission"; however, this nonspecific employee's statement of opinion does not amount to a scheme of fraudulent billing for procurement of a non-viable kidney. For these reasons, excerpts (f), (g), (h) and (i), individually and collectively, cannot serve as basis for a violation of the FCA.

Chase identifies a specific individual in excerpt (j), "former CEO and President Niles." Therefore, the "who" is adequately alleged; however, this identified statement by Niles fails to assert an admission of a particular scheme to fraudulently bill Federal Healthcare. Taken as true, Niles's statements that "Southwest Transplant Alliance's job was procure organs even if they were not viable for transplant" and its "success was the number of kidneys Southwest Transplant Alliance recovered, not the number of viable kidneys" do not provide sufficient factual basis to support Chase's allegation that Southwest Transplant Alliance engaged in a fraudulent scheme, nor do these statements support a conclusion that Southwest Transplant Alliance actually billed Federal Healthcare for improperly procured kidneys. Thus, these statements do not plead the when, where, and how. *Grubbs*, 565 F.3d at 190-91; *Ruscher v. Omnicare, Inc.*, No. 4:08-CV-3396, 2014 WL 2618158, at *10-11. Consequently, excerpt (j) cannot serve as basis for a violation of the FCA.

Finally, in excerpt (k), Chase provides some statistical basis for the alleged scheme: the number of kidneys donated for transplant compared to the number of kidneys that were ultimately viable, leaving a 34% viable-kidney ratio. Chase compares this to the ratio of viable hearts procured for transplant. This statement is unsupported and falls short of identifying individuals

involved or even describing and providing an example of the alleged fraudulent scheme. This statement is simply an unsupported and conclusory comparison to the recovery ratio of viable hearts for transplant, which does not provide support for any fraudulent scheme. Therefore, excerpt (k) cannot serve as basis for a violation of the FCA.

Collectively, excerpts (a) – (k) could be liberally construed to describe non-specific conduct of improper procurement of non-viable kidneys. However, taking these allegations as true, this described improper conduct does not provide any example of billing Federal Healthcare for any known non-viable procured kidney, which is the act that would constitute fraud. Therefore, these allegations fall short of describing a fraudulent scheme.

Although Chase does not provide sufficient factual details of a fraudulent scheme, the Court will analyze the second prong of the test to determine sufficiency of pleading.

### b. Reliable Indicia that Lead to a Strong Inference Southwest Transplant Alliance Improperly Billed for Non-viable Kidneys

For the second prong of the pleading requirements, Chase must allege reliable indicia that lead to a strong inference Southwest Transplant Alliance improperly procured known, non-viable kidneys and billed Medicaid for the procurement. *See Grubbs*, 565 F.3d at 190.

In *Grubbs*, the Fifth Circuit found the relator provided reliable indicia to support his allegations by stating "the particular workings of a scheme [that were] communicated directly to the relator by those perpetrating the fraud," and the relator "describe[d] in detail, including the date, place, and participants, the dinner meeting at which two doctors ... attempted to bring him into the fold of their on-going fraudulent plot." *Grubbs*, 565 F.3d at 191-92. The *Grubbs* relator also corroborated this allegation with descriptions of a meeting with nurses who tried to help him carry out the scheme, along with specific dates on which "each doctor falsely claimed to have provided services to patients." *Id.* at 192.

In contrast, Chase simply asserts he gained knowledge or became aware of improper conduct of procurement of known, non-viable kidneys through his "interactions with Southwest

Transplant Alliance" and "upon information and belief." In these allegations, Chase describes the improper acts of kidney procurement; however, he does not allege anyone communicated to him the workings of the alleged fraud of billing Federal Healthcare for any improperly procured kidneys or that he viewed any other indicia, like internal documents, evidencing such fraud. *See Grubbs*, 565 F.3d at 191; *United States v. Cath. Health Initiatives*, No. 4:18-CV-123, 2022 WL 2657131, at *10 (S.D. Tex. Mar. 31, 2022*), report and recommendation adopted*, 2022 WL 2652135 (S.D. Tex. July 8, 2022).

For this reason, even if Chase had pleaded particular details of the alleged scheme, Chase does not provide the "reliable indicia" needed to satisfy the requirements of Rule 9(b). *United States ex rel. Hendrickson*, 343 F. Supp. 3d at 635. With these pleading deficiencies, the Court finds Chase fails to satisfy the pleading requirements of Federal Rule 9(b) to assert a violation of the FCA against Southwest Transplant Alliance based upon an alleged scheme of procuring known non-viable kidneys and billing Federal Healthcare for this procurement. With this deficiency, Chase fails to allege sufficient detail of elements (1) and (4) of the cause of action of violation of the FCA based upon this theory of liability. For this reason, the Court will not analyze whether Chase satisfies the pleading requirement of elements (2), scienter, and (3), materiality, based upon the theory of an alleged scheme of improper procurement of kidneys and fraudulent billing for these kidneys.

For these reasons, this theory of liability for violation of the FCA will be dismissed.

**(2) Liability Theory of Submitting Excessive Cost Reports**

Chase also asserts FCA violation based upon the theory that Southwest Transplant Alliance submitted false and excessive cost reports for reimbursement as "pertaining to patient care." Again, the Court will begin by analyzing whether Chase sufficiently plead elements (1) and (4) of this theory of violation: (1) Southwest Transplant Alliance made a false statement or engaged in a fraudulent course of conduct, and (4) that caused the government to pay out money.

In the Second Amended Complaint, pertinent to this alleged theory of liability, Chase alleges:

a) "[Federal Healthcare] reimburses OPOs directly for any cost related to a Medicare patient. This includes all costs related to kidneys. However, OPOs are only responsible for organ procurement, rather than organ transplant. Because any donor will most likely have more than one organ, the OPOs' work will necessarily require splitting costs between the Medicare covered portion and the non-Medicare covered portion. OPOs neither properly allocate charges to Medicare nor limit their charges to only those that are reasonable and necessary. *ECF No. 37, pp. 48-49;*

b) "Southwest Transplant Alliance built its own medical facility so it could perform the procurements itself and put all of the fees on its own cost report. An OPO building a medical facility creates an inefficient process because the donor body needs to be transported from the hospital to the transplant center for procurement. However, it does allow Southwest Transplant Alliance to greatly increase its billings to Medicare, because it can now bill for the office space and all of the costs associated with the procedure rather than paying those costs to the hospital." *ECF No. 37, p. 49;*

c) "Further Southwest Transplant Alliance spared no expense when building its medical facility, as Southwest Transplant Alliance knew they could charge the costs back to Medicare. Southwest Transplant Alliance bought its own land, built state of the art facilities, built its own office building, and had state of the art offices on site. Upon information and belief these costs were included on [Southwest Transplant Alliance's] cost reports but would not be reasonable and necessary. *ECF No. 37, pp. 49-50;*

d) "Southwest Transplant Alliance built this facility, in part, to avoid any oversight from the hospitals of the donors, which allowed Southwest Transplant Alliance to procure even more non-viable organs to further inflate their cost report." *ECF No. 37, pp. 49-50;*

e) "Former Southwest Transplant Alliance President and CEO Patricia Niles would regularly hold lunches with surgeons and, upon information and belief, include the cost of the lunches on Southwest Transplant Alliance's cost report for reimbursement from Medicare." *ECF No. 37, p. 50;*

f) "Southwest Transplant Alliance would also send an excessive number of staff to conferences. For example, Southwest Transplant Alliance regularly sent 8 to 12 staff to various conferences, such as the annual Association of Organ Procurement Organizations (AOPO) conference, UNOS Transplant Management Forum, and the Regional Transplant meetings. Southwest Transplant Alliance representatives would often number the most of any organization, when many of the staff were not necessary at the conference. Upon information and belief, both the time and expense of the attendance would be included on Southwest Transplant Alliance's cost report." *ECF No. 37, p. 50;*

g) "Further, the OPOs provide excessive salaries and bonuses, particularly to their executives. At the end of the year, before each OPO submits its cost report, the staff reviews its costs to ensure that the costs have increased from the year before. If they are not, the OPO will incur unnecessary charges, including salary increases and bonuses, unnecessary furniture, and other expenses, to ensure their budgets are going up and the OPO will receive more funding the next year. The operating costs are exorbitant. For example, the former President and CEO of Southwest Transplant Alliance, Patricia Niles, made $762,269 in 2019…." *ECF No. 37, pp. 50-51;*

h) "The excessive costs not only improperly inflated the costs included on the cost reports but improperly increased the SAC charged for each organ the OPO Defendants procured.

14

The inflated SAC cost was then passed on to the transplant recipient's ultimate healthcare provider, including Federal Healthcare." *ECF No. 37, pp. 50-51.*

Again, allegations (a),(g), and (h) are generalized allegations of a scheme pertinent to "the OPO Defendants" group, and describe general conduct performed by this group of defendants. For this reason, these allegations do not satisfy the heightened pleading requirements of Federal Rule 9(b), and, individually and collectively, cannot serve as basis for a violation of the FCA. *See In re Parkcentral Glob. Litig.*, 884 F.Supp.2d at 470-71; *Lakeway Reg'l Med. Ctr.*, 2020 WL 6146571, at *2.

The excerpted allegations specific to Southwest Transplant Alliance are (b), (c), (d), (f), and a portion of (g) in which Chase presents a theory of liability for alleged excessive, unnecessary, and unreasonable costs: the construction of a state-of-the art medical facility; meal expenditures; excessive conference attendance and travel, and; exorbitant executive salaries. Chase theorizes these excessive costs result in "inflation" of organ acquisition costs, and these "inflated" costs are submitted to Federal Healthcare through the cost reports.

These allegations in excerpts (b), (c), (d), (f), and (g) fail to provide sufficient particularity even under a relaxed standard because Chase fails to identify a person involved in the alleged scheme to submit fraudulent excessive costs, (the "who"), and fail to present the "what," and "how" required. Instead, these assertions are generalized, conclusory allegations based upon Chase's opinion of what constitutes "excessive." *Nunnally*, 519 F. App'x at 895.

Chase does not provide any representative examples of specific fraudulent acts conducted pursuant to the alleged engagement in incurring "excessive costs." *See Bennett*, 747 F.Supp.2d at 768 (quoting *Bledsoe*, 501 F.3d at 509–10 (6th Cir. 2007)). For each of the actions or schemes described in excerpts (b), (c), (d), (f), and (g), Chase does not provide any specific allegation of what makes the identified costs of the construction of a state-of-the-art facility designed specifically for the donation process, meal expenditures, conference attendance, travel, and executive

salaries inappropriate, excessive, or unlawful, nor does he cite any law or regulation prohibiting the cited expenditures.

These allegations do not amount to a scheme of fraudulent conduct unless Southwest Transplant Alliance fraudulently submitted them to Federal Healthcare for reimbursement. To support this requirement, Chase states only "upon information and belief these costs were included on [Southwest Transplant Alliance's] cost reports but would not be reasonable and necessary" *ECF No. 37, pars. 188, 190 (meals), 191 (conference attendance), and 193 (salaries and bonuses)*. Chase does not identify any specific false claim for payment that Southwest Transplant Alliance submitted to Federal Healthcare pertaining to any of these broad expenditure categories. Chase's allegation that these excessive costs inflated Southwest Transplant Alliance's costs that were presented in cost reports is too nebulous and unsupported by specific factual detail or statistics to support a claim of FCA violation based upon this theory of liability.

For these reasons, the allegations in excerpts (b), (c), (d), (f), and (g), individually and collectively, cannot serve as basis for a violation of the FCA. With this deficiency, Chase fails to allege sufficient detail of elements (1) and (4) of the cause of action of violation of the FCA based upon this theory of liability. For this reason, the Court will not analyze whether Chase satisfies the pleading requirement of elements (2), scienter, and (3), materiality, based upon the theory of an alleged scheme of improper incurrence or submission of excessive costs to Federal Healthcare for reimbursement.

For these reasons, this theory of liability for violation of the FCA will be dismissed.

### (3)    Liability Theory of False Inflation of Statistics and Failure to Attempt to Recover Every Possible Organ

Chase asserts FCA violation based upon the theory that OPOs failed to recover every possible organ as required by statute, and fraudulently inflated reported statistics to reflect compliance with this statutory requirement. Again, the Court will analyze whether Chase sufficiently plead elements (1) and (4) of this theory of violation: (1) Southwest Transplant Alliance made a

false statement or engaged in a fraudulent course of conduct, and (4) that caused the government to pay out money.

In the Second Amended Complaint, pertinent to this alleged theory of liability, Chase alleges:

a) "OPOs are required to try to recover every organ possible. See 42 C.F.R. § 486.322…. However, OPOs regularly fail to try to recover every organ. OPOs regularly fail to go to hospitals that service low-income or minority populations under the mistaken belief that these patients will not consent to organ donation. Further, OPOs fail to attempt to recover organs from older donor candidates who may only have one viable organ. *ECF No. 37, p. 52*;

b) "[t]he OPOs specifically instruct certain hospitals to not refer potential organ donors. If the donors are not referred, then they will not count toward the OPO's statistics for failing to recover an organ. *ECF No. 37, p. 52;*

c) The OPOs also control how their statistics are reported. So, when an OPO fails to respond to a potential donor, they can simply fail to put that potential donor into their electronic health record and put in a fake reason for why the potential donor was not contacted. The OPOs hide their failings through this false data. *ECF No. 37, p. 52.*

All of these excerpts in support of this theory of liability are generalized allegations of a scheme pertinent to "the OPO Defendants" group, and describe general conduct performed by this group of defendants. For this reason, these allegations do not satisfy the heightened pleading requirements of Federal Rule 9(b), and, individually and collectively, cannot serve as basis for a violation of the FCA particular to Southwest Transplant Alliance. *See In re Parkcentral Glob. Litig.*, 884 F.Supp.2d at 470-71; *Lakeway Reg'l Med. Ctr.*, 2020 WL 6146571, at *2.

For this reason, this theory of liability for violation of the FCA will be dismissed

**(4) Theory of Liability of Receipt of Improper Kickbacks**

Chase asserts FCA violation based upon the theory that Southwest Transplant Alliance accepted payment from tissue processors for tissue collection more than the limited amount permitted under the Anti-Kickback Statute as a predicate to violation of the FCA.

In the Second Amended Complaint, pertinent to this alleged theory of liability, Chase alleges:

(a) While tissue processors can use their own staff to collect tissue, they use OPOs' staff given the OPOs' unique access to potential donors. Every hospital is mandated to report potential organ donors, who all are potential tissue donors, to the OPO in their DSA. The OPOs collect the tissue for free and make a profit when they are paid by the tissue processors. Part of that

payment by the tissue processors is a kickback for the OPOs' access to organ donors, procedures that are paid by Federal Healthcare. *ECF No. 37, p. 54;*

(b) Even though the OPO Defendants are non-profit organizations, tissue procurement provides them with a significant source of revenue. Chase directly witnessed and discussed with doctors, nurses, and ICU staff that Southwest Transplant Alliance staff prioritized tissue collection over organ recovery. ECF No. 37, p. 54;

(c) Upon information and belief, the ultimate payment by the tissue processors to the OPO Defendants was for more than the cost of collection. This means tissue processors effectively paid the OPO Defendants a profit, which is a kickback for the OPO Defendants' access to the patients through organ collection paid for by Federal Healthcare. *ECF No. 37, p. 54.*

All of these excerpts in support of this theory of liability are generalized allegations of a scheme pertinent to "the OPO Defendants" group, and describe general conduct performed by this group of defendants. These excerpts are based upon "information and belief" and do not describe sufficient or reliable indicia of a fraudulent scheme. The one exceprt specific to Southwest Transplant Alliance states only that it engaged in improper prioritization of tissue collection over organ recovery, but falls short of describing a fraudulent scheme in violation of the FCA.

For these reasons, these allegations do not satisfy the heightened pleading requirements of Federal Rule 9(b), and, individually and collectively, cannot serve as basis for a violation of the FCA particular to Southwest Transplant Alliance. *See In re Parkcentral Glob. Litig.*, 884 F.Supp.2d at 470-71; *Lakeway Reg'l Med. Ctr.*, 2020 WL 6146571, at *2.

## II.     Cause of Action of Reverse False Claims Act Violation

The Complaint contains a "Reverse False Claims" cause of action pursuant to 31 U.S.C. § 3729(a)(G).

However, Chase does not address nor allege any facts pertaining to this theory of liability or any actual element of this statutory violation. Chase does not provide any factual basis pertaining to this provision of the FCA.

For this reason, the cause of action based upon an improper reverse False Claims Act violation against Southwest Transplant Alliance will be dismissed.

**III.    Cause of Action of Violation of State Law**

In the Second Amended Complaint, Chase asserts state law causes of action that mirror the alleged violations of the federal FCA.

These state law theories of liability fail for the same reasons Chase's theories of liability for violation of the federal FCA fail. Further, because this Court will dismiss all of Chase's theories of liability under the FCA, it will exercise its discretion to refrain from exercising any supplemental jurisdiction over a state cause of action. *See Heggemeier v. Caldwell Cnty., Tex.*, 826 F.3d 861, 872 (5th Cir. 2016) (per curiam); *Brookshire Bros. Holding, Inc. v. Dayco Prods., Inc.*, 554 F.3d 595, 602 (5th Cir. 2009).

For these reasons, any cause of action based upon a violation of state law against Southwest Transplant Alliance will be dismissed.

## AMENDMENT OF SECOND AMENDED COMPLAINT

Prior to dismissal of a Complaint, a court must "freely give leave [to amend the pleadings] when justice so requires." Fed. R. Civ. P. 15(a)(2). However, leave to amend is within the sound discretion of the court and can be appropriately denied when "it is clear that the defects [of a complaint] are incurable." *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002).

This Court provided Chase a final opportunity to cure all pleading defects prior to submission of this Motion to Dismiss. In response to the Court's admonition that Chase had one, final opportunity to amend the Complaint, he submitted the live Second Amended Complaint. Based upon this procedural posture and the Court's admonition, the Court finds Chase was provided ample opportunity to satisfy Federal Rule 15.

## CONCLUSION

For the reasons stated, Southwest Transplant Alliance's Motion to Dismiss for Failure to State a Claim pursuant to Federal Rule 12(b)(6) is **GRANTED**.


It is so ORDERED.
SIGNED this 6th day of January, 2026.


_____
JASON  PULLIAM
UNITED STATES DISTRICT JUDGE