UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

UNITED STATES, EX REL; AND
STATE OF TEXAS,

   *Plaintiffs*,

PATREK CHASE,

*Relator,*

v.

                        CASE NO.  SA-23-CV-00381-JKP

PARKLAND HEALTH AND
HOSPITAL SYSTEM, LOYOLA
UNIVERSITY MEDICAL CENTER,
SOUTHWEST TRANSPLANT
ALLIANCE, LIVEONNY, NEW
JERSEY SHARING NETWORK,
UNITED NETWORK FOR ORGAN
SHARING,

   *Defendants*.

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Dallas County Hospital District's (sued under its former d/b/a, Parkland Health and Hospital System) (hereafter "Parkland") Motion to Dismiss for Failure to State a Claim. *ECF Nos. 102,105*. Plaintiff/Relator Patrek Chase responded. *ECF No. 104*. Upon consideration, the Motion to Dismiss is **GRANTED**.

### FACTUAL BACKGROUND

On March 28, 2023, Relator Patrek Chase filed this qui tam action alleging violation of the False Claims Act (FCA) in the name of the United States and many individual states. *ECF No. 1*. In the Second Amended Complaint, Chase names as Defendants entities in the organ donation and transplant system which includes transplant centers, such as Parkland, Organ

1

Procurement Organizations (OPOs), and the United Network for Organ Sharing (UNOS).[1] *ECF No. 37*. In general terms, Chase alleges these named Defendants fraudulently billed Medicare and Medicaid (Federal Healthcare) and accepted illegal kickbacks in the process of procuring kidneys for transplant to patients in need. *Id. at par. 5*.

In this kidney-procurement system, OPOs hold exclusive territorial rights over specific geographic regions to recover organs in that area. *Id. at pars. 53-55*. As a condition to participate in Federal Healthcare, every hospital must contact the OPO in the region in which it sits to obtain potential organs for a patient in need. *Id. at par. 55*; 42 U.S.C. §§ 1320b-8(a)(1)(B), (C). Federal Healthcare reimburses each OPO for kidneys procured and intended for transplant, even if the kidney is later determined unusable; however, Federal Healthcare will not compensate an OPO for a kidney the OPO knows is not viable at the time of procurement. 42 C.F.R. § 413.402(a). Because much of an OPO's costs are covered by Federal Healthcare, OPOs submit to Federal Healthcare a cost report which contains a certification attesting the expenses are reasonable and related to patient care and are allowed and accurate. 42 C.F.R. § 413.402(d)(1); *see also* 42 C.F.R. § 413(b); 42 C.F.R. § 413.24(f)(4)(iv)(A)(4),(B). Further, OPOs can charge a standard acquisition cost fee for organs to the organ recipient's Medicaid healthcare. *Id*. Therefore, the OPOs' costs are also passed on to Medicaid patients through the standard acquisition cost fee. *Id. at par. 67*. However, OPOs can only charge costs that are reasonable and related to patient care. 42 C.F.R. § 413.402(d); *see also* 42 C.F.R. § 413(b).

Particular to this Motion, Chase alleges Parkland, as a public teaching hospital and transplant center, contracted with University of Texas Southwestern Medical Center (UT Southwestern) to provide all of its internal transplant services. Under this contract, UT

---

[1] Chase named numerous entities and persons in the original Complaint. However, the only remaining Defendants are: LiveOnNY, New Jersey Sharing Network, Parkland Health and Hospital System, Southwest Transplant Alliance, Trinity Health's Loyola University Medical Center, and United Network for Organ Sharing.

Southwestern's doctors approved organs and patients for transplant and performed all transplants for Parkland patients. Chase alleges that within these contracted services, UT Southwestern created a scheme to improperly pass over Parkland patients in need of organ transplants, and UT Southwestern never intended to provide transplants to these Parkland patients. Instead, UT Southwestern rejected viable organs for Parkland patients and accepted the same organs for its own patients, leaving Parkland with almost no transplants. *ECF No. 37, pars. 5,6,101-109*. This allowed UT Southwestern, which controlled and billed for all organ-transplant work its doctors performed at Parkland, to charge Parkland unnecessary and excessive fees for individuals at Parkland on the organ transplant waiting list. *Id*.

Chase provides examples of ten Parkland patients who were eligible for kidney transplants, and the potential kidneys were rejected, yet the same organs were provided to patients at UT Southwestern. *Id. at pars. 111-124*. Chase provides statistics to support his allegations that organs were turned down by UT Southwestern doctors for transplant into Parkland patients because the doctors believed the organ was not properly preserved or not otherwise viable, yet the same UT Southwestern doctors allowed transplantation of these organs into patients at UT Southwestern. *Id. at pars. 116-122*. Chase alleges UT Southwestern doctors also improperly removed Parkland patients from the transplant waitlist.

Chase alleges UT Southwestern created a fraudulent scheme through a loophole created by its contract with Parkland. *Id. at pars. 126-131*. Under this fraudulent scheme, Chase alleges that when performing under its contract with Parkland, UT Southwestern required the most expensive laboratory tests to be performed in its own laboratories, rather than Parkland's, even though the blood draw for the tests happened at Parkland. UT Southwestern would then charge Parkland for these lab tests under the contract. *Id. at pars. 126-131*. While some of the lab-test

charges, and all of the charges related to kidney transplants, were reimbursable by Federal Healthcare, Chase alleges Parkland is only allowed to bill to Federal Healthcare its own cost of services, not the payments made to UT Southwestern under the contract. Therefore, if Parkland conducted lab testing and performed living donor surgery for its patients in house, Parkland could recover its costs from Federal Healthcare. Similarly, UT Southwestern can only recover its costs of performing these services for its own patients from Federal Healthcare. However, when UT Southwestern performed lab tests and surgery on a Parkland patient at its facilities, it would charge Parkland a 33 percent markup from its costs, thereby recovering more than it could recover from Federal Healthcare. Similarly, Chase alleges that by creating the scheme to keep the transplant patients at Parkland and use the UT Southwestern lab for expensive tests, UT Southwestern is able to recover a 33 percent markup from its costs. *Id. at pars. 126-131.*

While employed at Parkland, Chase alleges he suggested to Ambulatory Chief Medical Officer, Dr. Joseph Chang and VP of Ambulatory, Patricia Shirey, that Parkland hire its own doctors to remove UT Southwestern's influence on Parkland's organ transplants. Chase alleges both agreed and set a meeting with the senior leadership of both UT Southwestern and Parkland to discuss Chase's proposal. Chase alleges he then presented his proposal to Parkland's Capital Planning Review Committee (CPRC), which was attended by Dr. Chang and other key individuals involved in Parkland's financial decision making, and the proposal was approved during the committee meeting. *Id. at pars. 132-135*. Chase alleges he was then asked to present the proposal at "the Chief's Meeting," which is attended by Parkland's top executives, including its CEO. However, before this meeting occurred, Patricia Shirley informed him that Jessica Hernandez, SVP of Population Health, would make the presentation at the Chief's Meeting.

Chase alleges the proposal was denied at the Chief's Meeting, despite it being approved by the CPRC. *Id. at pars. 132-135*.

Chase alleges he then requested a meeting with Yvette Chapman of Southwest Transplant Alliance and requested to see the organ acceptance criteria for Parkland patients and for UT Southwestern. In a conversation with Chapman in roughly January 2020 or late 2019, Chase alleges Chapman told him that, "'everyone knows that this,' referring to the practice of passing over Parkland patients, 'has been happening for years.'" *Id. at par. 135*. Chase received the information and passed it along to Parkland leadership. Despite presenting this documentation to Parkland leadership, Chase alleges UT Southwestern and Parkland failed to address his concerns.

Chase alleges he repeatedly reported these alleged issues to the proper personnel at Parkland, and he raised his concerns with UNOS. Chase alleges he applied for, and was offered, a position with the Southwest Transplant Alliance; however, Southwest Transplant Alliance revoked the job offer on the same day UNOS closed its investigation on his complaint. Chase's direct supervisor at Parkland, Patricia Shirey, then gave Chase a written warning, stating he needed to manage his emotions, body language, and tone with staff and improve his communications. *Id. at pars. 132-135, 324-325*. Chase alleges "Shirey told him that she 'didn't agree with it but senior leadership was forcing her to and if she didn't write him up her job would be on the line also.'" Chase alleges "Shirey stated she informed Yvonne Alsbury, who worked in Parkland's human resources team, that Chase had done nothing wrong, and there had been no prior coaching she could reference in a write up, so Alsbury instructed Shirey to 'make something up.'" *Id. at par. 326*. Chase contends this written warning was in retaliation for his protected activity of submitting a complaint to those at Parkland and to UNOS. *Id. at par. 327*.

Chase contends he felt his supervisors at Parkland would continue to retaliate against him and eventually terminate him, and this caused him to leave his job at Parkland. *Id. at par. 327*.

Based upon these allegations, Chase asserts causes of action against Parkland for violation of the False Claims Act by knowingly submitting or causing to be submitted a false claim for payment of Government funds or knowingly making or causing to be made a false record or statement material to a false claim. 31 U.S.C. § 3729(a)(1)(A), (B). *ECF no. 37, pars. 328-339*. Chase also asserts a cause of action of reverse false claims in violation of § 3729(a)(1)(G), and mirror violations of numerous state laws.[2] *Id. at pars. 340-344, 350-533*.

In addition, Chase asserts a cause of action for retaliation in violation of 31 U.S.C. §3730(h). *Id. at pars. 345-349*. With regard to this retaliation cause of action, Chase alleges he engaged in protected activity under the FCA by investigating and reporting Parkland's false or fraudulent practices internally, including issues related to UT Southwestern's unjustified rejection of organs for Parkland patients, and Parkland had knowledge of Chase's protected activity. *Id. at par. 347*. Chase alleges that following this protected activity, he was removed from his position with Parkland, harassed, and eventually forced out of his job, constituting unlawful retaliation under the FCA.

Although Chase filed this qui tam action on March 28, 2023, on June 20, 2025, the United States declined to intervene in this action. *ECF No. 25*. On June 25, 2025, the State of Texas and all other Plaintiff states declined to intervene in this action. *ECF No. 27*. This Court unsealed this action. On August 1, 2025, this Court permitted Chase to file the live Second

---

[2] In his Response to the Motion to Dismiss, Chase withdraws the causes of action of reverse false claims in violation of § 3729(a)(1)(G). *ECF No. 104, p. 27*. Consequently, the Court dismisses this asserted cause of action and will not discuss it.

Amended Complaint; due to the age of the case at that time, this Court cautioned Chase no further amendments would be allowed. *ECF Nos. 33,37*.

Parkland now files this Motion to Dismiss for Failure to State a Claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

## LEGAL STANDARD

To provide opposing parties fair notice of the asserted cause of action and the grounds upon which it rests, every pleading must contain a short and plain statement of the cause of action which shows the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To satisfy this requirement, the Complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555-558, 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The focus is not on whether the plaintiff will ultimately prevail, but whether that party should be permitted to present evidence to support adequately asserted causes of action. *Id.*; *Twombly*, 550 U.S. at 563 n.8. Thus, to warrant dismissal under Federal Rule 12(b)(6), a Complaint must, on its face, show a bar to relief or demonstrate "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Fed. R. Civ. P. 12(b)(6); *Clark v. Amoco Prod. Co.,* 794 F.2d 967, 970 (5th Cir. 1986). Dismissal "can be based either on a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Frith v. Guardian Life Ins. Co.,* 9 F.Supp.2d 734, 737–38 (S.D.Tex. 1998). "Thus, the court should not dismiss the claim unless the plaintiff would not be entitled to relief under any set of facts or any possible

theory that he could prove consistent with the allegations in the complaint." *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999); *Vander Zee v. Reno,* 73 F.3d 1365, 1368 (5th Cir. 1996).

In assessing a Motion to Dismiss under Federal Rule 12(b)(6), the Court's review is limited to the Complaint and any documents attached to the Motion to Dismiss, which are also referred to in the Complaint and central to the plaintiff's claims. *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014). When reviewing the complaint, the "court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)(quoting *Jones*, 188 F.3d at 324).

A complaint should only be dismissed under Federal Rule 12(b)(6) after affording every opportunity for the plaintiff to state a claim upon which relief can be granted, unless it is clear amendment would be futile. *Foman v. Davis,* 371 U.S. 178, 182 (1962); *Hitt v. City of Pasadena,* 561 F.2d 606, 608–09 (5th Cir. 1977); *DeLoach v. Woodley,* 405 F.2d 496, 496-97 (5th Cir. 1968). Consequently, when it appears a more careful or detailed drafting might overcome the deficiencies on which dismissal is sought, a Court must allow a plaintiff the opportunity to amend the Complaint. *Hitt,* 561 F.2d at 608–09. A court may appropriately dismiss an action with prejudice without giving an opportunity to amend if it finds that the plaintiff alleged his best case or amendment would be futile. *Foman,* 371 U.S. at 182; *DeLoach*, 405 F.2d at 496–97.

## DISCUSSION

Parkland contends this suit against it should be dismissed because Chase fails to allege any plausible claim under the False Claims Act and fails to plead any claim with sufficient particularity as required by Federal Rule 9(b). Parkland contends Chase only alleges violations of the FCA committed by UT Southwestern in detriment to Parkland patients but does not allege

any facts to support a cause of action against Parkland for submitting any false claims or causing any false claims to be submitted to Federal Healthcare. Parkland contends any cause of action for retaliation in violation of the FCA must be dismissed because

### 1. Causes of Action for Violation of the False Claims Act

The FCA imposes liability on any person who knowingly submits or causes to be submitted a false claim for payment of Government funds, knowingly makes or causes to be made a false record or statement material to a false claim or conspires to commit any such violation. 31 U.S.C. § 3729(a)(1)(A)–(C). The FCA also imposes liability on any person who knowingly makes or causes to be made a false record or statement material to an obligation to transmit money to the Government or knowingly conceals an obligation to transmit money to the Government (reverse FCA cause of action). *Id.* at § 3729(a)(1)(G). Thus, the elements of liability under the FCA are: "'(1) there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due….'" *United States ex rel. Porter v. Magnolia Health Plan, Inc.*, 810 F. App'x 237, 240 (5th Cir. 2020) (quoting *Abbott v. BP Expl. & Prod., Inc.*, 851 F.3d 384, 387 (5th Cir. 2017)). Thus, a "false claim" in the FCA context consists of a demand for money that induces the government to disburse funds or otherwise suffer immediate financial detriment. *U.S. ex rel. Shupe v. Cisco Sys., Inc.*, 759 F.3d 379, 385 (5th Cir. 2014), abrogated by *Wisconsin Bell, Inc. v. United States ex rel. Heath*, 145 S. Ct. 498 (2025). "The FCA may be enforced not just through litigation brought by the Government itself, but also through civil qui tam actions that are filed by private parties, called relators, in the name of the Government." *Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter*, 575 U.S. 650, 653 (2015)(quotations omitted).

### Legal Standard of Pleading in FCA Cases

A complaint filed under the FCA must meet the heightened pleading standard of Federal Rule 9(b), which requires a relator to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185

(5th Cir. 2009); *United States ex rel. Integra Med Analytics, L.L.C.*, 816 Fed. App'x. 892, 896 (5th Cir. 2020). "What constitutes 'particularity' will necessarily differ with the facts of each case, 'at a minimum 'Rule 9(b) requires the who, what, when, where, and how to be laid out.'" *Grubbs*, 565 F.3d at 185; *Bowles v. Mars, Inc.*, No. 4:14-CV-2258, 2015 WL 3629717, at *3 (S.D. Tex. June 10, 2015) (quoting *Benchmark Electronics, Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir.), *opinion modified on denial of reh'g*, 355 F.3d 356 (5th Cir. 2003)). This standard imposed in FCA cases ensures the complaint "provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims then attempting to discover unknown wrongs." *Grubbs*, 565 F.3d at 190.

To meet this pleading requirement, a relator's complaint that does not allege "the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable details that present a strong inference those claims were actually submitted, such as dates and descriptions of recorded, but unprovided, services and a description of the billing system that the records were likely entered into. *Grubbs*, 565 F.3d at 190-91. This pleading requirement must be imposed less stringently when the alleged fraud occurred over an extended period and consists of numerous acts. *U.S. ex rel. Ruscher v. Omnicare, Inc.*, No. 4:08-CV-3396, 2014 WL 2618158, at *10 (S.D. Tex. June 12, 2014), *on reconsideration in part*, 2014 WL 4388726 (S.D. Tex. Sept. 5, 2014) (quoting *United States ex rel. Foster v. Bristol–Myers Squibb Co.*, 587 F.Supp.2d 805, 821 (E.D. Tex. 2008)). However, even under this "relaxed" standard, the plaintiff must adhere to the basic rule that the complaint must include a sufficient factual basis to support the relator's belief that a defendant engaged in a fraudulent scheme. *Ruscher*, 2014 WL 2618158, at *11 (quoting *Foster*, 587 F.Supp. 2d at 822); *see also Frey*, 2023 WL 2563239, at *7.

In the Second Amended Complaint, pertinent to this alleged theory of liability, Chase alleges a scheme in which UT Southwestern fraudulently inflated Parkland's bills to be paid under the contract between these parties, and through this scheme, UT Southwestern harmed

Parkland and submitted fraudulent claims to Federal Healthcare. *ECF No. 37, pars. 5,6,101-135,321-327*. Chase alleges that Parkland became aware of this scheme when he reported it; however, Chase does not allege Parkland submitted false claims to Federal Healthcare or caused false claims to be submitted. Chase does not allege Parkland participated in UT Southwestern's scheme or took any action to facilitate the scheme. *See id*. The information Chase provides is limited to a conclusory description of the alleged scheme committed by UT Southwestern, yet provides no details regarding how or when the alleged scheme was in fact carried out or specific examples of fraudulent claims submitted by UT Southwestern to Federal Healthcare that Parkland might have participated in. *See id*. While these excerpts allege egregious and potential fraudulent acts committed by UT Southwestern, Chase falls short in alleging a sufficiently specific fraudulent scheme committed by Parkland. Therefore, Chase does not provide any factual detail from which the Court or Parkland could derive the "who, what, when, where" of any purported scheme in which Parkland submitted false claims. *See id*. Because all of the allegations related to Parkland in the Second Amended Complaint refer to Chase's conclusory allegations of UT Southwestern's purported scheme to fraudulently pass over Parkland patients for organ transplants and fraudulently drive up its own claims that it purportedly submitted to Federal Healthcare, Chase fails to adequately allege the basic elements of any FCA cause of action against Parkland.

For these reasons, Parkland's Motion to Dismiss Chase's theory of liability for violation of the False Claims Act by knowingly submitting or causing to be submitted a false claim for payment of Government funds or knowingly making or causing to be made a false record or statement material to a false claim, 31 U.S.C. § 3729(a)(1)(A), (B), will be dismissed.

### 2. Retaliation Cause of Action

The FCA protects an employee who is "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment" for acts "in furtherance of" an FCA claim or "other efforts to stop" fraud against the government. 31 U.S.C. § 3730(h). Thus, to establish a cause of action for retaliation in

violation of the FCA, the plaintiff must show: (1) he engaged in protected activity with respect to the False Claims Act; (2) his employer knew he engaged in protected activity; and (3) his employer retaliated against him because he engaged in protected activity. *Thomas v. ITT Educ. Servs., Inc.*, 517 F. App'x 259, 262 (5th Cir. 2013) (per curiam).

While the Fifth Circuit has not expressly stated which pleading standard applies to FCA retaliation claims, "[a]ll federal circuit courts of appeal that have faced this issue" and fellow courts in this District conclude such causes of action under the FCA need only meet the Federal Rule 8(a) pleading standard.'" *See, e.g.*, *Paige v. AM Hospice, Inc.*, No. 3:19-CV-319, 2020 WL 2543301, at *2 (W.D. Tex. May 15, 2020); *see also Thomas v. ITT Educ. Servs., Inc.*, No. CIV.A. 11-544, 2011 WL 3490081, at *3 (E.D. La. Aug. 10, 2011) (collecting cases). Because this retaliation cause of action does not require a showing of fraud, and therefore, does not necessitate the heightened pleading requirements of Federal Rule 9(b), this Court finds these authorities persuasive and concludes Chase must only satisfy Federal Rule 8's requirement of a short and plain statement to survive Parkland's Motion to Dismiss. *See ITT Educ. Servs., Inc.*, 2011 WL 3490081 at *3 (citation omitted).

"A protected activity is one motivated by a concern regarding fraud against the government." *United States ex rel. Johnson v. Raytheon Co.*, 395 F. Supp. 3d 791, 798 (N.D. Tex. 2019) (quoting *Thomas*, 517 F. App'x at 262). Expression of concerns about possible fraud to a supervisor is a sufficient step in furtherance of uncovering fraud, and thus, is protected under the FCA. *Paige*, 2020 WL 2543301, at *3. To constitute protected conduct, an employee's internal report must specifically address concern regarding fraudulent claims for payment of federal funds, not merely address concerns about general misconduct. *United States ex rel. Patton v. Shaw Servs., L.L.C.*, 418 F. App'x 366, 371–72 (5th Cir. 2011); *Guerrero v. Total Renal Care, Inc.*, No. EP-11-CV-449, 2012 WL 899228, at *5 (W.D. Tex. Mar. 12, 2012). "Mere criticism by an employee of the employer's methods of conducting business, without any suggestion that the employee was attempting to expose illegality or fraud within the meaning of the FCA, does not rise to the level of protected activity" actionable under the FCA. *United States*

12

*ex rel. Johnson v. Kaner Med. Grp., P.A.*, No. 12-CV-757, 2014 WL 7239537, at *8 (N.D. Tex. Dec. 19, 2014).

To sufficiently allege the second prong, employer's knowledge, a relator must allege sufficient basis to support the defendant knew he engaged in a protected activity. *ITT Educ. Servs., Inc.*, 517 F. App'x at 262. "It is insufficient for the relator to show that the employer knew that the whistleblower had concerns about compliance with the law; [he] must show that the employer was on notice of the distinct possibility of *qui tam* litigation." *United States ex rel. Gonzales v. Fresnius Med. Care N. Am.*, 748 F. Supp. 2d 95, 104 (W.D. Tex. 2010).

In the Second Amended Complaint, Chase contends he "repeatedly reported the Parkland fraud, including raising the fraud with UNOS," and he "engaged in protected activity under the FCA by investigating and reporting Defendant Parkland's false or fraudulent practices internally, including issues related to the unjustified rejection of organs for Parkland patients in need of transplant in favor of those same organs being transplanted into UT Southwestern Patients." *ECF No. 37, pars. 345-349*. Chase alleges Parkland had knowledge of this protected activity because he reported it to his supervisors.

These allegations cannot constitute protected conduct under the FCA because Chase does not sufficiently plead he reported Parkland's or UT Southwestern's fraudulent conduct against Federal Healthcare. As discussed, Chase does not allege Parkland committed fraud against Federal Healthcare; he only alleges in conclusory fashion that UT Southwestern did so. Chase allegations amount to mere criticism of Parkland's method of conducting business with UT Southwestern, and does not suggest Parkland, itself, acted illegally or fraudulently within the meaning of the FCA. For this reason, Chase's reports to his supervisors and other Parkland personnel cannot rise to the level of protected activity actionable under the FCA. *See United States ex rel. Johnson v. Kaner Med. Grp., P.A.*, 2014 WL 7239537, at *8.

Further, Chase fails to sufficiently plead Parkland had actionable knowledge because, for the same reason, Parkland had no reason to know Chase's reports indicated a fraud on Federal Healthcare. In addition, nothing Chase reported to Parkland could possibly place it "on notice of

13

the distinct possibility of qui tam litigation" to impose knowledge. *See Fresenius*, 748 F. Supp. 2d, at 104.

For these reasons, Parkland's Motion to Dismiss Chase's theory of liability for retaliation in violation of the False Claims Act will be dismissed.

### 3. Causes of Action of Violation of State Law

In response to Parkland's Motion to Dismiss the mirror state-law causes of action, Chase presents argument pertaining only to a cause of action for violation of Texas law. Therefore, the Court deems Chase's lack of response pertaining to all other asserted state-law causes of action to be abandoned or waived.

Pertinent to the asserted cause of action for violation of Texas law, Chase argues "Parkland is also liable for claims submitted to Medicaid for patients who were passed over" under the Texas Healthcare Fraud Prevention Act (THCFPA) "for the same reason Parkland's other arguments fail."

Chase's cause of action for violation of Texas law fails for the same reasons Chase's causes of action for violation of the federal FCA fail. Further, because this Court will dismiss all of Chase's theories of liability under the FCA against all Defendants, it will exercise its discretion to refrain from exercising any supplemental jurisdiction over any state cause of action. *See Heggemeier v. Caldwell Cnty., Tex.*, 826 F.3d 861, 872 (5th Cir. 2016) (per curiam); *Brookshire Bros. Holding, Inc. v. Dayco Prods., Inc.*, 554 F.3d 595, 602 (5th Cir. 2009).

For these reasons, any cause of action based upon a violation of THCFPA against Parkland will be dismissed.

### AMENDMENT OF SECOND AMENDED COMPLAINT

Prior to dismissal of a Complaint, a court must "freely give leave [to amend the pleadings] when justice so requires." Fed. R. Civ. P. 15(a)(2). However, leave to amend is within the sound discretion of the court and can be appropriately denied when "it is clear that the

14

defects [of a complaint] are incurable." *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002).

This Court provided Chase a final opportunity to cure all pleading defects prior to submission of this Motion to Dismiss. In response to the Court's admonition that Chase had one, final opportunity to amend the Complaint, he submitted the live Second Amended Complaint. Based upon this procedural posture and the Court's admonition, the Court finds Chase was provided ample opportunity to satisfy Federal Rule 15.

## CONCLUSION

For the reasons stated, Parkland's Motion to Dismiss for Failure to State a Claim pursuant to Federal Rule 12(b)(6) is **GRANTED**.

**IT IS SO ORDERED.**
SIGNED THIS 16TH DAY OF JANUARY, 2026.

JASON PULLIAM
UNITED STATES DISTRICT JUDGE

15